# Exhibit A

# COMMONWEALTH OF VIRGINIA



LYNCHBURG CIRCUIT COURT
Civil Division
900 COURT STREET P. O. BOX 4
LYNCHBURG VA 24505
(434) 455-2620

Summons

To: DICKS SPORTING GOODS INC                    Case No. 680CL25000095-00
CORPORATION SERVICE CO.
100 SHOCKOE SLIP
FLOOR 2
RICHMOND VA 23219

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment, or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia on, Friday, January 31, 2025

Clerk of Court: TODD SWISHER

by _____
(CLERK/DEPUTY CLERK)

Instructions:


Hearing Official:


Attorney's name:        FEINMAN, JUSTIN S
WILLIAMS MULLEN, PC
PO BOX 1320
RICHMOND VA 23218

VIRGINIA:

IN THE CIRCUIT COURT FOR THE CITY OF LYNCHBURG

| | |
|---|---|
| RIVER RIDGE MALL JV, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. CL25000095 |
| | ) |
| DICK'S SPORTING GOODS, INC., | ) |
| | ) |
| Serve: Corporation Service Company | ) |
| 100 Shockoe Slip, Floor 2 | ) |
| Richmond, Virginia 23219 | ) |
| | ) |
| Defendant. | ) |
| | ) |

## COMPLAINT

Plaintiff River Ridge Mall JV, LLC ("River Ridge"), by counsel, states the following in

support of its claims against Defendant Dick's Sporting Goods, Inc. ("Tenant") for declaratory

judgment and breach of contract.

1.    This action is necessitated due to Tenant's refusal to acknowledge River Ridge's

satisfaction of a co-tenancy requirement in the parties' lease, and Tenant's continued refusal to pay

the ordinary rent that is due and owing for its occupation of the premises.

2.    With over 800 retail stores, nearly $13 billion in revenue, and approximately 55,000

employees, Tenant is the largest sporting goods retail company in the United States.  One of

Tenant's 800 retail locations is in the shopping center known as River Ridge Mall in Lynchburg,

Virginia (the "Shopping Center").

3.    At the time Tenant entered into the lease at issue, the Shopping Center was in the

midst of a significant transformation, and Tenant was among the first tenants in the new

development area of the Shopping Center.  At Tenant's behest, the lease included a requirement

that River Ridge secure appropriate co-tenants in retail spaces that were not-yet constructed, but would be adjacent to Tenant's leased premises. Until River Ridge satisfied the relevant co-tenancy requirements, Tenant was entitled to pay Substitute Rent, which is ***substantially*** lower than ordinary rent.

4.      All parties agree that Tenant was entitled to pay Substitute Rent from October 2021 through July 2023. But, when a second national retailer opened on July 7, 2023, the co-tenancy requirement was fully satisfied. Tenant, however, refuses to pay full rent because Tenant wrongly believes River Ridge was absolutely bound to construct adjacent buildings (that would be occupied by co-tenants) exactly as conceptually noted in a preliminary floor plan attached to the lease.

5.      Tenant's reliance on a strained reading of the co-tenancy requirements to eschew its obligation to pay rent is entirely unjustified. Indeed, a federal court previously rejected an earlier attempt by Tenant to rely on a similar co-tenancy requirement at another retail location in Washington State—based on their previous attempt to push this same position, this appears to have been a premeditated leasing strategy implemented by Tenant. *See Smokey Point Commer., LLC v. Dick's Sporting Goods, Inc.*, No. C17-1015, 2017 WL 4882664 (W.D. Wash. 2017).

6.      By way of this action, River Ridge seeks a declaration that it satisfied the co-tenancy requirements at issue, and that it is entitled to past due rent from the time such co-tenancy requirements were satisfied through present and continuing. River Ridge also seeks a judgment to collect the unpaid, past due rent. River Ridge does not—at this time—seek to terminate the lease or evict Tenant from the Shopping Center, but it reserves the right to do so.

### PARTIES, JURISDICTION, AND VENUE

7.      River Ridge is a limited liability company with a principal place of business in Lynchburg, Virginia.

8.      Tenant is a Delaware corporation with a principal place of business in Pennsylvania.

9.      Personal jurisdiction may be exercised over Tenant in the Commonwealth under Virginia Code § 8.01-328.1 because Tenant transacts substantial business, supplies things in the Commonwealth, and has leasehold interests in real property in the Commonwealth.

10.     Venue in Lynchburg is permissible under Virginia Code § 8.01-262 because causes of action arose in this venue and there exists a practical nexus to the dispute because the central issue in this case relates to a lease of real property located in the City of Lynchburg.

## FACTUAL ALLEGATIONS

### *The Lease*

11.     On December 2, 2019, River Ridge, as landlord, entered into a commercial lease agreement (the "Lease") with Dick's Sporting Goods, Inc, as tenant, to govern construction, inspection, approval, occupation, and use of a retail location consisting of a one-story building with approximately forty-five thousand square feet of leasable floor area (the "Demised Premises") in the Shopping Center. A true and correct copy of the Lease is attached as Exhibit A.

12.     The Demised Premises would be in a section of the Shopping Center that had been demolished, re-designed, and would be reconstructed for new retail spaces—the northeast corner of the Shopping Center near the entrance from Candlers Mountain Road. This area was referred to in the Lease as the "Sears Redevelopment Area," based on its prior occupant.

13.     The conceptual layout of the Shopping Center was depicted on a preliminary Lease Plan, which was attached as an exhibit to the Lease and is separately attached here as Exhibit B.

14.     Relevant to this dispute, section 1.7(a) of the Lease creates a "Deferred Co-Tenancy Requirement" and referenced a "Deferred Co-Tenancy Area," which is depicted below in a snippet from the preliminary Lease Plan with an orange border and orange interior slanted lines:

3



15.     The Deferred Co-Tenancy Area preliminarily anticipated two additional retailers that would occupy approximately 16,000 and approximately 25,000 square feet of leasable floor area. As demonstrated by the use of "+/-" vs. the use of specific figures for already established retailers (*e.g.*, TJ-Maxx), the specific square footages in the Deferred Co-Tenancy Area were never intended to be a final drawing or building plan that would govern the exact layout for other national and regional tenants, who would undoubtedly have their own strategy and requirements to be used in the construction of their retail locations.

16.     The Deferred Co-Tenancy Requirement is defined to mean: (i) at least one national or regional "Required Tenant" occupying the space identified as "±16K" on the Lease Plan; and (ii) at least one national or regional "Required Tenant" occupying the space contiguous to the Demised Premises and identified as "Home ±25K" on the Lease Plan. Ex. A § 1.7(a).

17.     The Lease defines "Required Tenant" as a:

4

(A) national Occupant operating a minimum of fifty (50) high quality retail
stores of the types typically found in first-class regional shopping centers;
(B) regional Occupant with at least seven (7) high quality retail stores in
Virginia, North Carolina and/or South Carolina of the types typically found
in first-class regional shopping centers; or (C) local Occupant operating a
high quality retail store.

*Id.* § 1.8(a).

18.   According to the Lease, Tenant is obligated to pay "Minimum Rent" to River Ridge

in the amount of $540,000.00 per year for the first five years of the lease term. Ex. A § 4.1(a)(i).

But if the Deferred Co-Tenancy Requirement is not satisfied pursuant to the terms of the Lease,

Tenant is permitted to pay "Substitute Rent" to River Ridge "until the end of the calendar month

in which such Deferred Co-Tenancy Requirement is satisfied." Ex. 1 § 1.7(b).

19.   The term "Substitute Rent" is defined to mean 2% of Tenant's gross sales, "but

never more than the Minimum Rent for the month that would have otherwise been payable." *Id.*

§ 1.5(c)(i).  There is a substantial delta between Minimum Rent and Substitute Rent, and that sum

continued to grow.  However, as of October 1, 2024, the difference was Three Hundred Eleven

Thousand, Eight Hundred Forty-Four and 13/100 Dollars ($311,844.13).

### The Deferred Co-Tenancy Area Is Reconfigured to Accommodate a Third Co-Tenant

20.   When Tenant entered the Lease, the Shopping Center was still under construction.

And in fact, the Lease Plan was drafted before the construction process even began.

21.   River Ridge was not required to construct the Shopping Center in strict compliance

with the preliminary Lease Plan, but instead enjoyed an express right to make reasonable changes

to the layout of buildings within the Shopping Center.

22.   The Lease provided River Ridge express authority to make reasonable alterations

to the buildings within the Shopping Center, "including changes in configuration and/or location,"

5

so long as the changes did "not adversely affect the business operations of Tenant in the Demised

Premises and/or the visibility of the Demised Premises." Ex. A. § 1.3.

23.    In accordance with this express authority, during construction of the Shopping

Center Buildings, the preliminary design of the Deferred Co-Tenancy Area in the Lease Plan was

reconfigured to accommodate design requests made by the Required Co-Tenants and to create a

third retail location for another Co-Tenant.

24.    On June 23, 2020, River Ridge sent Tenant a Notice of Punch List Inspection,

asserting, *inter alia*, substantial completion of the Shopping Center construction, which included

completion of the Demised Premises and the building within the Deferred Co-Tenancy Area.

25.    On August 26, 2020, River Ridge sent its Notice of Delivery, certifying that

Landlord's Work (as defined in the Lease) would comply with the Final Plans—not the preliminary

Lease Plan—and "in a form and substance reasonably satisfactory to Tenant."

26.    The as-built configuration of the Shopping Center, in accordance with the Final

Plans, is depicted below:



27.     The Final Plans accommodated a request from HomeGoods to alter the design of the outer shell to accommodate a dedicated loading dock; reconfiguration of the internal layout of the two retail spaces to provide additional floor space for HomeGoods; installation of a new mall entrance for the public that made certain leasable floor area internal (no longer externally facing); a revised footprint for a second national retailer, Ulta, to occupy less than 16,000 square feet; and creation of a third retail space that would be occupied by a strong regional tenant, Penelope.

28.     At no point during the inspection and approval process did Tenant assert that River Ridge failed to properly complete the construction of the Shopping Center in conformity with its requirements under the Lease.

29.     Instead, on December 4, 2020, after its due diligence period to inspect Landlord's Work, provide punch list items, and raise objections to the construction, Tenant elected to approve Landlord's Work by endorsing the Rental Commencement Date and Expiration Date Agreement. Tenant did not object to River Ridge's reconfiguration of the Deferred Co-Tenancy Area during the defined period in which it was authorized to raise objections to Landlord's Work, despite construction of the Shopping Center Buildings already being underway at that time.

### *River Ridge Satisfies the Deferred Co-Tenancy Requirement*

30.     On October 28, 2021, Tenant served River Ridge with a notice alleging that the Deferred Co-Tenancy Requirement had not been satisfied.  River Ridge did not contest the notice because the Required Co-Tenants had not yet opened for business, as of the Rental Commencement Date for Tenant's Demised Premises.

31.     However, River Ridge later satisfied the Deferred Co-Tenancy Requirement when two national tenants opened for business in the Deferred Co-Tenancy Area.

32.     Specifically, HomeGoods—a national home furnishings retailer with over one thousand retail locations in the United States—opened its store to the public on January 19, 2023. Then, Ulta—a second national retailer of cosmetics with over one thousand retail locations in the United States—opened its retail location to the public within the Deferred Co-Tenancy Area on July 7, 2023.

33.     Accordingly, by July 7, 2023, the Deferred Co-Tenancy Requirement was satisfied because both Required Co-Tenants were operating in adjacent retail locations within the Deferred Co-Tenancy Area.

34.     In addition to HomeGoods and Ulta, a third co-tenant, Penelope, opened to the public in the Deferred Co-Tenancy Area.  Penelope is a regional boutique offering clothing and jewelry, which has nine brick-and-mortar retail locations within the Commonwealth of Virginia, and which is a well-regarded and popular regional retailer that meets the requirements of the Deferred Co-Tenancy Requirement.

### *Tenant Refuses to Pay Minimum Rent*

35.     Tenant's right to pay Substitute Rent ended once the Deferred Co-Tenancy Requirement was satisfied, *i.e.*, when Ulta—the second national retailer—opened for business on July 7, 2023 (the "Satisfaction Date").

36.     On October 18, 2023, River Ridge sent Tenant a notice confirming satisfaction of the Deferred Co-Tenancy Requirement and seeking payment of Minimum Rent, beginning from the Satisfaction Date and continuing.  A copy of the October 18, 2023, correspondence is attached as Exhibit C.

37.     River Ridge's October 18, 2023 notice expressly reinstituted Minimum Rent and sought payment within ten days of the full net deficiency that accrued from Tenant's payment of Substitute Rent after the Satisfaction Date.

38.     Nevertheless, Tenant continues paying Substitute Rent to River Ridge, arguing that the Co-Tenancy Requirement has not been satisfied because Ulta is occupying less than 16,000 square feet of leasable floor area, as conceptually noted in the preliminary Lease Plan.

39.     On January 5, 2024, Tenant sent a letter confirming its position that the Deferred Co-Tenancy Requirement remained unsatisfied because "Ulta has opened in only ten thousand (10,000) square feet of LFA within the portion of the Deferred Co-Tenancy Area."  A copy of the January 5, 2024 letter (which is misdated January 5, 2023) is attached as Exhibit D.

40.     According to Tenant, the fact that "Ulta has opened in only ten thousand (10,000) square feet of LFA within the portion of the Deferred Co-Tenancy Area identified as '16K' on the Lease Plan" allows Tenant "to continue to pay Substitute Rent."  Ex. D, p. 2.

41.     There is no good faith argument that the minor changes made to the Deferred Co-Tenancy Area have adversely affected Tenant's operations.  The fact that Ulta operates in less than 16,000 LFA does not preclude satisfaction of the Deferred Co-Tenancy Requirement.

42.     All three Co-Tenants are fully open for business within the Deferred Co-Tenancy Area, and they are fulfilling the intended purpose of the Deferred Co-Tenancy Requirement.

43.     Indeed, the purpose of the Deferred Co-Tenancy Requirement was to secure strong retailers to occupy new adjacent parcels with attractive storefronts and good reputations that would draw additional customers to the Shopping Center.  That has been accomplished.

9



44.     Despite River Ridge's efforts to engage in good-faith negotiations, Tenant refuses to budge from its position—refusing to pay anything more than Substitute Rent.

45.     Tenant's failure to pay Minimum Rent after River Ridge satisfied the Deferred Co-Tenancy Requirement constitutes a monetary default under Section 12.1 of the Lease, entitling Landlord to certain remedies, including but not limited to a judgment for unpaid rent, costs incurred, interest, plus reimbursement of reasonable attorney's fees incurred herein.

### COUNT I
### DECLARATORY JUDGMENT

46.     River Ridge re-alleges and incorporates by reference Paragraphs 1–45 of this Complaint, as if fully set forth herein.

47.     Section 8.01-184 of the Virginia Code empowers this Court to issue declaratory judgments.

48.     There is an actual and justiciable controversy regarding River Ridge's authority to make changes to the Shopping Center Buildings, satisfaction of the Deferred Co-Tenancy Requirement, Tenant's payment default, and Tenant's continuing obligation to pay Minimum Rent.

49.     River Ridge secured two national Co-Tenants and a third regional Co-Tenant to operate in the Deferred Co-Tenancy Area depicted on the preliminary Lease Plan, in satisfaction of the Deferred Co-Tenancy Requirement.

50.    Notwithstanding, Tenant refuses to pay full Minimum Rent and maintains that the Deferred Co-Tenancy Requirement has not been satisfied.

51.    The controversy is ripe for adjudication, as the requested relief is necessary for the parties to assess their obligations and rights under the Lease.

52.    River Ridge, therefore, seeks a declaration: (a) that River Ridge was expressly authorized in Section 1.3 of the Lease to make the minor changes that were made to configuration of the Shopping Center Buildings in its Final Plans; (b) that the Co-Tenants satisfied the Deferred Co-Tenancy Requirement upon the opening of Ulta on July 7, 2023; and (c) that River Ridge is entitled to further relief directly arising from the controversy, including a monetary judgment for past-due rent from August 1, 2023 through the date of judgment, plus interest, costs, and attorney's fees, pursuant to Section 17.17 of the Lease.

## COUNT II
## BREACH OF CONTRACT

53.    River Ridge re-alleges and incorporates by reference Paragraphs 1–45 of this Complaint as if fully set forth herein.

54.    The Lease is a valid and enforceable contract.

55.    The Lease expressly provides that Tenant is obligated to pay Minimum Rent beginning on the first day of the calendar month after the Deferred Co-Tenancy Requirement is satisfied. Ex. 1 § 1.7(b).

56.    Tenant breached its obligation to pay Minimum Rent beginning on August 1, 2023 (i.e., the first day of the calendar month after River Ridge satisfied the Deferred Co-Tenancy Requirement), when it continued paying Substitute Rent.

57.    Tenant is in default under the Lease, and that default is ongoing because Tenant refuses to pay Minimum Rent.

58.    As a direct and proximate result of Tenant's breach, River Ridge has suffered damages, including but not limited to the loss of significant funds that should be calculated as the difference between Substitute Rent and Minimum Rent from August 1, 2023 to present, plus costs incurred, interest, and reasonable attorney's fees under Section 17.17 of the Lease.

WHEREFORE, River Ridge respectfully prays that this Honorable Court:

(1) Enter judgment in its favor of each count alleged in this Complaint;

(2) Enter an Order declaring: (a) that River Ridge satisfied the Deferred Co-Tenancy Requirement on July 7, 2023 or another date determined in this action; (b) that Tenant is in default under the Lease; (c) that River Ridge is entitled to past due rent from the Satisfaction Date through present based on the difference between the Minimum Rent and the rent payments remitted by Tenant; and (d) that Tenant cannot use the Deferred Co-Tenancy Requirement going forward as a basis for refusing to pay Minimum Rent (absent material adverse changes in fact);

(3) Enter judgment in favor of River Ridge and against Dick's Sporting Goods, Inc. for the full measure of past due rent from August 1, 2023 through present, calculated as the difference between Minimum Rent and the rent remitted by Tenant, plus interest and costs through judgment, which should not be less than $500,000.00;

(4) Award River Ridge its reasonable attorneys' fees per Section 17.17 of the Lease, plus interest at the Default Rate per Section 12.1 of the Lease, its costs incurred; and

(5) Award any other relief the Court deems just and appropriate.

## **JURY DEMAND**

River Ridge demands trial by jury on all issues so triable.

Dated: January 24, 2025

Respectfully submitted,
**RIVER RIDGE MALL JV, LLC**

By Counsel

Justin S. Feinman (VSB No. 87511)
William J. Homer (VSB No. 99988)
WILLIAMS MULLEN, P.C.
200 South 10th Street
Richmond, Virginia 23219
Telephone: 804.420.6000
Facsimile:  804.420.6507
jfeinman@williamsmullen.com
whomer@williamsmullen.com

FILED IN THE CLERK'S OFFICE OF THE CIRCUIT
COURT OF THE CITY OF LYNCHBURG

JAN 31 2025    TIME 8:54 M.

TESTE: TODD SWISHER, CLERK

BY: _____ Dep. Clerk

13

# LEASE

## RIVER RIDGE MALL JV, LLC

### (Landlord)

## DICK'S SPORTING GOODS, INC.

### (Tenant)

### City of Lynchburg,
### Commonwealth of Virginia

**EXHIBIT**

A

## LEASE

THIS LEASE (this "**Lease**") dated _December 2nd_, 2019 (the "**Effective Date**"), is entered into by and between **RIVER RIDGE MALL JV, LLC**, a Virginia limited liability company, as landlord ("**Landlord**"), and **DICK'S SPORTING GOODS, INC.**, a Delaware corporation, as tenant ("**Tenant**"). Landlord and Tenant are sometimes hereinafter referred to as the "**Party(ies)**".

## ARTICLE I
## DEMISED PREMISES

1.1    Demised Premises.

Landlord, in consideration of the rents hereinafter reserved and agreed to be paid by Tenant, hereby leases to Tenant and Tenant hereby leases from Landlord the following described premises (the "**Demised Premises**") situated within the City of Lynchburg, Commonwealth of Virginia, being part of a shopping center to be known as River Ridge Mall (the "**Shopping Center**") as shown on Exhibit A (the "**Lease Plan**"). The portion of the Shopping Center legally described in Exhibit A-1 and as generally shown on the Lease Plan as "Landlord's Parcel" is referred to herein as the "**Landlord's Parcel.**" If Landlord gains control of any other tract or parcel within the Shopping Center after the date hereof, the term "Landlord's Parcel" shall include such additional tract or parcel. The Demised Premises is a one-story building containing a leasable floor area ("**LFA**") as further defined in Section 1.2(d) of approximately forty-five thousand (45,000) square feet with a minimum frontage of two hundred eighteen (218) lineal feet located as shown on the Lease Plan (the "**Building**"). The Demised Premises is demised subject to "**Title Matters**" set forth on Exhibit B and with the benefit of the easements, rights, restrictions, agreements and encumbrances on the Shopping Center including the OEA (as defined in Section 1.9). All land comprising the Landlord's Parcel is referred to as the "**Property**" and is legally described in Exhibit A-1. Landlord represents and warrants to Tenant that the terms and conditions of this Lease are not in conflict with the provisions of any OEA or Title Matters and further, that neither the OEA nor the Title Matters shall prohibit Landlord or Tenant from constructing Tenant's standard building, including storefront and signage, or Tenant from conducting its business in the Demised Premises in accordance with the terms and conditions hereof. All buildings and improvements situated or to be situated on the Property may sometimes be collectively referred to as "Shopping Center Buildings" as depicted on the Lease Plan. The Building shall constitute one of the Shopping Center Buildings. Appurtenant to the Demised Premises is an area within which Tenant is to locate its loading area, trailer storage area, compactor and dumpster station and electrical transformer and/or generator, if applicable ("**Tenant's Service Area**"), all as more particularly identified on the Lease Plan. Subject to compliance with all Legal Requirements (as defined in Section 17.22) and in addition to Tenant's right to use the sidewalks directly in front of the Demised Premises, Tenant shall also have the right to use the Common Areas (as defined below) within the Tenant's Preferred Area as identified on the Lease Plan ("**Tenant's Preferred Area**") for seasonal and promotional sales and other sales customary to Tenant's business operations. Tenant's use of the Tenant's Preferred Area as aforesaid shall be limited to one (1) time each year for Tenant's typical company-wide annual sale to be held within the period from June 1 to August 15. Tenant shall maintain the Tenant's Preferred Area during the period of such use; keep, protect and insure (subject to Section 11.5 herein) any merchandise or other personal property located therein during such period; keep such area in a clean and attractive condition; and return same to the condition which existed prior thereto upon the conclusion of such use.

The Demised Premises shall also include a non-selling storage/office mezzanine area which is not included in the LFA and this mezzanine square foot area shall not be used or included in the calculation of Rent or any other charges due pursuant to this Lease.

1.2    Definitive Areas and Terms.

(a)     Landlord covenants that no buildings, monument or pylon signs, structures or obstructions (whether temporary or permanent) other than canopies, building appurtenances and signs attached to store buildings, lighting equipment and directional and other signs, permitted by the provisions of this Lease or the OEA, if any, may be located in any area of the Shopping Center identified on the Lease Plan as the "**No-Build Areas**".

(b)     Landlord covenants that: (i) no portion of the Parking Areas (defined in Section 1.3 below) identified on the Lease Plan as the "**Protected Parking Areas**" may be modified (including any change in the configuration of the parking stalls, driveways, aisles or curbing, and any change in the location or reduction in the number of expectant mother parking spaces required by Section 3.1(c)(ii) of this Lease, and any change in the location or reduction in the number of "buy online pick-up in store" spaces required by Section 3.1(c)(iii) of this Lease) without Tenant's consent; and (ii) the Parking Areas will always contain the handicap accessible parking spaces required by Section 3.1(c)(iv) of this Lease.

(c)     If Landlord breaches its covenant with respect to Subsection (a) or (b) above, and such violation continues for a period of three (3) business days following written notice from Tenant to Landlord, Rent (as defined in Section 4.1(c) below) or Substitute Rent (as defined in Section 1.5 below) or Restricted Use(s) Alternate Rent (as defined in Section 1.4 below), as applicable, shall be reduced by One Thousand Five Hundred Dollars ($1,500) per day, for each day of such breach, in addition to Tenant's right to seek other remedies available in equity.   Such reduction shall constitute liquidated damages for costs incurred and/or sales lost by Tenant in connection with the interference with Tenant's No-Build Areas and Protected Parking Areas, the exact amount of which would be impracticable or extremely difficult to ascertain.   The Parties acknowledge and agree that the amount of liquidated damages set forth in this Section 1.2(c) are a reasonable estimate of such future damages and are not a penalty.

(d)     The term "**LFA**" as used in this Lease means the number of gross square feet of leasable floor area (whether occupied or unoccupied) of the Shopping Center Buildings intended for the exclusive use by any tenant, subtenant, assignee, licensee, concessionaire or other occupant of the Shopping Center ("**Occupant**"), excluding mezzanines if used for ancillary purposes such as storage or office (provided that any mezzanines or other levels used for retail sales shall be included in LFA).  The LFA of such premises shall be measured from the exterior face of exterior walls and the exterior face of service corridor walls, the line along the front of such premises where it abuts the sidewalk or other Common Areas, and the center line of any wall that such premises shares with an adjoining premises.

(e)     Except with respect to determining the height of Tenant's parapet wall or storefront entrance feature, the height of the Building shall extend from the finished floor-slab to the underside of the roof deck.

(f)     On and after the Rental Commencement Date (as hereinafter defined), Landlord covenants that the points of ingress and egress to and from the Shopping Center and adjacent right-of-ways identified on the Lease Plan as "**Critical Access Ways**," including required traffic signals as shown on the Lease Plan, shall remain in an open and functioning manner, subject only to temporary and incidental closures for repair, improvement or maintenance or as required by Legal Requirements; provided, Landlord shall use its commercially reasonable efforts to minimize any interference with the Critical Access Ways during such temporary and incidental closures and, if such work is by Landlord, then Landlord shall further commence and complete such repairs in a diligent and prudent manner.   Furthermore, Landlord shall use commercially reasonable efforts to perform such work in a manner that will not materially impair the access to or visibility of the Demised Premises.

1.3     Restrictions on Common Areas.

The areas of the Sears Redevelopment Area (as defined in Section 3.1(c) below) shown on the Lease Plan as Parking Areas shall at all times be maintained as Parking Areas.

2

The expression "**Parking Areas**" shall mean all parking spaces, sidewalks, driveways and footways, and includes the areas identified on the Lease Plan as Parking Areas plus such other areas as Landlord shall from time to time designate as Parking Areas. The areas in the Landlord's Parcel currently used or proposed to be used for service drives and identified on the Lease Plan as the "**Service Drive**" shall be maintained so that, during the term hereof, there shall be adequate service roads or access ways to and from Tenant's Service Area. Notwithstanding the foregoing, Landlord shall have the right to change or modify such Service Drive provided continuous and equivalent access to and from Tenant's Service Area is maintained and any such change shall permit a sixty-eight (68) foot tractor trailer to access Tenant's Service Area. "**Common Areas**" means those areas designed for the common use, convenience and benefit of Landlord, Tenant and all other Occupants, whether or not identified on the Lease Plan, located on the Property exclusive of Tenant's Building and any other Shopping Center Buildings designed to be occupied by an Occupant. The Common Areas shall include: the Parking Areas, Tenant's Service Area, the Service Drive, the entrances and exits of the Shopping Center, sidewalks, any landscaped areas and exterior planted areas, retaining walls and other site improvements within the Shopping Center. Landlord agrees that, except for necessary and/or emergency repairs, there will be free and uninterrupted access as shown on the Lease Plan and further that Landlord shall take no action nor consent to a third party's taking any action to materially and adversely affect access as shown on the Lease Plan: (a) for motor vehicles between any and all access streets to the Shopping Center and the Protected Parking Areas; and (b) for pedestrians between the Protected Parking Areas and the main customer entrance of the Demised Premises. The entrances and exits between all adjacent streets and Parking Areas shall be maintained as shown on the Lease Plan. Landlord agrees that the Parking Areas within the Landlord's Parcel will always contain at least five (5) parking spaces for so-called standard size American automobiles, and driveways and footways incidental thereto, for each one thousand (1,000) square feet of LFA existing in the Landlord's Parcel from time to time, unless the reduction in the parking is related to an action governed by Article X hereof, in which event the terms of Article X shall govern and control.

The initial construction of the Sears Redevelopment Area shall be as shown on the Lease Plan. After initial construction of the Sears Redevelopment Area, Landlord reserves the right to alter the Common Areas and to construct any and all improvements including, without limitation, buildings on the Common Areas as it determines and to make changes to any of the Shopping Center Buildings within the Sears Redevelopment Area (as identified on the Lease Plan), including changes in configuration and/or location; provided, however, that in all events: (i) any such changes shall not adversely affect the business operations of Tenant in the Demised Premises and/or the visibility of the Demised Premises; (ii) the parking ratio provided for in the preceding grammatical paragraph shall not be violated; (iii) there shall be no changes to the No-Build Areas or Protected Parking Areas which are prohibited by Sections 1.2(a) and (b) except with Tenant's consent as provided therein; (iv) the Critical Access Ways shall remain in an open and functioning manner and signalized where required; and (v) the Service Drive, if relocated, shall provide satisfactory access to Tenant's Service Area.

1.4    Restrictions on Use of Landlord's Parcel.

(a)    Landlord agrees that during the term of this Lease the Landlord's Parcel shall not be used for any of the following "**Restricted Use(s)**" (subject to the rights of existing Occupants under the existing leases set forth in Exhibit M as of the date hereof, provided Landlord shall not modify any such existing lease to permit any such Occupant to use its premises for any Restricted Use(s)):

(i)    for any purpose that is inconsistent with a first-class shopping center;

(ii)    for any purpose that is not permitted under the Title Matters, specifically including the OEA, or the matters set forth in Exhibit I;

3

(iii)    for any non-retail purposes (repairs, alterations, storage and offices incidental to retailing, and banks and small loan offices, shall be deemed retail), provided that Retail Offices (as hereinafter defined) shall be permitted (1) within up to fifteen thousand (15,000) square feet of LFA in the aggregate in the Future Development Area (as defined in Section 3.11 below), and (2) within up to fifteen thousand (15,000) square feet of LFA in the aggregate in the remainder of the Landlord's Parcel, except that no Retail Office shall be permitted within the portion of the portion of the Landlord's Parcel identified as the "**Deferred Co-Tenancy Area**" on the Lease Plan. As used herein, "**Retail Offices**" shall mean an office, commonly found in first-class shopping centers, that provides services directly to consumers, such as insurance agency offices, real estate brokerage, title companies and medical and dental offices;

(iv)    for any entertainment purposes such as a bowling alley, skating rink, bar, night club, discotheque, amusement gallery, cinema, poolroom, health club (except that one [1] health club shall be permitted within those certain premises identified as "Belk" or "Regal" on the Lease Plan), massage parlor, sporting event, sports or game facility or off-track betting club, except that one (1) high-end entertainment use that is typically found in first-class shopping centers (such as, by way of example only, Dave & Busters, Pinstripes and Main Event, as such entertainment facilities typically operate as of the date of this Lease) shall be permitted within each of those certain two premises identified as "Entertainment" on the Lease Plan;

(v)    for any establishment which sells or displays pornographic materials;

(vi)    for any establishment which sells or displays used merchandise or second hand goods; or

(vii)    for a restaurant or establishment selling food prepared on premises for consumption on or off premises located within three hundred (300) lineal feet of the Demised Premises.

(b)    To the extent of Landlord's rights and remedies contained therein, Landlord will enforce the provisions of the Title Matters and the OEA against the parties to the OEA and other Occupants.

(c)    A "**Restricted Use(s) Violation**" shall be deemed to have occurred if an Occupant of the Shopping Center operates a Restricted Use(s) and either: (i) is permitted to do so under the terms of its lease or occupancy agreement; or (ii) such Occupant operates a Restricted Use(s) in violation of the terms of its lease, occupancy agreement or the OEA and Landlord does not use best efforts to cure such violation promptly and diligently (including the filing of appropriate legal action including seeking injunctive relief). To the extent permitted by applicable law, Tenant, at its expense, shall have the right to enforce the restrictions of this Section 1.4 directly against the Occupant in breach.

(d)    If a Restricted Use(s) Violation occurs, then, in addition to Tenant's right to seek other remedies available in equity (including, but not limited to, the right to injunctive relief), Tenant shall have the right to pay to Landlord, in lieu of Minimum Rent (as defined in Section 4.1(a) below), fifty percent (50%) of the Minimum Rent then in effect ("**Restricted Use(s) Alternate Rent**"), during the period which extends from the beginning of the first full calendar month following the date of the Restricted Use(s) Violation and continuing until the end of the calendar month in which such Restricted Use(s) Violation ceases. If the Restricted Use(s) Violation shall continue for a period in excess of twelve (12) months (the "**Restricted Use(s) Violation Period**"), Tenant shall either: (A) terminate this Lease by written notice delivered to Landlord within sixty (60) days following the Restricted Use(s) Violation Period, effective thirty (30) days from the date of such notice; or (B) resume the full payment of Minimum Rent in the first full calendar month to occur at least sixty (60) days after the Restricted Use(s) Violation Period. If Tenant fails to deliver written notice to Landlord exercising such termination right within sixty (60) days after the

4

end of the Restricted Use(s) Violation Period, then such termination right shall be deemed waived and Tenant shall resume the full payment of Minimum Rent; provided, however, that Tenant shall retain all of its rights under this Section 1.4(d) with respect to any future Restricted Use(s) Violations.

<u>1.5    Competition Rent Reduction.</u>

(a)    Subject to the limitations set forth below in this Section 1.5, Landlord warrants and agrees that, during the term of this Lease, it will not, nor will any entity under common control with Landlord, enter into any lease, license agreement or other similar agreement nor permit any premises in the Shopping Center (other than the Demised Premises) or any land adjacent to or contiguous (but for roadways or access ways) to the Shopping Center or within a five (5) mile radius of the Shopping Center which is owned or otherwise controlled by Landlord or a parent, subsidiary or affiliate entity of Landlord (collectively, the "**Restricted Property**"), or otherwise transfer or allow a possessory interest in the Restricted Property to an Occupant to be used for any of the following "**Precluded Use Activity(ies)**":

(A)    the sale, rental and/or distribution, either singly or in any combination of: (i) health, fitness and/or exercise equipment; (ii) sporting goods and sporting equipment (including, but not limited to, golf equipment and accessories); (iii) hunting, camping and fishing equipment and accessories; (iv) athletic footwear; and/or (v) local, collegiate and/or professional licensed sports apparel, sportswear, gifts, memorabilia and/or accessories (collectively, the "**Protected Items**"); and/or

(B)    the operation of a store whose primary use is the sale of athletic, fitness, work-out and/or yoga apparel, such as, without limitation, Lululemon, Athleta and Lucy.

(b)    Notwithstanding the foregoing Precluded Use Activity(ies) set forth in Subsection (a)(A) above:

(i)    The retail sale and/or distribution of sporting goods and/or sporting equipment in the lesser of (y) ten percent (10%) in the aggregate of any such Occupant's LFA (which shall include an allocable portion of the aisle space adjacent to such sales floor area of such use) or (z) two thousand (2,000) square feet in the aggregate of such Occupant's LFA (which shall include an allocable portion of the aisle space adjacent to such sales floor area of such use), shall not be a violation of the Precluded Use Activities.

(ii)    The retail sale and/or distribution of local, collegiate and/or professional licensed sports apparel, sportswear, gifts, memorabilia and/or accessories in the lesser of (y) five percent (5%) in the aggregate of any such Occupant's LFA (which shall include an allocable portion of the aisle space adjacent to such sales floor area of such use) or (z) one hundred fifty (150) square feet in the aggregate of such Occupant's LFA (which shall include an allocable portion of the aisle space adjacent to such sales floor area of such use), shall not be a violation of the Precluded Use Activities.

(iii)    The retail sale and/or distribution of the Protected Items on or from any campus of Liberty University (including any satellite campus of Liberty University) shall not be a violation of the Precluded Use Activities.

(iv)    The operation of a Liberty University retail store within up to three thousand (3,000) square feet of LFA in the Shopping Center shall not be a violation of the Precluded Use Activities.

(c)    If Landlord is in default of the provisions of this Section 1.5 and the Occupant of any such premises shall engage in such Precluded Use Activity(ies) beyond those permitted under (b) above then Tenant shall have the following remedies, said remedies being separate, distinct and cumulative remedies, and the exercise of any one or more of which shall not be deemed to preclude Tenant's rights to exercise any other legal or equitable remedy available, including, but not limited to, an action for injunctive relief:

(i)    to pay to Landlord monthly in respect of each applicable calendar month, in arrears, not later than the thirtieth (30th) of each such following calendar month in lieu of Rent (as defined in Section 4.1(c)), two percent (2%) of Gross Sales (as defined in Section 6.2), but never more than the Minimum Rent for that month that would have otherwise been payable for such calendar month ("**Substitute Rent**"), during the period which extends from the beginning of the first full calendar month following the date on which the Precluded Use Activity(ies) were commenced and continuing until the end of the calendar month in which such Precluded Use Activity(ies) are ceased; and

(ii)    if Landlord fails to cure such violation within one hundred eighty (180) days after the Precluded Use Activity(ies) commenced, then Tenant shall have the right to terminate this Lease at any time prior to the date of discontinuance of the Precluded Use Activity(ies) by giving thirty (30) days' advance notice to Landlord unless Landlord cures such violation or such Precluded Use Activity(ies) ceases prior to the date Landlord receives Tenant's termination notice.

(d)    In addition to the foregoing remedies, Tenant shall also have the right to recover from Landlord any lost or reduced profits caused by Landlord's breach of this Section 1.5 and the cost to Tenant of any Leasehold Improvements (as such phrase is defined in Section 9.2(b) of this Lease) and trade fixtures paid for by Tenant if this Lease is terminated and any other rights or remedies available to Tenant at law or in equity, including injunctive relief.  Tenant's rights and Landlord's obligations under this Section 1.5 shall survive the termination of this Lease.

(e)    (i)    Notwithstanding anything contained herein to the contrary, the restrictions in Section 1.5(a) shall not apply to existing Occupants under the existing leases set forth in Exhibit M as of the date hereof (individually, an "**Existing Lease**", and collectively, the "**Existing Leases**"), provided Landlord shall not modify any such existing lease to permit any such Occupant to use its premises in violation of Section 1.5(a).

(ii)    In addition, Landlord shall not exercise any right of discretion or consent it has under an Existing Lease or OEA to a request of an Occupant to change its use, assign, sub-let or otherwise, where to do so would expand the rights of an Occupant or a party listed on Exhibit M, if applicable, or would cause a use to be in violation of this Section 1.5.

(f)    Landlord shall not be in violation of this Section 1.5 unless an Occupant of the Restricted Property operates a use in violation of this provision and either:  (i) is permitted to do so under the terms of its lease or occupancy agreement; or (ii) such Occupant operates a use in violation of the terms of its lease or occupancy agreement and Landlord does not use best efforts to cure such violation promptly and diligently (including the filing of appropriate legal action including seeking injunctive relief).  Tenant shall also have the right to enforce the restrictions of this Section 1.5 directly against the Occupant in breach.

(g)    In the event the Demised Premises is not operated as a sporting goods store for a period of one (1) year for reasons other than fire or casualty, a Force Majeure Event, assignment/subletting or repairs, remodeling and renovation, then Landlord's obligation with respect to Section 1.5(a) shall be of no further force and effect.  In the event Tenant or its assignee subsequently re-commences operations as a sporting goods store in the Demised Premises, and provides Landlord written notice thereof, then from

and after the date of Tenant's notice, Section 1.5(a) shall again be effective and Landlord's obligations thereunder shall resume; however, Occupants who engaged in Precluded Use Activity(ies) in the interim period of time when Section 1.5(a) was not effective pursuant to the this Section 1.5(g) shall be deemed not subject to the terms and provisions thereof for such Precluded Use Activity(ies), provided that such Precluded Use Activity(ies) are not in violation of said Occupant's occupancy agreement.

(h)    In addition, the Parties shall execute, concurrently with the execution of this Lease, a Declaration of Exclusive in substantially the form as shown on the attached <u>Exhibit N</u> (the "**Declaration**"), and, upon Tenant's request therefor, Landlord shall record the same at Tenant's expense against the Shopping Center with the applicable title registry office and provide Tenant with a copy of the recorded instrument showing filing information within thirty (30) days of the date of recording.  In the event of such recording, Landlord may not amend or terminate the Declaration without Tenant's prior written consent.

1.6    Initial Co-Tenancy Requirement.

(a)    The "**Initial Co-Tenancy Requirement**" shall mean that the following shall be open or will simultaneously open with Tenant, fully stocked and staffed, at the Shopping Center:

(i)    Belk in substantially all of those premises identified as "Belk" on the Lease Plan:

(ii)    Regal Cinemas in substantially all of those certain premises identified as "Regal Cinemas" on the Lease Plan; and

(iii)    at least seventy percent (70%) of the LFA of that certain portion of the Shopping Center identified as the "**Initial Co-Tenancy Area**" on the Lease Plan operated by an Occupant in substantially all of its premises, for the operation of a (1) a Retail Office, (2) an entertainment use, (3) a restaurant or (4) a retail business by a Required Tenant (as defined in Section 1.8 below), provided that the operation of any such Retail Office, entertainment use or restaurant is not in violation of the Restricted Uses set forth in Section 1.4 of this Lease.

The named operators set forth in Subsections (i) and (ii) of this Section 1.6 are sometimes collectively referred to herein as the "**Inducement Tenants.**"

(b)    In the event the Initial Co-Tenancy Requirement is not satisfied as of the Rental Commencement Date (as defined in Section 2.3), Tenant shall have the right, at its sole option, either to:  (i) elect to open the Demised Premises for business to the general public, in which event, subject to any other applicable provisions of this Lease, the Rental Commencement Date shall be determined as set forth in Section 2.3 and Tenant shall be entitled to pay Substitute Rent (as defined in Section 1.5) in lieu of Rent, in arrears, no later than the thirtieth (30th) day of the following month until the end of the month in which the Initial Co-Tenancy Requirement is satisfied; or (ii) elect to delay opening the Demised Premises for business to the general public, in which event, the Rental Commencement Date shall be delayed until the sixtieth (60th) day after the date on which the Initial Co-Tenancy Requirement is satisfied and Tenant receives notice from Landlord setting forth the date that the Initial Co-Tenancy Requirement was satisfied; or if such sixtieth (60th) day does not occur during the Opening Day period (as determined by Section 2.3), then the Rental Commencement Date shall be delayed until the Opening Day (as hereinafter defined) next following said period (as the case may be). Notwithstanding anything to the contrary contained in this Lease, under no circumstances will Tenant be obligated under this Lease to open for business in the Demised Premises or to pay any Rent to Landlord hereunder unless and until the Initial Co-Tenancy Requirement has been satisfied.

3637421-4 10429.0316000

(c)    (i)    In the event Tenant does not elect to delay its opening and the Initial Co-Tenancy Requirement has not been satisfied within two (2) years following the Rental Commencement Date (the "**Initial Co-Tenancy Requirement Period**"), Tenant shall have the right to terminate this Lease upon written notice to Landlord given within sixty (60) days following the expiration of the Initial Co-Tenancy Requirement Period. Termination of this Lease shall be effective on the date set forth in Tenant's notice of termination, which in no event shall be more than thirty (30) days following the expiration of such sixty-(60) day period. In the event Tenant fails to provide such written termination notice within the sixty-(60) day period set forth above, Tenant shall be deemed to have waived its right to terminate this Lease as provided herein. If this Lease is terminated hereunder, neither Party shall have any further liability under this Lease except: (A) as set forth in Section 17.13 below; (B) all actual and verifiable costs and expenses incurred by Tenant in connection with this Lease, including without limitation, costs associated with the preparation of the Final Plans (as defined in Exhibit C-1), legal costs and the performance of Tenant's Work (as defined in Section 3.1), if any; and (C) as to any other terms of this Lease which expressly survive termination or expiration. Landlord shall pay and/or reimburse such amount, as the case may be, within fifteen (15) days following the effective termination of this Lease. The foregoing obligation(s) on behalf of Landlord to pay and/or reimburse such actual and verifiable costs and expenses shall expressly survive the termination of this Lease.

(ii)    In addition to the foregoing, in the event Tenant elects to delay opening the Demised Premises for business and the Rental Commencement Date as set forth in Section 1.6(b)(ii) above, and if the Initial Co-Tenancy Requirement has not been satisfied within two (2) years following what would otherwise have been the Rental Commencement Date as defined in Section 2.3 (the "**Initial Co-Tenancy Requirement Deadline**"), Tenant shall have the right to terminate this Lease upon written notice to Landlord given at any time following the expiration of the Initial Co-Tenancy Requirement Deadline. Termination of this Lease shall be effective on the date set forth in Tenant's termination notice, which in no event shall be more than thirty (30) days following the date of such notice. If this Lease is terminated hereunder, neither Party shall have any further liability under this Lease except: (A) as set forth in Section 17.13 below; (B) all costs and expenses incurred by Tenant in connection with this Lease, including without limitation, costs associated with the preparation of the Final Plans (as defined in Exhibit C-1), legal costs and the performance of Tenant's Work (as defined in Section 3.1), if any; and (C) as to any other terms of this Lease which expressly survive termination or expiration. Landlord shall pay and/or reimburse such amount, as the case may be, within fifteen (15) days following the effective termination of this Lease. The foregoing obligation(s) on behalf of Landlord to pay and/or reimburse such costs and expenses shall expressly survive the termination of this Lease.

(d)    Beginning on the Landlord's Demised Premises Work Commencement Date (as hereinafter defined) and updated no less than every thirty (30) days thereafter until the Rental Commencement Date, Landlord shall deliver to Tenant a written report with a lease plan describing and depicting the status of the Initial Co-Tenancy Requirement, including the construction schedule and the proposed opening dates of the Occupants necessary to meet the Initial Co-Tenancy Requirement. Furthermore, if the Initial Co-Tenancy Requirement is not satisfied upon receipt of the initial report, Landlord shall provide the information set forth above on the first day of each succeeding calendar month until the Initial Co-Tenancy Requirement has been satisfied. Landlord shall not be deemed in default of this provision, however, unless and until Landlord has failed to deliver such written report after ten (10) days' written notice from Tenant.

1.7    Deferred Co-Tenancy Requirement.

(a)    As used in this Section 1.7, the term **"Deferred Co-Tenancy Requirement"** shall mean that (i) at least one (1) national or regional Required Tenant occupying at least sixteen thousand (16,000) square feet of LFA within the portion of the Deferred Co-Tenancy Area identified as "16K" on the Lease Plan, and (ii) at least one (1) national or regional Required Tenant occupying at least twenty-five thousand (25,000) square feet of LFA within the portion of the Deferred Co-Tenancy Area contiguous to the Demised Premises and identified as "25K" on the Lease Plan, shall be open, fully staffed, stocked and operated as a retail business in substantially all of their respective premises. As used herein, a regional or national Required Tenant shall mean an Occupant that satisfies either (A) or (B) of the Required Tenant definition set forth in Section 1.8 below.

(b)    If the Deferred Co-Tenancy Requirement is not satisfied on the later to occur of (i) the one hundred eightieth (180th) day after the Rental Commencement Date, and (ii) the satisfaction of the Initial Co-Tenancy Requirement (**"Deferred Co-Tenancy Requirement Violation"**), then Tenant shall pay to Landlord monthly, in lieu of Rent, in arrears, no later than the thirtieth (30th) day of the following month, Substitute Rent until the end of the calendar month in which such Deferred Co-Tenancy Requirement is satisfied. In the event the Deferred Co-Tenancy Requirement Violation continues for two (2) years (the **"Deferred Co-Tenancy Requirement Period"**), Tenant shall have the right to terminate this Lease upon written notice to Landlord given within sixty (60) days following the expiration of the Deferred Co-Tenancy Requirement Period. Termination of this Lease shall be effective on the date set forth in Tenant's notice of termination, which in no event shall be more than thirty (30) days following the expiration of such sixty-(60) day period. In the event Tenant fails to provide such written termination notice within the sixty-(60) day period set forth above, Tenant shall be deemed to have waived its right to terminate this Lease as provided herein.

(c)    Tenant, or its designated agent, shall have the right, at its own cost and expense, to audit and/or inspect Landlord's records with respect to the Deferred Co-Tenancy Requirement. Tenant shall give Landlord not less than fifteen (15) days' written notice of its intention to conduct any such audit. If such audit discloses a violation of the Deferred Co-Tenancy Requirement and Tenant elects to pay Substitute Rent for such period of violation in accordance with this section, Landlord shall pay to Tenant the cost of such audit and return such amounts Tenant paid for Rent less the amount of Substitute Rent due during such period due to the Deferred Requirement Violation.

<u>1.8    Ongoing Co-Tenancy Requirement.</u>

(a)    The **"Ongoing Co-Tenancy Requirement"** shall mean that the following shall be open, fully stocked and staffed, at the Shopping Center:

      (i)    Belk, or its Replacement Inducement Tenant, in substantially all of those premises identified as "Belk" on the Lease Plan;

      (ii)    Regal Cinemas, or its Replacement Inducement Tenant, in substantially all of those certain premises identified as "Regal" on the Lease Plan; and

      (iii)    at least seventy percent (70%) of the LFA of the Shopping Center, excluding the LFA of the Inducement Tenants (or their respective Replacement Inducement Tenant, if applicable), the Future Development Area (as defined in Section 3.11 below), the Demised Premises and any outparcels, operated by an Occupant in substantially all of its premises, for the operation of (1) a Retail Office, (2) an entertainment use, (3) a restaurant or (4) a retail business by a Required Tenant (as hereinafter defined), provided that the operation of any such Retail Office, entertainment use or restaurant is not in violation of the Restricted Uses set forth in Section 1.4 of this Lease.

A "**Required Tenant**" shall mean a: (A) national Occupant operating a minimum of fifty (50) high quality retail stores of the types typically found in first-class regional shopping centers; (B) regional Occupant with at least seven (7) high quality retail stores in Virginia, North Carolina and/or South Carolina of the types typically found in first-class regional shopping centers; or (C) local Occupant operating a high quality retail store (provided that Landlord may include only up to 75,000 square feet of such local Occupants towards the occupied LFA for purposes of satisfying the occupancy requirements set forth in Sections 1.6 and 1.8 of this Lease); provided, however, that, without limiting the foregoing, under no circumstances shall any of the following be considered a Required Tenant: (aa) temporary or seasonal Occupants; (bb) Occupants occupying space in the Shopping Center pursuant to a lease with an initial term of less than one (1) year; (cc) Occupants occupying space in the Shopping Center pursuant to a license or similar type of agreement; (dd) any Occupant whose use violates any provision of this Lease (including Section 1.4 and Section 1.5); and/or (ee) Occupants operating from kiosks or other temporary or moveable structures. Notwithstanding anything to the contrary contained herein, that certain Occupant more particularly known as "SeaQuest" (or such other trade name operating the same use) shall be deemed to be a Required Tenant for purposes of this Lease.

A "**Replacement Inducement Tenant**" shall mean up to two (2) Required Tenants occupying and operating, in the aggregate, at least fifty thousand (50,000) square feet of LFA of the premises occupied by the Inducement Tenant being replaced, which premises is more particularly shown on the Lease Plan, provided that any such Required Tenant shall individually occupy at least fifteen thousand (15,000) square feet of LFA; provided, however, that, notwithstanding the foregoing, under no circumstances shall any of the following be considered a Replacement Inducement Tenant: (A) Hobby Lobby; (B) furniture stores, such as, without limitation, Ashley Furniture (although a typical HomeGoods as currently operated or one [1] high-end national retailer whose primary use is the sale of furniture and home accessories, such as those currently operated by Pottery Barn, Kirkland's, Pier 1 Imports, and Restoration Hardware, may be considered a Replacement Inducement Tenant so long as such retailer meets the size requirements); (C) close out retailers, such as, without limitation, Big Lots, Odd Lots, and Tuesday Morning (although discount department stores such as those currently operated as TJ Maxx, Marshalls and Ross may be considered a Replacement Inducement Tenant so long as such retailers meet the size requirements); and/or (D) Dollar Tree, Dollar Wave, Dollar General and similar single price-point retailers.

(b)     If at any time after the Rental Commencement Date and the satisfaction of the Initial Co-Tenancy Requirement and the Deferred Co-Tenancy Requirement, the Ongoing Co-Tenancy Requirement is not satisfied (the "**Ongoing Co-Tenancy Violation**"), Tenant shall then pay to Landlord monthly, in lieu of Rent, in arrears, no later than the thirtieth (30th) day of the following month, Substitute Rent (defined in Section 1.5), during the period which extends from the beginning of the first full calendar month following the Ongoing Co-Tenancy Violation and continuing until the end of the calendar month in which such Ongoing Co-Tenancy Requirement is satisfied. In addition to the rights of Tenant to pay Substitute Rent, if the Ongoing Co-Tenancy Violation shall continue for a period in excess of eighteen (18) months, Tenant shall have the right to continue to pay Substitute Rent or, at its election, terminate this Lease by sixty (60) days' written notice delivered to Landlord within sixty (60) days after the expiration of such eighteen (18)-month period. In the event Tenant fails to provide such written termination notice within such sixty (60)-day period, Tenant shall be deemed to have waived its right to terminate this Lease as a result of such particular Ongoing Co-Tenancy Violation and Tenant shall continue the payment of Substitute Rent until the end of the calendar month in which the Ongoing Co-Tenancy Requirement is satisfied.

(c)     Landlord shall deliver to Tenant, within five (5) days of Tenant's request, a notice certifying the then current tradename and the LFA of each Occupant of the Shopping Center. Tenant, or its designated agent, shall have the right, at its own cost and expense, to audit and/or inspect Landlord's records with respect to the Ongoing Co-Tenancy

Requirement. Tenant shall give Landlord not less than fifteen (15) days' written notice of its intention to conduct any such audit. If such audit discloses a violation of the Ongoing Co-Tenancy Requirement and Tenant elects to pay Substitute Rent for such period of violation in accordance with this section, Landlord shall pay to Tenant the cost of such audit and return such amounts Tenant paid for Rent less the amount of Substitute Rent due during such period due to the Ongoing Co-Tenancy Violation.

1.9    Operating Agreement (OEA).

As used in this Lease, the term "OEA" shall mean: (a) that certain Multi-Party Development and Operating Agreement by and among River Ridge, Ltd., Thalhimers Brothers, Inc. and Sears, Roebuck & Co. dated as of July 19, 1979 and recorded in Deed Book 571 at page 224, as amended by that certain First Amendment to Multi-Party Development and Operating Agreement dated September 27, 1979 and recorded in Deed Book 576 at page 96, as further amended by that certain Second Amendment to Multi-Party Development and Operating Agreement dated July 1, 1980 and recorded in Deed Book 588 at page 455, and as further amended by that certain Third Amendment to Multi-Party Development and Operating Agreement dated December 31, 1980 and recorded in Deed Book 600 at page 565, or (b) any operating or reciprocal easement agreement controlling the Shopping Center or adjoining property.

(a)    Landlord covenants, represents and warrants to Tenant that: (i) the OEA has not been further modified, amended or terminated; (ii) the OEA is currently in full force and effect; (iii) as of the date hereof, no written notice of default under the OEA has been sent or received by Landlord, which default remains uncured; and (iv) the OEA is, and shall remain, superior in lien to all mortgages and related liens affecting the Shopping Center and all other land which is encumbered by the OEA. Landlord and Tenant each acknowledge that this Lease is made and shall continue to be subject and subordinate to the OEA, subject to the provisions of this Section 1.9, provided, however, as between Landlord and Tenant, in the event of any conflict between the OEA and this Lease, this Lease shall in all respects control.

(b)    Landlord shall, at its sole cost and expense, during the term of this Lease: (i) perform and observe all of the terms, covenants, provisions and conditions of the OEA on Landlord's part to be performed and observed; (ii) defend, indemnify and hold harmless Tenant from and against any and all claims, demands, causes of action, suits, damages, liabilities and expenses of any nature arising out of or in connection with: (A) the enforcement by Landlord or any other party to the OEA of any covenant, term, condition or provision of the OEA; or (B) a claimed breach by Landlord or any other party of any covenant, term, condition or provision of the OEA, including any alleged breach by Tenant arising out of its performance under this Lease (to the extent such performance is not in default of this Lease or the construction of the Building and/or improvements as provided for herein); and (iii) diligently enforce, at its sole expense, the covenants, agreements, and obligations of the OEA.

(c)    Whenever, pursuant to the OEA, the consent or approval of Landlord shall be required or requested, and such consent or approval could diminish the rights or increase the obligations of Tenant thereunder or under this Lease (except to a de minimus extent), or could materially and adversely affect Tenant's use or occupancy of the Demised Premises, or the conduct of Tenant's business therein, such consent or approval shall not be granted without the prior consent of Tenant, which consent shall not be unreasonably withheld or delayed.

(d)    Landlord shall, promptly and timely after receipt, forward to Tenant a copy of any and all written notices and/or demands received by Landlord under or pursuant to the OEA, which relate to, or would materially and adversely affect, Tenant's use or occupancy of the Demised Premises, the conduct of Tenant's business therein, or Tenant's rights pursuant to this Lease.

(e)    Landlord shall not (i) amend or modify the OEA without Tenant's prior written consent if such amendment or modification would: (A) diminish the rights or increase the obligations of Tenant thereunder or under this Lease, (B) materially and adversely affect Tenant's use or occupancy of the Demised Premises or (C) materially and adversely affect the conduct of Tenant's business therein, or (ii) terminate the OEA.

(f)    In the event Landlord defaults in the performance of any of its obligations under the OEA or fails to enforce the obligations of any other obligee under the OEA (to the extent of Landlord's rights thereunder), and such default or failure to enforce does materially and adversely affect Tenant's rights thereunder or under this Lease, Tenant's Work, Tenant's use or occupancy of the Demised Premises or the conduct of Tenant's business therein, Tenant may, but shall not be obligated to, after thirty (30) days' written notice (except in the event of emergency, in which case no notice shall be required) and Landlord's failure to commence to cure such default and diligently prosecute the same to completion if such cure reasonably requires longer than thirty (30) days, cure any default by Landlord under the OEA and/or enforce, in its own name, at Landlord's expense, the obligations of any other obligee under the OEA, subject to the cure rights contained therein. Landlord shall, upon demand, reimburse Tenant for the actual and verifiable costs incurred by Tenant in performing any of Landlord's obligations under the OEA or enforcing the obligations of any obligee under the OEA, together with interest thereon at the Default Rate, and failing such payment by Landlord, Tenant may, upon ten (10) days' prior notice to Landlord, offset such costs from the next succeeding payment or payments of any Rent, Restricted Use(s) Alternate Rent or Substitute Rent due hereunder, together with interest thereon at the Default Rate until such amount is paid in full to Tenant.

**ARTICLE II**
**TERM**

2.1    Original Term.

    The original term of this Lease shall be the period commencing on the Demised Premises Delivery Date (as defined in Section 3.3(b) hereof) and continuing for ten (10) years from the Rental Commencement Date (as defined in Section 2.3 hereof) plus a fraction of a year commencing on the tenth (10th) anniversary of the Rental Commencement Date and terminating on the January 31 following the tenth (10th) anniversary of the Rental Commencement Date (the **"original term"**).

2.2    Option to Extend.

    Tenant shall have the option at its election, to extend the original term of this Lease, for four (4) consecutive, additional extension period(s) of five (5) years each (individually, each period is referred to as an **"Extension Period(s)"**), the first of which Extension Period(s) shall commence upon the expiration of the original term. Tenant shall exercise an Extension Period(s) by delivering to Landlord, no later than six (6) months prior to the expiration of the then current term or Extension Period(s), written notice of Tenant's desire to extend the term of this Lease (the **"Notice Date"**). Notwithstanding the foregoing, if Tenant fails to give notice by such date, Tenant's time to give notice of its election shall continue until the date which is fifteen (15) days after Landlord notifies Tenant, in writing, that Tenant has failed to make such election. If Landlord does not give such notice to Tenant on or before the seventy-fifth (75th) day before the effective expiration date of the term of this Lease, the term will extend automatically past such expiration date to the date seventy-five (75) days after the earlier of: (a) Landlord's notice to Tenant of Tenant's failure to exercise its Extension Period(s) (subject to Tenant's right within such fifteen-(15) day period to extend the term of this Lease), or (b) Tenant's notice to Landlord that it will not exercise its option to extend the term of this Lease. Time shall be of the essence for all time periods set forth in this Section 2.2. Prior to the exercise by Tenant of any such elections, the expression **"the term of this Lease"** shall mean the original term; after the exercise by Tenant of any such elections to extend the original term, the expression **the term of this Lease"** shall mean the original term plus Extension Period(s) so exercised. Except as otherwise expressly provided in this Lease, all the agreements and conditions contained in

12

this Lease shall apply to each Extension Period(s) to which the original term shall be extended as aforesaid. If Tenant shall give notice of the exercise of any such election in the manner and within the time provided aforesaid, the term of this Lease shall be automatically extended upon the giving of such notice without the requirement of any additional action on the part of Landlord or Tenant except that either Landlord or Tenant may request from the other Party confirmation of any remaining Extension Period(s).

2.3    Rental Commencement Date.

(a)    Subject to the provisions of this Lease, the "**Rental Commencement Date**" shall be the first Opening Day to occur one hundred twenty (120) days after the Demised Premises Delivery Date (as defined in Section 3.3(b)). An "**Opening Day**" shall be any day between March 1 and June 15, and any day between September 1 and October 31. Within ninety (90) days following the determination of the Rental Commencement Date, as provided in this section or otherwise in this Lease, Tenant and Landlord shall execute, acknowledge and deliver, each to the other, a written statement in the form attached hereto as Exhibit J specifying the actual Rental Commencement Date.

(b)    If either Party shall be unable to obtain a certificate of occupancy (or local equivalent) for the Demised Premises on or before the Rental Commencement Date (as defined in Subsection (a) above) because of:

(i)    the condition of the Property or any improvements thereon (and such condition is not the result of some act or omission of Tenant or Tenant's employees, invitees, agents or contractors) Landlord is required to maintain; or

(ii)    any default by Landlord under this Lease and Tenant is unable to open for business for such reason, then in either such event:

(A)    Landlord shall promptly commence to correct such condition and diligently pursue such correction or cure such default so that such certificate may be obtained; and

(B)    the Rental Commencement Date shall then be the earlier of (i) the day Tenant opens for business, or (ii) the first Opening Day to occur that is at least thirty (30) days after such certificate (or local equivalent) is obtained (but in no event shall such date be earlier than would be calculated pursuant to Section 2.3(a)).

## ARTICLE III
## CONSTRUCTION

3.1    Construction Obligations of Parties.

(a)    Landlord and Tenant agree that, among other things, their construction obligations with respect to the Demised Premises shall be set forth in this Article III and the exhibits referred to in Article III, which exhibits are incorporated herein by reference.

(b)    It shall be Landlord's obligation with respect to the Demised Premises to construct the Demised Premises in conformity with Exhibit C-1 and timely deliver the Demised Premises to Tenant. Those obligations of Landlord described in this Section 3.1(b) may hereafter be referred to collectively as "**Landlord's Demised Premises Work**".

(c)    In addition to the obligations set forth above in Section 3.1(b), Landlord agrees to timely perform all work for the Landlord's Parcel:

(i)    necessary to obtain Tenant's certificate of occupancy and necessary for Tenant to operate its business in the Demised Premises including, but not limited to, (i) resealing and restriping the Protected Parking Areas; (ii)

relamping the lights surrounding the Building and in the Protected Parking Areas; and (iii) remulching and freshening landscaping surrounding the landscaping adjacent to the Building and in the Protected Parking Areas;

(ii)     designation of two (2) parking spaces in the Protected Parking Areas (which spaces are located as close to the main entrance to the Demised Premises as feasible) for exclusive use by expectant mothers;

(iii)    designation of four (4) parking spaces in the Protected Parking Areas (which spaces are located as close to the main entrance to the Demised Premises as feasible) as "Parking for Dick's Sporting Goods Buy Online Pick-Up In Store Customers";

(iv)    necessary to bring the Common Areas on the Landlord's Parcel into compliance with all applicable Legal Requirements (including ADA (as hereinafter defined)), including providing handicap accessible parking spaces in the Parking Areas in the quantity and location required by applicable Legal Requirements;

(v)     construction of the pylon and/or monument signs pursuant to Section 8.4 and Exhibit H, including service of the same by appropriate utilities and all other appurtenances thereto; and

(vi)    the completion of the Initial Redevelopment Work.   As used herein, the term "**Initial Redevelopment Work**" shall mean (1) the construction of all Common Areas improvements and curb cuts (all as shown on the Lease Plan) within the portion of the Shopping Center identified as the "**Sears Redevelopment Area**" on the Lease Plan, (2) the completion of the interior mall redevelopment in the manner shown on Exhibit C-2 attached hereto, and (3) the completion of the building shells of those certain Shopping Center Buildings within the Sears Redevelopment Area that are identified as "25K" and "16K" on the Lease Plan (the "**Building Shell Completion Area**").

The obligations of Landlord described in this Section 3.1(c) may hereafter be referred to collectively as the "**Shopping Center Work**". (Landlord's Demised Premises Work and the Shopping Center Work may hereafter be referred to collectively as "**Landlord's Work**".)

(d)     Upon the Demised Premises Delivery Date, Tenant may perform the work necessary to open the Demised Premises to the public, subject to all other terms and conditions of this Lease ("**Tenant's Work**").

3.2     Commencement of Landlord's Work.

(a)     The commencement and prosecution of Landlord's Demised Premises Work shall occur as follows:

(i)     Landlord agrees that Landlord's Demised Premises Work shall be commenced within sixty (60) days after the last to occur of:

(A)     the full and complete execution of this Lease;

(B)     the approval of Final Plans (as set forth in the relevant exhibit); and

(C)     receipt of site plan approval and building permit.

(A), (B) and (C) above shall hereinafter, upon completion, be referred to as ("**Landlord's Demised Premises Work Commencement Date**").

In no event shall Landlord's Demised Premises Work Commencement Date occur later than one hundred twenty (120) days prior to the Committed Demised Premises Delivery Date ("**Landlord's Work Commencement Deadline**"). Notwithstanding anything to the contrary herein contained, Landlord shall be deemed to have commenced Landlord's Demised Premises Work upon pouring the footings for the Demised Premises. Within five (5) days of Landlord's commencement of Landlord's Demised Premises Work, Landlord shall provide Tenant written notice of the commencement of Landlord's Demised Premises Work ("**Notice of Commencement**").

(ii)    Landlord shall prosecute Landlord's Demised Premises Work to completion with all due diligence, speed and dispatch. Landlord's Demised Premises Work shall be performed in a good and workmanlike manner, using only new first class materials; in accordance with all applicable laws; and in conformity with the relevant exhibits to this Lease. Landlord's Demised Premises Work shall be performed at Landlord's sole cost and expense.

(iii)    If Landlord shall not have commenced Landlord's Demised Premises Work on or before the Landlord's Work Commencement Deadline, then at any time thereafter, but prior to the actual commencement of significant and sustained construction activity in connection with Landlord's Demised Premises Work, Tenant shall have the right, at its election, to terminate this Lease, by giving Landlord written notice thereof.

(b)    Landlord shall commence the Shopping Center Work as it pertains to the Shopping Center Buildings on the Landlord's Parcel, Common Area improvements on the Landlord's Parcel and such related construction activities within the Landlord's Parcel no later than the Landlord's Work Commencement Deadline and certainly within a sufficient time to satisfy the Delivery of Possession Requirements (as defined in Section 3.3).

3.3    Completion of Landlord's Work.

(a)    In order for Landlord to be deemed to have delivered the Demised Premises to Tenant, all of the following conditions precedent shall have been satisfied or waived in writing by Tenant (collectively, the "**Delivery of Possession Requirements**"):

(i)    Physical possession of the Demised Premises has been delivered to Tenant with Landlord's Demised Premises Work substantially complete (as defined in Section 3.4(a) below);

(ii)    Landlord has delivered to Tenant an SNDA as required by Article XV;

(iii)    Landlord has delivered to Tenant a Recognition Agreement as required by Article XV;

(iv)    The Demised Premises does not contain any Hazardous Substances (as defined in the provisions of Article XVII);

(v)    Landlord has removed all obstructions (whether temporary or permanent) within the No-Build Areas; and

(vi)    Except for seasonal landscaping, Landlord has completed the Shopping Center Work in conformity with the applicable requirements set forth in this Lease and the relevant exhibits thereto and such work is otherwise substantially complete (as defined in Section 3.4(b)).

(b)    "**Demised Premises Delivery Date**" shall mean 8 a.m. (Eastern Standard Time) on the first (1st) business day following the date on which Landlord satisfies the

Delivery of Possession Requirements. It is the intention of the Parties, and Landlord shall use commercially reasonable efforts to ensure that the Demised Premises Delivery Date shall occur on August 28, 2020 (the "**Committed Demised Premises Delivery Date**"). In no event shall the Demised Premises Delivery Date occur prior to such date without Tenant's written consent.

(c)     Landlord acknowledges that if it shall fail to timely satisfy the Delivery of Possession Requirements, Tenant will sustain substantial, additional costs and expenses, including, without limitation, storage costs for Tenant's Personal Property, loss of value affecting inventory, costs associated with employees during such period of delay, additional advertising and promotional costs and other store opening opportunities and delays in expansion plans in affiliated markets; the exact amount of which would be impracticable or extremely difficult to ascertain. Subject to Force Majeure Events (as hereinafter defined) and Tenant Delay (as hereinafter defined), if the Demised Premises Delivery Date does not occur on or before the Committed Demised Premises Delivery Date, then Landlord shall pay to Tenant within ten (10) days after demand therefor by Tenant, as liquidated damages, on the Demised Premises Delivery Date or within ten (10) days from the date Tenant terminates this Lease, as the case may be, (i) for the first thirty (30) days of such delay in the satisfaction of the Delivery of Possession Requirements, the amount of Three Thousand Five Hundred Dollars ($3,500) multiplied by the number of days which accrue beginning with the Committed Demised Premises Delivery Date and continuing through the Demised Premises Delivery Date (if within such thirty [30]-day period), and (ii) for any such delay beyond such thirty (30)-day period, the amount of Five Thousand Dollars ($5,000) multiplied by the number of days which accrue beginning with the thirty-first (31st) day after the Commitment Demised Premises Delivery Date and continuing through the Demised Premises Delivery Date or the date Tenant terminates this Lease, whichever is earlier. If Landlord fails to pay Tenant within ten (10) days after demand therefor by Tenant, Tenant shall be entitled, at its election, to offset the amount of such liquidated damages due from Landlord to Tenant, against any amounts then owing or in the future owing to Landlord by Tenant plus interest at the Default Rate, including, inter alia, future installments of Rent (or Restricted Use(s) Alternate Rent or Substitute Rent) becoming due hereunder until Tenant offsets the entire amount of liquidated damages. Landlord and Tenant agree that the amount set forth above is a reasonable estimate of the damages Tenant would sustain if the delivery of the Demised Premises is so delayed, and that it is not and shall not be construed as a penalty. Subject to Force Majeure Events and Tenant Delay, if Landlord has not satisfied the Delivery of Possession Requirements on or before one hundred eighty (180) days after the Committed Demised Premises Delivery Date then at any time thereafter, but prior to the Demised Premises Delivery Date, Tenant shall have the right, at its election, to terminate this Lease, by giving Landlord notice thereof. Tenant's rights to the liquidated damages and Landlord's obligations to pay such liquidated damages under this Section 3.3(c) shall survive the termination of this Lease.

(d)     In addition to the liquidated damages provisions contained in Section 3.3(c) which are intended to compensate Tenant for non-construction-related expenses, Tenant shall be entitled to all remedies in equity, including without limitation, the right to specific performance and injunctive relief.

(e)     As used herein, "**Tenant Delays**" shall mean any actual delay in the performance of Landlord's Demised Premises Work as a result of Change(s) (as defined in Section 3.5(a) below) [taking into account any time reductions resulting from such Change(s)], the performance or completion of any work in the Demised Premises by Tenant or delays arising from the negligence, default or willful misconduct of Tenant, its agents, employees, representatives or contractors; provided Tenant receives notice of such delay within five (5) business days of the occurrence of such delay.

3.4     Substantial Completion.

(a)     "**Substantially complete and/or substantial completion**" in connection with Landlord's Demised Premises Work, in addition to substantial completion of the site

3637421-4 10429.0316000

preparation work and the construction of the Building pad, if applicable, shall mean, by way of illustration and not of limitation, that the structure has been completed; permanently enclosed; completely decorated both inside and out; the exterior walls and storefront(s) of the Demised Premises have been completed consistent with Exhibit K, including design, color, materials and dimensions; all floor coverings have been installed; the electrical and mechanical systems have been completely installed and are fully functioning under Novar controls and operable; all utilities have been permanently hooked up, permanently and separately metered and service is established, including but not limited to T1 lines; the toilet facilities are completed; the fire and theft protection systems have been completely installed, are functioning, and are capable of being monitored; all site work has been completed including landscaping (except seasonal landscaping), curbing, paving and striping; all necessary permits and approvals have been obtained so as to permit the installation of fixtures and the stocking of merchandise; that the work is complete and the structure is capable of being stocked and occupied so that Tenant may use and enjoy the structure as intended as a Dick's Sporting Goods retail store. Further, substantial completion anticipates that the work performed by Landlord shall be in conformity with Exhibit C-1 and shall be subject only to minor punch list items that do not affect use, enjoyment, occupancy or the issuance of permits. To the extent not already subsumed within the definition of substantial completion in this Section 3.4(a), substantial completion shall also include and mean:

      (i)    all systems for the Demised Premises are installed and in good working order;

      (ii)    all final utility services serving the Demised Premises are in place and connected to the lines of the appropriate utility company and permanently metered;

      (iii)    Landlord has completed the installation of the floor, ceiling, all mechanicals, walls and storefront of the Demised Premises;

      (iv)    Landlord has obtained and delivered to Tenant a temporary or permanent certificate of occupancy, in such form and substance as typically provided by the applicable authority;

      (v)    Landlord has obtained and delivered to Tenant a written certification from the general contractor for Landlord's Work, in form and substance reasonably satisfactory to Tenant, that the Demised Premises has been constructed (A) in accordance with the Final Plans, and (B) in compliance with all Legal Requirements, including but not limited to the Americans with Disabilities Act ("**ADA**"); and

      (vi)    that there are no items of Landlord's Demised Premises Work remaining that would in any way restrict Tenant from commencing any and all of its "**pre-opening activities**", including by way of example, but not limitation: installation of signs; interviewing prospective employees; setting up offices; merchandising; and opening in the Demised Premises for business with the public; and further that all punch list items would be considered minor such that only touch ups or adjustments may be required for full completion.

      (b)    "**Substantially complete and/or substantial completion**" in connection with the Shopping Center Work, shall mean that, pursuant to the Lease Plan:

      (i)    all resurfacing and restriping of the Protected Parking Areas is complete;

      (ii)    all landscaping (except seasonal landscaping) in the area adjacent to the Demised Premises and within the Protected Parking Areas and No-Build Areas has been remulched and freshened;

3637421-4 10429.0316000

(iii)    all final Protected Parking Areas lighting has been relamped, is operational and such lighting is consistent throughout the Landlord's Parcel;

(iv)    the Protected Parking Areas contain two (2) parking spaces that are designated for exclusive use by expectant mothers, which spaces are located as close to the main entrance to the Demised Premises as possible;

(v)    the Protected Parking Areas contain four (4) parking spaces that are designated as "Parking for Dick's Sporting Goods Buy Online Pick-Up In Store Customers", which spaces are located as close to the main entrance to the Demised Premises as possible;

(vi)    Landlord has obtained and delivered to Tenant a written certification from a licensed architect or engineer, in form and substance reasonably satisfactory to Tenant, that the Common Areas on the Landlord's Parcel comply with all Legal Requirements (including ADA), and the Parking Areas contain handicap accessible parking spaces in the quantity and location required by all applicable Legal Requirements;

(vii)    the installation of the Shopping Center pylon and/or monument signs have been completed;

(viii)    the Initial Redevelopment Work has been completed;

(ix)    there are no items of Landlord's Work remaining that would in any way restrict Tenant from commencing any and all of its pre-opening activities; and

(x)    such elements of the Shopping Center Work which will be completed as a condition precedent to the issuance of an occupancy permit for the Demised Premises has, in fact, been properly completed, subject to punch-list items.

(c)    Inspection of Landlord's Work by Tenant shall occur as follows:

(i)    The Shopping Center Work shall be substantially complete on the Committed Demised Premises Delivery Date.  Landlord shall give Tenant ninety (90) days' prior written notice of the Demised Premises Delivery Date (which notice shall be referred to as the **"Notice of Punch List Inspection"**).  The Notice of Punch List Inspection shall state that on or before the Demised Premises Delivery Date, Landlord shall deliver possession of the Demised Premises substantially complete, in conformity with the requirements for Landlord's Demised Premises Work set forth in this Lease, and any revisions thereto, and relevant exhibits, excluding specifically described punch list items and that the Demised Premises shall be free of all occupancies.  The Notice of Punch List Inspection shall also state that Landlord intends to deliver the Common Areas with Landlord's Work substantially complete, on or before the Demised Premises Delivery Date.  Upon Tenant's receipt of the Notice of Punch List Inspection, Landlord and Tenant shall then arrange to meet at the Demised Premises on a date within five (5) days prior to the Demised Premises Delivery Date set forth in the Notice of Punch List Inspection in order to inspect the Demised Premises and Common Areas together and to produce a punch list (**"Punch List"**) of remaining items to be completed by Landlord.

(ii)    Landlord acknowledges that (A) Tenant will not conduct the Punch List inspection until such time as Landlord has given the Notice of Punch List Inspection, and (B) Tenant will not accept possession of the Demised Premises until Landlord and Tenant have conducted the Punch List inspection and the Landlord's Demised Premises Work and the Shopping Center Work are

18

substantially complete. Landlord acknowledges that failure to give the Notice of Punch List Inspection shall delay the Demised Premises Delivery Date.

(iii)    If the current Punch List generated at the time of the inspection set forth in this Section 3.4(c) reflects that Landlord's Demised Premises Work and/or the Shopping Center Work, as the case may be, is not substantially complete, Landlord shall pay Tenant the amount of Tenant's actual out-of-pocket expenses not to exceed Two Thousand Dollars ($2,000) as reimbursement for the costs and expenses incurred by Tenant in conducting such Punch List inspection ("**Punch List Reimbursement**").

(iv)    If the current Punch List generated at the time of the inspection set forth in Section 3.4(c) reflects that the Landlord's Demised Premises Work and/or the Shopping Center Work, as the case may be, is/are not substantially complete, in addition to Landlord's obligation to pay the Punch List Reimbursement as provided above, Landlord shall diligently and promptly pursue substantial completion of the Punch List. Upon completion of the Punch List, Landlord and Tenant will again together inspect the Landlord's Demised Premises Work and/or the Shopping Center Work, as the case may be, upon reasonable notice from Landlord and, if the Punch List is not completed, together shall produce the final Punch List. Tenant will not be required to finally accept the Demised Premises until the Landlord's Work, including the Shopping Center Work, is substantially complete. Landlord shall diligently and promptly complete all final Punch List items within ten (10) days after the Landlord's Demised Premises Work and/or the Shopping Center Work, as the case may be, are determined to be substantially complete, but in the event such Punch List items cannot reasonably be completed within ten (10) days, Landlord may have up to an additional thirty (30) days to complete all final Punch List items, provided Landlord is diligently prosecuting such Punch List items to completion. In the event that Landlord fails to complete the Punch List items to the reasonable satisfaction of Tenant within the applicable time period required for Landlord to do so, Tenant may, upon five (5) days' written notice to Landlord, cause such Punch List items to be corrected ("**Punch List Correction**"). In the event Landlord fails to (A) pay the Punch List Reimbursement, and/or (B) reimburse Tenant for actual and verifiable expenses due to the Punch List Correction within thirty (30) days following Tenant's written demand therefor, which shall be accompanied by reasonable documentation substantiating such expenses, Tenant shall be entitled to offset such expenses, together with interest thereon at the Default Rate (as defined in Section 12.1) against any amounts then owing or in the future owing to Landlord by Tenant, including, inter alia, future installments of Rent (or Restricted Use(s) Alternate Rent or Substitute Rent) becoming due hereunder. Nothing contained in this Section 3.4 shall be construed to require Tenant to finally accept the Demised Premises prior to the Demised Premises Delivery Date as defined in Section 3.3(b) above.

(d)    Notwithstanding anything else to the contrary contained in this Lease, Tenant's acceptance of the Demised Premises, in discharge of Landlord's applicable Landlord's Demised Premises Work obligations under Section 3.1(b), shall not operate to commence Tenant's obligations to pay Rent, Restricted Use(s) Alternate Rent or Substitute Rent until the later of the following occurs: (i) Tenant's obligation to pay Rent, Restricted Use(s) Alternate Rent or Substitute Rent arises under the express terms of this Lease; or (ii) Landlord substantially completes the Shopping Center Work.

3.5    Changes in Landlord's Demised Premises Work Caused by Tenant.

(a)    Once Landlord and Tenant agree on the Final Plans as defined in the relevant exhibit describing Landlord's Demised Premises Work, Tenant shall, prior to the date that Landlord sends the Notice of Punch List Inspection, have the right to require Landlord to make changes to the Final Plans or Tenant may issue changes or updates to the Plans and Drawings (as defined in Exhibit C-1) [whether through the issuance of

19

additional Design Revision Bulletins ("**DRBs**") beyond what is incorporated into the Plans and Drawings but prior to the generation of Final Plans, or otherwise] ("**Change(s)**"), subject to the economic adjustments and terms and conditions set forth below. The Changes shall be incorporated in Landlord's Demised Premises Work in a timely manner to avoid any unnecessary costs, expenses or delays. Thereafter such Changes shall be incorporated into and then be deemed to be the Final Plans for Landlord's Demised Premises Work. Notwithstanding anything to the contrary herein contained: (i) in the event that Changes are for purposes of clarification, for conforming the same to the Specifications and Plans and Drawings (defined in the relevant exhibit), or such information or requirements had already been disclosed pursuant to the relevant exhibit, then there shall be no increased cost to Tenant occasioned thereby; (ii) Landlord shall not be required to effect a Change unless it is evidenced by a written change order signed by an authorized representative of Tenant, which change order shall incorporate the provisions of this Section 3.5; and (iii) Tenant agrees that Landlord does not have to honor a Change that would increase the LFA of the Demised Premises unless Tenant executes a lease modification to this Lease memorializing the increase in LFA and Tenant's responsibility for increased Rent to the extent that Rent is calculated herein on a per square foot basis.

(b)     The economic adjustments for such Changes are as follows:

(i)     Tenant shall pay to Landlord the net reasonable additional third-party costs of Landlord's Demised Premises Work resulting directly and solely from the aggregate Changes (exclusive of any charges for overhead and profit, other than fees for subcontractor profit, not to exceed five percent (5%), and general contractor profit, not to exceed five percent (5%) thereon), taking into account any and all actual costs and savings resulting from all Changes, in the aggregate (including, without limitation, reasonable costs approved by Tenant in advance associated with any acceleration of the work schedule which Tenant, at its sole option, may require) ["**Tenant's Additional Costs**"]. Such payment of any Tenant's Additional Costs shall be due and payable within thirty (30) days after Tenant's receipt of supporting information reasonably substantiating all of Tenant's Additional Costs, including, without limitation, invoices, receipts and lien waivers of subcontractors and materialmen.

(ii)     Landlord shall credit to Tenant the net reasonable cost savings resulting from the aggregate Changes, taking into consideration all reasonable additional third-party costs of Landlord's Demised Premises Work directly and solely resulting from Changes ("**Tenant's Aggregate Credit**"). Such payment shall take the form of a credit against the first Rent due under this Lease, unless the amount of Tenant's Aggregate credit is paid in full by Landlord prior to such time.

(iii)     Documentation related to costs or credits for each Change shall be provided from Landlord to Tenant not later than thirty (30) days after the incorporation of each such Change into the Final Plans. In addition, at Tenant's request, Landlord shall deliver to Tenant supporting information reasonably substantiating all such Tenant Additional Costs, including, without limitation, invoices, receipts, and lien waivers of subcontractors and materialmen. Such reconciliation shall be due within thirty (30) days after the Demised Premises Delivery Date.

(c)     Tenant shall have the right, in its sole discretion and by the delivery of written notice to Landlord within thirty (30) days after the date that the amount of the Tenant Additional Costs is finally determined, to elect, in lieu of reimbursing Landlord for the Tenant Additional Costs as provided in Section 3.5(b) above, to pay such Tenant Additional Costs instead by increasing the annual amount of the Minimum Rent owing hereunder by an amount per annum equal to nine percent (9%) of the amount of the Tenant Additional Costs, with such annual increase to be payable in equal monthly installments that are added to the amount of Tenant's previously scheduled monthly

20

Minimum Rent installment payment. For example, if the amount of the Tenant
Additional Costs equals One Hundred Thousand Dollars ($100,000), the annual
Minimum Rent shall increase by Nine Thousand Dollars ($9,000) for the term of this
Lease, including Extension Period(s), to the extent applicable. Landlord and Tenant
agree to execute an amendment to this Lease confirming the terms and conditions of this
Section 3.5(c), if Tenant makes the election referenced in this Section 3.5(c). If Tenant
makes the aforesaid election after Minimum Rent has commenced under this Lease, the
Minimum Rent increase referenced herein will be retroactive to the date that Minimum
Rent commenced under this Lease, and Tenant shall pay to Landlord the amount of any
such retroactive Minimum Rent increase (prorated for any partial month) within thirty
(30) days after Tenant makes its aforesaid election.

3.6   Landlord's Construction Representations.

Effective as of the Demised Premises Delivery Date, Landlord represents and
warrants that:

(a)   the Demised Premises and all rights of Tenant under this Lease will be
free and clear of all liens and encumbrances other than the Title Matters as set forth in
this Lease, such that there shall be no other liens or encumbrances affecting the Demised
Premises and all rights of Tenant under this Lease which will prevent Tenant from
completing its work or operating its business; and

(b)   Landlord's Demised Premises Work and the Shopping Center Work shall
be in full compliance with all Legal Requirements and insurance rating bureaus having
jurisdiction (including, without limitation, zoning and building codes).

Landlord further agrees that if, at any time, any governmental or quasi-
governmental entity or insurance rating bureaus having jurisdiction shall determine that
(i) the Shopping Center, including the Common Areas, is not in compliance with any
Legal Requirement or insurance rating standard, or (ii) the Shopping Center, including
the Demised Premises and Landlord's Work, shall not have been performed or
constructed in compliance with any Legal Requirement or insurance rating standard, or
(iii) the Parking Areas do not contain handicap accessible parking spaces in the quantity
and location required by all applicable Legal Requirements, or (iv) Landlord's operation
of the Shopping Center is not in compliance with any Legal Requirement or insurance
rating standard, and such governmental or quasi-governmental entity or insurance rating
bureau shall request compliance with the same or if Landlord's failure to comply shall in
any way materially and adversely affect the use of the Demised Premises, Tenant's
Service Area, the Service Drive or the Parking Areas by Tenant or materially and
adversely affect any other rights of Tenant under this Lease or impose any obligation
upon Tenant not contained in this Lease, then Landlord shall, upon receipt of notice of
such complaint, or determination of non-compliance, promptly, at its sole cost and
expense, cause such repairs, alterations or other work to be done or action to be taken so
as to bring about the compliance requested and/or otherwise eliminate the adverse effect
upon Tenant. If by reason of such failure of compliance or by reason of such repairs,
alterations or other work done by Landlord, Tenant shall be deprived of the use or
enjoyment of the whole or any part of the Demised Premises, Tenant's Service Area or
the Common Areas, all Rent, Restricted Use(s) Alternate Rent or Substitute Rent shall
abate on a per diem basis in proportion to such deprivation. Further, if at any time the
applicable zoning and other applicable laws shall not permit the retail sale of any and all
types of wearing apparel, sporting goods or hunting equipment (including, inter alia,
firearms for hunting, skeet, sport and recreational use) in the Demised Premises, then, in
addition to the aforesaid Rent abatement, Tenant, without waiving any other rights that
Tenant may have on account thereof, may terminate this Lease, by giving Landlord
notice thereof, provided, however, that Landlord shall have thirty (30) days within which
to cure such non-compliance with zoning and/or other applicable laws prior to Tenant's
exercising such right to terminate. Tenant's right to terminate hereunder shall be delayed
until after a binding decision or order is rendered against Landlord to the contrary, so
long as: Landlord objects and commences an action or proceeding to contest the validity

21

of the alleged violation within thirty (30) days after receipt of notice from the applicable governmental entity; Tenant's use and enjoyment of the Demised Premises and the Common Areas are not unreasonably impaired; and the violation does not create a risk of damage to property or personal injury to Tenant, its customers, invitees, contractors and/or employees.

3.7     Pre-Delivery Date Entry.

Tenant shall have the right, without the payment of Rent (as defined in Section 4.1(c) hereof), Restricted Use(s) Alternate Rent or Substitute Rent, after the commencement of Landlord's Demised Premises Work and prior to the Demised Premises Delivery Date, whenever Tenant shall deem it reasonably appropriate, to enter the Demised Premises to inspect the same and, prior to the Demised Premises Delivery Date, to commence Tenant's Work, so long as Tenant shall not interfere with the performance of Landlord's Demised Premises Work. Tenant's entry upon the Demised Premises for the foregoing purpose prior to the Demised Premises Delivery Date shall be governed by and subject to the provisions, covenants and conditions of this Lease including without limitation insurance, indemnity, remedies, and mechanic's liens. Tenant agrees that any such entry and the making of any such installations shall be done in compliance with all Legal Requirements. No such entry by Tenant shall be deemed an acceptance of the Demised Premises. Until the Demised Premises Delivery Date, Landlord shall pay the cost of water, sewer, gas, electricity, heat, air-conditioning and other utilities used in and upon the Demised Premises until such time as Tenant shall have the exclusive right to use the Demised Premises. Landlord shall have no obligation for payment of charges for any utility services consumed in the Demised Premises by Tenant, or any person claiming under Tenant, from and after the Demised Premises Delivery Date.

3.8     Intentionally Deleted.

3.9     Satellite Dish.

In connection with Landlord's Demised Premises Work, Landlord will install, or cause to be installed, a satellite communications dish system (the "**Dish**") on the roof of the Demised Premises for Tenant's use. There shall be no additional charge payable by Tenant to Landlord for the use of such roof area or for the installation of the Dish. Tenant will be responsible for the maintenance of the Dish and Tenant will coordinate any relocation of the Dish with Landlord. The maintenance, repair and removal of the Dish shall be performed at Tenant's sole expense in a manner which will not impair the integrity of, damage or adversely affect the warranty applicable to, the roof or any other portion of the Building. Landlord may require Tenant to use Landlord's roofing contractor for any roof penetrations.

3.10     Construction Easement.

Landlord hereby grants to Tenant, its contractors, subcontractors, materialmen and others engaged in the construction of the improvements referred to in this Lease, the non-exclusive right and license to use the drive areas of the Common Areas designated for construction vehicles for ingress and egress and to use the Parking Areas designated for construction vehicles for parking and to use a portion of the Protected Parking Areas as reasonably designated by Landlord for staging of construction and storage of construction materials. Any right and license granted in this Section 3.10 may be relocated by Landlord by written notice to Tenant.

3.11     Future Construction.

Tenant acknowledges that, as of the Demised Premises Delivery Date, the (a) redevelopment of the portion of the Shopping Center identified as the "**Future Development Area**" on the Lease Plan, including the Shopping Center Buildings and Common Areas to be located within such area may not be constructed, and (b) interior

construction within the Building Shell Completion Area may not be completed. Tenant further acknowledges that Landlord may, but shall not be required to, construct the building shells identified as "**Future Pad Buildings**" on the Lease Plan. Landlord's construction of the Future Development Area shall be completed no later than December 21, 2023, subject to the terms and conditions of this Lease (including Section 1.3). Furthermore, Landlord's construction of the Future Development Area, the completion of any interior construction within the Building Shell Completion Area, and any construction of the Future Pad Buildings shall be subject to the following additional conditions, as applicable:

(i)    the Shopping Center Buildings within the Future Development Area and the Future Pad Buildings shall be located within the permissible building areas depicted on the Lease Plan;

(ii)    the development, construction and/or build-out of the Building Shell Completion Area and any Future Pad Buildings shall not occur during the holiday season, which is defined as from November 15 until the following January 15;

(iii)    any staging area for the Building Shell Completion Area and any Future Pad Buildings shall in no event be located (A) in the Protected Parking Areas or the No-Build Areas or (B) in a location that violates, interferes with, obstructs, or affects the Critical Access Ways, Tenant's Service Area and/or Tenant's Service Drive. Notwithstanding the foregoing, with respect to the Future Pad Buildings, any staging area for such buildings shall be located to the south of such building areas;

(iv)    if Tenant's delivery vehicles or customers' access are blocked at any time, Landlord shall immediately, upon oral request from Tenant, require such blockage to be removed (the foregoing shall not limit Tenant's remedies hereunder if Landlord fails to comply with the request, including Tenant's remedies under this Lease);

(v)    Landlord shall cause all construction within the Future Development Area, any Future Pad Buildings and the Building Shell Completion Area to be performed in compliance with all Legal Requirements and shall not permit any such construction to (A) materially interfere with the use, occupancy or enjoyment of any part of the Demised Premises by Tenant or (B) cause the Demised Premises to be in violation of any Legal Requirements. In addition, once the redevelopment of the Future Development Area and Future Pad Buildings has commenced, such construction shall be diligently and continuously pursued to completion;

(vi)    with respect to the Future Pad Buildings, Landlord shall cause all construction vehicle and trucks to access such Future Pad Buildings through the Parking Areas located to the south of such building areas; and

(vi)    upon completion of the redevelopment within the Future Development Area and any Future Pad Buildings, Landlord shall at its cost restore, or cause to be restored, any affected accessways, parking areas and other portion of the Common Areas to a condition equal to or better than the condition thereof existing prior to the commencement of such redevelopment, and remove all rubble and debris from the Shopping Center.

**ARTICLE IV**
**RENT**

4.1    Minimum Rent.

(a)    Tenant shall pay the following sums per lease year ("**Minimum Rent**") to Landlord as follows:

(i)    from the Rental Commencement Date until the end of the fifth (5th) lease year thereof, Tenant shall pay Minimum Rent to Landlord at the rate of Five

23

Hundred Forty Thousand and No/100 Dollars ($540,000.00) (i.e., $12.00 per square foot of LFA of the Demised Premises) per lease year;

(ii)    from the commencement of the sixth (6th) lease year until the end of the original term, Tenant shall pay Minimum Rent to Landlord at the rate of Five Hundred Sixty-Two Thousand Five Hundred and No/100 Dollars ($562,500.00) (i.e., $12.50 per square foot of LFA of the Demised Premises) per lease year;

(iii)    during the first (1st) Extension Period(s), if any, Tenant shall pay Minimum Rent to Landlord at the rate of Five Hundred Eighty-Five Thousand and No/100 Dollars ($585,000.00) (i.e., $13.00 per square foot of LFA of the Demised Premises) per lease year;

(iv)    during the second (2nd) Extension Period(s), if any, Tenant shall pay Minimum Rent to Landlord at the rate of Six Hundred Seven Thousand Five Hundred and No/100 Dollars ($607,500.00) (i.e., $13.50 per square foot of LFA of the Demised Premises) per lease year;

(v)    during the third (3rd) Extension Period(s), if any, Tenant shall pay Minimum Rent to Landlord at the rate of Six Hundred Thirty Thousand and No/100 Dollars ($630,000.00) (i.e., $14.00 per square foot of LFA of the Demised Premises) per lease year; and

(vi)    during the fourth (4th) Extension Period(s), if any, Tenant shall pay Minimum Rent to Landlord at the rate of Six Hundred Fifty-Two Thousand Five Hundred and No/100 Dollars ($652,500.00) (i.e., $14.50 per square foot of LFA of the Demised Premises) per lease year.

(b)    All Minimum Rent shall be payable in monthly installments of one-twelfth (1/12) the annual rate thereof then in effect, in advance, without notice or demand and without offset or abatement except as expressly set forth herein, upon the first business day of each calendar month included within the term of this Lease.    The initial installment of Minimum Rent shall be paid on the first day of the month following the Rental Commencement Date and after receipt of an invoice and fully executed W-9 form if not previously furnished.    All Minimum Rent and other payments to be made by Tenant to Landlord shall be made payable to Landlord and sent to the place where notices to Landlord are required to be sent, unless Landlord shall direct otherwise by notice to Tenant.    Minimum Rent for any fraction of a month at the commencement or expiration of the term, shall be prorated on a per diem basis.    Minimum Rent for any partial lease year shall be prorated on a calendar month basis or a per diem basis, as the case may be.

(c)    In addition to the payment of Minimum Rent as provided in this Article IV, Restricted Use(s) Alternate Rent (as defined in Section 1.4) and Substitute Rent (as defined in Sections 1.5 and 6.3), if applicable, Tenant shall pay to Landlord as "**Additional Rent**" all other sums of money and charges required to be paid by Tenant to Landlord under this Lease whether or not the same are designated Additional Rent.    Minimum Rent and Additional Rent are collectively referred to herein as "**Rent.**"

(d)    As a material inducement to Tenant to enter into this Lease, Landlord shall pay to Tenant the sum of Nine Hundred Forty-Five Thousand and No/100 Dollars ($945,000.00) (i.e., $21.00 per square foot of LFA of the Demised Premises) (the "**Inducement Payment**") within thirty (30) days following Tenant opening for business in the Demised Premises (it being acknowledged and agreed that, in the event Tenant elects to delay opening pursuant to Section 1.6(b)(ii) of this Lease, then Tenant opening for business shall no longer be a condition to Landlord's payment of the Inducement Payment and such payment shall be due within thirty (30) days after the Rental Commencement Date would otherwise have occurred).    Tenant shall use the Inducement Payment toward the cost of Leasehold Improvements to the Demised Premises and/or furniture, fixtures and equipment for the Demised Premises.    Should Landlord fail to

24

make such payment when due and such failure shall continue for a period of thirty (30) days following written notice from Tenant, then: (i) interest on the unpaid balance shall accrue at the Default Rate, until paid in full; and (ii) Tenant shall have the right and option to offset any such unpaid amounts (together with the interest accrued thereon) against Rent, Substitute Rent, Restricted Use(s) Alternate Rent, and/or other monetary obligations under this Lease, until such amounts, together with all interest accrued thereon, are recovered in full.

4.2    Measurement of Demised Premises.

(a)    Within ninety (90) days after the Rental Commencement Date, Tenant may have Tenant's architect re-measure the Demised Premises in the manner set forth in Section 1.2(d) in order to verify the LFA of the Demised Premises ("**Tenant's LFA Verification**"). In the event that Tenant's LFA Verification reveals that the measured size of the Demised Premises is less than the size set forth in Section 1.1 of this Lease and Landlord and Tenant are unable to agree upon the LFA for purposes of this Lease, an independent architect acceptable to Landlord and Tenant (the cost of which shall be divided equally between Landlord and Tenant) shall measure the Demised Premises in the manner set forth in Section 1.2(d). In the event that Tenant's architect, Landlord or its architect, and the independent architect are unable to agree upon the LFA of the Demised Premises for purposes of this Lease, the LFA shall be deemed to be the average LFA of the two (2) closest of the three (3) measurements. In the event that the LFA of the Demised Premises, as determined in accordance with the methodology set forth above, is less than the LFA set forth in Section 1.1 of this Lease, Landlord and Tenant agree to execute a lease modification agreement (effective retroactive to the Rental Commencement Date) adjusting the LFA of the Demised Premises and, if necessary, appropriately adjusting the Minimum Rent and those items of Additional Rent that are calculated on a "per square foot basis". Any necessary payments or reimbursements shall be paid within thirty (30) days of the full execution of the lease modification agreement referred to in this provision.

(b)    In addition to Tenant's right to obtain the Tenant's LFA Verification as provided in Section 4.2(a) above, if there are modifications to the Shopping Center in the future, the square footage of the remainder of the Shopping Center may be re-measured by Landlord or Tenant within ninety (90) days after written notice of any such modification.

## ARTICLE V
## REAL ESTATE TAXES

Landlord shall pay, or cause to be paid, prior to delinquency, all real estate taxes, charges and assessments related to the Shopping Center (collectively, "**Taxes**"). Landlord acknowledges this is a "gross minimum rent" Lease and Tenant shall have no obligation during the term to reimburse or pay for any portion of Taxes. Tenant shall be solely responsible for and shall pay before delinquency all taxes, assessments, license fees and public charges levied, assessed or imposed upon Tenant's Personal Property (as defined in Section 11.2) in or upon the Demised Premises whether or not owned by Tenant.

## ARTICLE VI
## LEASE YEAR AND GROSS SALES DEFINITIONS

6.1    Lease Year.

A "**lease year**" shall mean any twelve-(12) month period commencing on February 1 and ending on the following January 31. If the Rental Commencement Date shall occur on a day other than the first day of February, then the period of time from the Rental Commencement Date through the next January 31 shall be a "**partial lease year.**" The first lease year shall then commence on the first February 1 then following such partial lease year and end on the next following January 31.

6.2    Gross Sales.

25

The **"Gross Sales"** for any lease year or partial lease year shall be the total amount of all sales of merchandise and services where the order is received, payment is taken and the order is fulfilled, in, upon or from the Demised Premises during such lease year or partial lease year, in each case whether the same shall be made by Tenant or by any subtenant, licensee or concessionaire of Tenant, whether for cash or on a charge or credit basis, except that the following shall not be included in Gross Sales for such lease year or partial lease year or, if previously included in Gross Sales for any lease year or partial lease year, the same shall be deducted from Gross Sales for such lease year or partial lease year, as the case may be:

(a)    the amounts of all discounts, refunds, credits, allowances and/or adjustments made to customers;

(b)    the amounts of all sales taxes or other taxes in the nature of sales taxes, whether or not the same be called sales taxes, imposed by any governmental authorities, federal, state or local, irrespective of whether the same be imposed by present or future laws;

(c)    the amounts of all sales to employees of Tenant or of any subtenants, licensees or concessionaires of Tenant which are made at discounts from prices charged to customers;

(d)    the amounts received for merchandise transferred to any other place of business of Tenant or any subtenant, licensee or concessionaire of Tenant or any business organization affiliated with Tenant wherever located, provided such merchandise is not used to fill a sale made in the Demised Premises, and the amounts received for merchandise returned to suppliers for credit;

(e)    interest or other carrying charges on lease, credit or time sales;

(f)    the amounts charged to customers for mailing, delivery, alterations or other services where such services are rendered to the customer without profit;

(g)    unpaid balances of credit sales which are charged off as "bad debts", provided that if at any time after any such unpaid balance shall be so charged off, but prior to the expiration of the term of this Lease, any amount shall be collected on account thereof, such amount shall then be included in Gross Sales;

(h)    the amounts received from sales of distressed, damaged or obsolescent merchandise sold to other than Tenant's retail customers, and amounts received from sales of used trade fixtures and store operating equipment;

(i)    the amounts received from licensees or concessionaires of Tenant for occupancy, for services rendered to such licensees or concessionaires by Tenant or for the costs of supplies or equipment furnished to such licensees or concessionaires by Tenant;

(j)    the amounts paid by Tenant to companies providing credit card services or check fees for Tenant's customers as the fees and other charges for such credit card or check services;

(k)    any penalty charged by Tenant for a returned check;

(l)    internet, e-commerce or catalog sales which are not allocated internally by Tenant as a sale from the store occupying the Demised Premises, so long as such allocation is consistent with Tenant's chain-wide practices; and

(m)    the amounts received from the sale of any sporting licenses and permits including but not limited to "hunting", "fishing" and "boating" licenses and permits.

6.3    Substitute Rent.

26

All exclusions or deductions from Gross Sales allowed pursuant to Section 6.2 shall be exclusions or deductions from Gross Sales for purposes of Substitute Rent. All Substitute Rent payable and due under this Lease shall be paid in arrears thirty (30) days after each monthly accounting period therefor calculated. Any payment of Substitute Rent under this Lease shall be accompanied by a statement of Gross Sales and any exclusions or deductions therefrom permitted under this Lease.

6.4    Gross Sales Audit.

Tenant agrees that it will keep in its principal accounting office true and accurate records, in accordance with generally accepted accounting principles, showing all sales made in, upon or from the Demised Premises, and that upon and after Tenant has the right to pay Substitute Rent under this Lease, Landlord and its duly authorized agents may, upon at least thirty (30) days' written notice to Tenant and at times reasonably convenient for Tenant, examine and audit such records for the purpose of verifying the aforesaid statements no more than one (1) time in any lease year during which Tenant has the right and elects to pay Substitute Rent. If Landlord does not give Tenant notice that it challenges any statement or payment within one (1) year to which such statement or payment relates, such statement or payment shall be deemed final and conclusive and the obligation of Tenant to keep available for Landlord's examination the sales records upon which such statement or payment was based shall cease. Furthermore, no such audit shall occur in the months of November, December, January or February. Landlord acknowledges and agrees that the information contained in the records and statements relating to Tenant's sales constitute proprietary and confidential business information and Landlord shall keep, and shall use commercially reasonable efforts to cause its authorized agents and employees to keep, all such information obtained in any audit confidential. Notwithstanding the foregoing, Landlord may, upon written notice to Tenant, disclose Tenant's sales information to (a) Landlord's attorneys in connection with the enforcement of Tenant's obligations to pay Substitute Rent, (b) any bona fide prospective purchaser of Landlord's interest in the Landlord's Parcel, and (c) any prospective lender for the Landlord's Parcel.

6.5    Open for Business.

Nothing in this Article VI or any other provision of this Lease shall require Tenant to open and/or keep the Demised Premises open for business at any time or times.

**ARTICLE VII**
**REPAIRS AND MAINTENANCE**

7.1    Tenant's Repair Obligations.

Damage by fire or other casualty (which shall be controlled by Article IX hereof) and reasonable wear and tear excepted Tenant agrees, at Tenant's expense, to keep in good order and repair: (a) the interior of the Demised Premises; (b) all glass; (c) all heating and air conditioning equipment ("HVAC") in or serving the Demised Premises exclusively (except as otherwise provided in Section 7.3 hereof); (d) all permitted signs of Tenant; (e) the interior and exterior of all entry doors; (f) door frames, checks and closers; (g) window and window frames; (h) electrical, plumbing, sewage and other mechanical and utility equipment and systems located upon and serving the Demised Premises exclusively; (i) trade fixtures, business machinery and trade equipment; and (j) floor coverings; provided, however, that Tenant shall not be required to perform any such repairs in (a) through (j) above if such damage is caused by any negligent act or omission or willful misconduct of Landlord, its agents, servants, contractors, employees, or invitees. In addition, Tenant shall contract and pay for trash and garbage removal from the Demised Premises on a regular basis. Notwithstanding anything contained in this Section 7.1 to the contrary, Landlord agrees that any repairs, alterations or replacements that shall be required at any time from the Demised Premises Delivery Date until the expiration of the term of this Lease as a result of: (i) any negligent act or omission or willful misconduct of Landlord, its agents, servants, contractors, or employees; (ii) structural failure or movement of the Building upon the

27

Demised Premises such as settling; (iii) settling of the Common Areas; (iv) defective materials or workmanship in the performance of Landlord's Work; or (v) Landlord's failure to perform Landlord's Work as required, shall be made promptly by Landlord at Landlord's sole cost and expense.

7.2    Landlord's Repair Obligations.

(a)    For a one (1) year period from and after the Demised Premises Delivery Date, Landlord agrees, at its sole cost and expense, to make all repairs and replacements of Landlord's Demised Premises Work, whether structural or nonstructural including all utility lines and areas within or under the floor-slab, however, excluding damage caused by Tenant or its agents, contractors and employees, in and about the Demised Premises. Thereafter, Landlord agrees to assign to Tenant all warranties relating to the Demised Premises and the equipment located therein, except such warranties as may be used to cover any of Landlord's obligations stated herein. Furthermore, Landlord covenants and agrees that it will, at its sole cost and expense, during the entire term of this Lease, maintain and keep in good order and repair those portions of the Demised Premises which are not Tenant's obligation under Section 7.1 above including, but not limited to, the repair and replacement of the foundation, all structural elements of the Demised Premises or the Building thereon, floor-slab, exterior walls, steel frame, roof, HVAC (pursuant to Section 7.3 below), flashings, gutters, downspouts, irrigation system, sprinkler system to the Demised Premises and utility lines serving the Demised Premises or the Building thereon but located outside the same, including any damage caused to elements that would otherwise be Tenant's responsibility in Section 7.1 but due to a failure of an item of Landlord's responsibility in this Section 7.2 (e.g., damage to flooring caused by shifting floor slabs), but excluding damage caused by Tenant or its agents, servants, contractors or employees. In addition, Landlord shall paint the exterior of the Building thereon on a periodic basis when needed (as to the storefront of the Demised Premises, the color shall be approved by Tenant). In performing its obligations under this Section 7.2, Landlord shall not materially and adversely interfere with Tenant's business operations. Landlord shall commence any repairs required under this Lease within fifteen (15) days after the receipt by Landlord of written notice from Tenant, and so long as Landlord commences to make such repairs in a diligent and prudent manner, it will be allowed such additional time as necessary to make such repairs.

(b)    Landlord shall keep or cause to be kept in good order and repair all Shopping Center Buildings and other structures located in the Shopping Center situated outside of Tenant's Building consistent with the highest standards of repair normally demanded in a first-class shopping center.

7.3    HVAC Maintenance.

For a one (1) year period from and after the Demised Premises Delivery Date, Landlord agrees, at its sole cost and expense, to carry an industry standard service contract for the HVAC system serving the Demised Premises to provide for routine preventive maintenance (including changing filters, belts and the lubrication of all moving parts) (the "**HVAC Service Contract**"), and to make all repairs and replacements to the HVAC system serving the Demised Premises (whether or not covered by such HVAC Service Contract), and thereafter to assign to Tenant any and all original warranties provided to Landlord for the future benefit of Tenant to include, at a minimum, the warranties set forth in the Specifications (as defined in Exhibit C-1). Commencing in the second lease year and continuing thereafter for the remainder of the term of this Lease: (i) Tenant agrees to provide routine maintenance by carrying the HVAC Service Contract; and (ii) Landlord shall promptly perform repairs and replacements not covered by the HVAC Service Contract maintained or required to be maintained by Tenant herein. Upon written request of Landlord, from time to time, Tenant shall promptly furnish a copy of such HVAC Service Contract to Landlord. In the event Landlord fails to perform such repairs and replacements, Tenant may perform same, and Tenant shall be reimbursed by Landlord, upon Tenant's delivery of an invoice to Landlord setting forth the actual and verifiable cost of such repair or replacement. If payment is not made within thirty (30) days of

28

receipt of Tenant's invoice thereof, said reimbursement may be effected by Tenant's deducting the amount thereof from the payments of Rent (or Restricted Use(s) Alternate Rent or Substitute Rent) due and payable hereunder.

7.4    Utilities.

Landlord agrees that, on the Demised Premises Delivery Date, the Demised Premises will be serviced with the utility requirements specified in the Final Plans, and that from and after the Demised Premises Delivery Date, Tenant shall pay all charges for utility services used or consumed in the Demised Premises directly to the public utility provider, subject to the provisions in this Section 7.4. Landlord agrees that from the Demised Premises Delivery Date until the expiration of the term of this Lease, the Demised Premises shall be connected to the utility lines serving the municipality wherein the Demised Premises is located including the water and sewer systems of such municipality and each utility shall be separately metered for each such utility service; provided, however, that water and sewage service may be sub-metered and billed by Landlord, if required, so long as Tenant's responsibility for such sub-metered utilities shall not exceed the amount that Tenant would pay to the utility company serving the Shopping Center if such services were provided directly to Tenant and metered separately to the Demised Premises. Landlord agrees that from the Demised Premises Delivery Date until expiration of the term of this Lease: (a) all such water, electricity and gas shall be in such amounts and capacities as shall be required by the Final Plans (including, without limitation, sufficient water pressure to maintain fire suppression systems throughout the term of this Lease); and (b) all such sewage disposal facilities shall be of such capacity as shall have existed on the Demised Premises Delivery Date.

Landlord shall not take, nor permit any Occupant of the Shopping Center or any person claiming under Landlord or any such Occupant to take any action which shall interrupt, or interfere with, any electric, gas, water, sewage or telephone service to the Demised Premises. If certain meters, controls and conduits for the utilities systems serving the Demised Premises are located outside the Demised Premises in such other premises (the "**Utilities Room**") within the Shopping Center, then Tenant shall have reasonable access to such Utilities Room and the controls and other conduits therein. If such Utilities Room is in common with Landlord and other Occupants, Tenant shall not interfere with any utilities except those relating solely to the Demised Premises. Tenant shall be entitled to all savings, credits, allowances, rebates or other incentives awarded by or on behalf of a utility provider in connection with Tenant's design of or use of the Demised Premises.

7.5    Utilities Easements.

Tenant shall have the right and easement within the Landlord's Parcel to install, replace, maintain and use additional utilities conduits, communication conduits and/or equipment to serve the Demised Premises and all of the signs which Tenant is hereby permitted to erect and/or maintain under this Lease, provided that such conduits and/or equipment shall only be located in areas subject to the reasonable prior written approval of Landlord, not to be unreasonably withheld, conditioned or delayed. Furthermore, Tenant shall keep to a reasonable minimum any interference with the business of other Occupants of the Shopping Center. Furthermore, Tenant shall maintain any such conduits and/or equipment in good condition and repair and shall repair any and all damage to the Shopping Center caused by the exercise of its rights hereunder.

## ARTICLE VIII
## ALTERATIONS, SIGNAGE AND LIENS

8.1    Alterations.

Tenant agrees that: (a) any repairs, alterations, replacements, other improvements or installations made by Tenant to or upon the Demised Premises ("**Alterations**") shall be done in a good and workmanlike manner and in conformity with all Legal Requirements; (b) materials of new (or like new) and good quality shall be employed

29

therein; (c) the structure of the Demised Premises shall not be endangered or impaired thereby; (d) the Building shall not be diminished in value thereby; and (e) except for signs, the Dish, HVAC and utilities' equipment, which Tenant is permitted to erect and required to maintain pursuant to the provisions of this Lease, neither the perimeter of the Demised Premises nor the height of the Demised Premises shall be increased without the written consent of Landlord not to be unreasonably withheld, conditioned or delayed. Furthermore, Tenant agrees that Tenant, its assignees and/or sublessees shall not, except as specifically provided in other provisions of this Lease, make any alterations to the foundation, roof, exterior walls, storefront, or any structural parts of the Demised Premises, without first submitting plans and specifications therefor to Landlord for Landlord's approval, which approval shall not be unreasonably withheld, conditioned or delayed. Landlord shall have the right to disapprove of the same if, and only if, the same violate any of the preceding provisions of this Section 8.1. Failure of Landlord to give notice of disapproval of such plans and specifications within fifteen (15) days after receipt thereof shall be deemed an approval. If Landlord so disapproves such plans and specifications, Landlord shall provide Tenant with reasonable detail as to why such plans and specifications were not approved. Notwithstanding the foregoing, Landlord's approval shall not be required for any Alterations to the exterior of the Demised Premises to Tenant's then-current prototype exterior, provided that such exterior Alterations are in conformity with any uniform architectural design for the Shopping Center. All salvage in connection with any work done by Tenant pursuant to provisions of this Section 8.1 may be disposed of by Tenant. It is agreed and understood that, upon expiration of the term of this Lease, Landlord shall accept possession of the Demised Premises as altered pursuant to the provisions hereof without any obligation upon Tenant to restore the Demised Premises to its former condition.

8.2    Surrender of Alterations.

All repairs, alterations, replacements, other improvements or installations made to or upon the Demised Premises which are so attached to the realty that the same shall by law be deemed a part of the realty and shall (subject, however, to the provisions of the following sentence) be the property of Landlord and remain upon and be surrendered with the Demised Premises as a part thereof upon the expiration of the term of this Lease. Notwithstanding the foregoing, all of Tenant's Personal Property, including signs, whether or not by law deemed to be a part of the realty installed at any time or times by Tenant or any person claiming under Tenant (at the sole cost and expense of Tenant or such other person without any contribution from or reimbursement by Landlord and which are not replacements of property installed by Landlord) shall remain the property of Tenant or persons claiming under Tenant and may be removed by Tenant or any person claiming under Tenant at any time or times during the term of this Lease or any occupancy by Tenant thereafter. Tenant shall repair any damage to the Demised Premises occasioned by the removal by Tenant or any person claiming under Tenant of any property from the Demised Premises and leave the Demised Premises in broom clean condition, except for (a) necessary, minor, interior holes made by nails, screws and other fasteners and other minor openings and unavoidable minor damage to sheetrock and painted surfaces resulting therefrom, and (b) necessary repairs and replacements due to casualty or condemnation.

8.3    Permits.

Tenant shall procure all necessary governmental permits pursuant to Section 8.1 before making any repairs, alterations, other improvements or installations to or upon the Demised Premises at no cost to Landlord. Landlord shall cooperate with Tenant in obtaining such permits.

8.4    Signage and Storefront.

(a)    Building Signage: Landlord warrants and represents that there are no signage restrictions which bind the Shopping Center either by a restrictive covenant or uniform signage plan, whether or not recorded or filed with the local recording or governing authority, and that, subject to the OEA and Legal Requirements, Tenant shall

have the right to install, at Tenant's sole cost and expense, Tenant's signage upon the exterior of the Demised Premises in the size and in the manner depicted on <u>Exhibit K</u>. To the extent that Tenant requires a variance from the local governing authority in order to get approval to erect such signage, Landlord agrees that it will reasonably cooperate with Tenant in Tenant's efforts to procure such variance; provided, however, if Tenant shall be unable to obtain such variance, if any, then Tenant shall be permitted to erect signage on the Building in the locations indicated by <u>Exhibit K</u> but in a size consistent with the local sign ordinance without a variance.

(b)     Ground Signage:  Landlord shall install, at Landlord's expense, Tenant's identification panel on any directional signs in the Shopping Center in the manner depicted on <u>Exhibit H</u>.  In addition, if Landlord subsequently constructs a pylon or monument sign(s) or if a pylon or monument sign is constructed on or in any way serving the Shopping Center, Tenant shall have the right to install Tenant's identification panel upon any future pylon or monument sign(s), with the size and location of Tenant's identification panel to be determined on a pro rata basis, e.g. the Occupant with the most square footage in the Shopping Center shall have the largest panel and choice of location on the sign or in any location approved by Landlord and Tenant.

(c)     Tenant Storefront:  Landlord shall obtain governmental approvals for and, in accordance with the Final Plans, construct Tenant's prototypical building exterior storefront structure (upon which Tenant will mount Tenant's storefront signage [i.e., Tenant's channel letters] consistent with <u>Exhibit K</u>), including design, dimensions, color, materials, architectural features and height as shown on <u>Exhibit K</u>, attached hereto.

(d)     Subtenant or Assignee:  The signage rights granted to Tenant pursuant to this Article VIII shall be allocated to any subtenant of all or any portion of the Demised Premises or any assignee of Tenant (but not licensee) so long as such sublease or assignment was not executed in violation of the terms of this Lease.  All signage installed by Landlord or Tenant in this Subsection (d) shall comply with applicable Legal Requirements.

8.5     <u>Mechanics' Liens by Tenant.</u>

Tenant shall permit no mechanic's, materialman's or other lien to be recorded against the Demised Premises or Property of which the Demised Premises is a part in connection with any materials, labor or equipment furnished, or claimed to have been furnished, to or for Tenant or any person claiming under Tenant; except, however, that if any such lien shall be filed against the Demised Premises or Property of which the Demised Premises is a part, Tenant shall cause the same to be discharged, provided, however, that if Tenant desires to contest any such lien in good faith, it may do so as long as the enforcement thereof is stayed, but in any event Tenant shall either:

(a)     cause any such lien to be discharged of record within thirty (30) days after written request of any mortgagee or of Landlord (Landlord acknowledges that Tenant shall have satisfied such requirement by securing and recording a payment performance bond in the amount of such lien); or

(b)     while contesting the same as aforesaid, deposit with Landlord or at Landlord's request, Landlord's mortgagee, pending such contest, a sum sufficient to cover the amount of such lien and all interest, penalties or costs that would be payable to discharge such lien if such lien were valid.

8.6     <u>Mechanic's Liens by Landlord.</u>

Landlord shall permit no mechanic's, materialman's or other lien against the Demised Premises or Property of which the Demised Premises is a part in connection with any materials, labor or equipment furnished, or claimed to have been furnished, to or for Landlord or any other Occupant of premises in the Shopping Center.  If any such lien or a notice of intent to file a lien shall be filed against the Demised Premises or Property of

31

which the Demised Premises is a part, Landlord shall cause the same to be canceled or discharged of record (Tenant acknowledges that Landlord shall have satisfied such requirement by securing and recording a payment performance bond in the amount of such lien protecting Tenant from any loss or expense because of non-payment of such lien by Landlord within the statutory time period required), provided that if Landlord desires to contest any such lien in good faith, Landlord may do so as long as the enforcement thereof is stayed and Landlord indemnifies Tenant from any cost or expense related thereto.

8.7    Shopping Center Renovation.

Prior to performing any renovation, repaving or other remodeling work to the Shopping Center or the Common Areas on the Landlord's Parcel, Landlord agrees to provide Tenant with at least forty-five (45) days' prior written notice [any written notice under this Section 8.7 shall include a copy to: Dick's Sporting Goods, Inc., 345 Court Street, Coraopolis, PA 15108, Attn: Vice President of Facilities and Construction] as to the nature of the work involved, the dates on which such work is scheduled to be performed and the anticipated time schedule to complete such work. Landlord agrees to use commercially reasonable efforts to minimize interruption of Tenant's business operations during any such renovation or remodeling work.

## ARTICLE IX
## FIRE AND OTHER CASUALTY

9.1    Landlord's Obligations.

(a)    If, at any time from and after the Demised Premises Delivery Date, the Demised Premises or any part thereof, Tenant's Service Area or any part of the Common Areas on the Landlord's Parcel shall be damaged or destroyed by fire, the elements or other casualty, then, except as hereinafter otherwise provided, Landlord shall, promptly thereafter, repair or restore the Demised Premises, Tenant's Service Area and the Common Areas on the Landlord's Parcel (including Landlord's Work as defined in Section 3.1(c)) to substantially the same condition they were in immediately prior to such casualty except that Tenant shall have the right to require Landlord to make changes to the Demised Premises in the course of such restoration, subject to Landlord's reasonable approval of such changes. If the cost and expense of restoration of the Demised Premises is increased by any change or changes made by Tenant or if Landlord is damaged by any delay caused solely by such change or changes, then Tenant shall pay Landlord, within thirty (30) days after demand therefor, the aggregate amount or amounts by which the cost or expense of restoration of the Demised Premises was thereby increased and the amount by which Landlord was damaged by such delay. If the damage to the Demised Premises, Tenant's Service Area or the Common Areas on the Landlord's Parcel shall render the whole or any part thereof unsuitable for the use for which they were intended and they are actually not used for their intended purpose, a just proportion of the Rent payable by Tenant pursuant to this Lease, according to the nature and extent of the injury to Tenant's business, shall be abated until the earlier of the thirtieth (30th) day after the Demised Premises or part thereof and the Common Areas shall be repaired or restored to substantially the same condition they were in immediately prior to such casualty or the date Tenant reopens for business in the damaged area. Rent paid in advance for a period beyond the date on which the same were so rendered unsuitable for the use for which the same were intended shall be apportioned and adjusted.

(b)    If the Demised Premises, for any period, shall be closed for business as a result of damage or destruction to other premises in the Landlord's Parcel, then, during any such period or periods, no Rent, Restricted Use(s) Alternate Rent or Substitute Rent shall be payable by Tenant. If more than thirty percent (30%) of the LFA in the aggregate of all other premises in the Landlord's Parcel shall for any period be closed for business as a result of damage or destruction to the Landlord's Parcel and if the Demised Premises remains open for business during such casualty or during the repair period, then in lieu of Rent, Tenant shall pay to Landlord, for such period, Substitute Rent, payable monthly in arrears on or before the thirtieth (30th) day after the end of each calendar month or fraction thereof included in such period.

(c)    In addition, if Landlord shall fail to commence to repair or restore any such damage referenced in paragraph (a) or (b) above within sixty (60) days after the occurrence thereof or shall fail to complete the repair and restoration of such damage within one (1) year after the occurrence thereof, then, in either such event, and prior to the commencement or completion thereof, as the case may be, Tenant may, at its election, terminate this Lease anytime thereafter, by giving Landlord written notice thereof and the term of this Lease shall then terminate on the date specified therefor in such notice. All insurance proceeds required pursuant to this Lease or otherwise on account of any damage or destruction by fire, the elements or other casualty shall be made available for the payment of the cost of the aforesaid repair or restoration.

9.2    End of Term Casualty.

(a)    It is agreed and understood that:

(i)    if, during the two-(2) year period preceding the expiration of the term of this Lease, the Demised Premises shall be damaged or destroyed to the extent of twenty percent (20%) or more of its replacement cost; or

(ii)    if, during the one-(1) year period immediately preceding the expiration of the term of this Lease, the Demised Premises shall be damaged or destroyed to the extent of fifteen percent (15%) or more of its replacement cost,

then either Landlord or Tenant may, if either shall so elect, terminate the term of this Lease, by notice to the other within thirty (30) days after such damage or destruction. If Landlord shall give such notice of termination at a time when Tenant shall have the right to exercise an election to extend the term of this Lease for an Extension Period(s) (as provided in Section 2.2 hereof) and if, within fifteen (15) days after Tenant shall receive such notice of termination from Landlord, Tenant shall exercise such election, then such notice of termination shall become void and of no force or effect. In the event of any termination of the term of this Lease pursuant to the provisions of this Section 9.2:

(iii)    the termination shall become effective on the twentieth (20th) day after the giving of the notice of termination,

(iv)    a just proportion of the Rent payable by Tenant pursuant to this Lease, according to the nature and extent of the injury to the Demised Premises or the Common Areas, shall be suspended or abated until the time of termination,

(v)    Rent shall be apportioned as of the time of termination and proper adjustments shall be made, and

(vi)    neither Landlord nor Tenant shall be obligated to repair or restore any damage or destruction caused by such fire or other casualty.

(b)    In addition, if Landlord shall terminate this Lease pursuant to the provisions of this Section 9.2 and, prior to the date of such termination, Tenant provided Landlord with the cost associated with Tenant's Leasehold Improvements, Landlord shall pay to Tenant an amount equal to the unamortized cost to Tenant of any Leasehold Improvements made and paid for by Tenant to the Demised Premises and Landlord's obligation herein shall survive the termination of this Lease. The unamortized cost to Tenant of any Leasehold Improvements made and paid for by Tenant to the Demised Premises shall be determined in accordance with the straight-line method of amortization and the life expectancy of such Leasehold Improvement used by Tenant for federal income tax purposes. As used in this Article IX and elsewhere in this Lease, **"the cost to Tenant of any Leasehold Improvements"** shall mean the actual cost to Tenant of making such Leasehold Improvements less any contribution thereto or reimbursement thereof made by Landlord to Tenant, including without limitation, reimbursement effected by deductions from Rent payable under this Lease, if any.

33

## ARTICLE X
## EMINENT DOMAIN

10.1    Condemnation of Demised Premises.

If, after the execution of this Lease and prior to the expiration of the term of this Lease, the whole of the Demised Premises shall be appropriated by right of eminent domain, then the term of this Lease shall cease as of the time the fee simple interest shall be vested in the taking authority and Rent and all other payments under this Lease shall be apportioned and adjusted as of the time of such termination.  Tenant shall have the right, at its election, to continue to occupy the Demised Premises, to the extent permitted by law, for all, or such part as Tenant may elect, of the period between the time of such appropriation and the time when physical possession of the Demised Premises shall be taken, subject to the provisions of this Lease insofar as the same may be applicable to such occupancy by Tenant, but the amount, if any, charged to Tenant by the taking authority or its assigns for Rent or use and occupancy shall be deductible from the Rent paid or payable by Tenant hereunder.

10.2    Partial Condemnation.

If, by right of eminent domain or any other act of public authority:

(a)    any part of the Demised Premises shall be appropriated and if, as a result thereof, the LFA of the Demised Premises shall be reduced to less than ninety percent (90%) of the LFA thereof set forth in Section 1.1 of this Lease;

(b)    a part of the Common Areas of the Shopping Center shall be appropriated and if, as a result thereof (taking into account any prior appropriation of any portion of the Shopping Center), the Parking Areas shall be reduced in size by ten percent (10%) or more, or as a result thereof the Shopping Center has a parking ratio of less than that required by local code, or a part of Tenant's Service Area shall be appropriated or Tenant is unable to receive merchandise in the ordinary course;

(c)    the Protected Parking Areas shall cease to have satisfactory ingress and egress for pedestrians and motor vehicles to and from all access streets to the Shopping Center;

(d)    there shall cease to be satisfactory access for pedestrians between the Parking Areas and the main customer entrance of the Demised Premises;

(e)    there shall cease to be satisfactory access for trucks to and from the access streets to and around Tenant's Service Area or the Service Drive shall be materially modified so that Tenant's method of delivery in and to the Demised Premises is materially modified;

(f)    any part of the Demised Premises shall be appropriated during the last year of the term of this Lease; or

(g)    any part of the Protected Parking Areas are appropriated and such appropriation has a material adverse effect upon Tenant's business operation;

then Tenant may, if Tenant shall so elect, terminate the term of this Lease, by giving Landlord notice of the exercise of such election within thirty (30) days after the receipt by Tenant of notice from Landlord of such appropriation.  If, by right of eminent domain, any part of the Demised Premises shall be appropriated during the last year of the term of this Lease, Landlord may, if Landlord shall so elect, terminate the term of this Lease by giving Tenant notice of the exercise of such election within thirty (30) days after the receipt by Landlord of notice of such appropriation.  If Landlord shall give such notice of termination at a time when Tenant shall have the right to exercise an election to extend the term of this Lease for an Extension Period(s), as provided in Section 2.2 hereof, and if, within fifteen

(15) days after Tenant shall receive such notice of termination from Landlord, Tenant shall exercise such election, then such notice of termination shall become void and of no force or effect. In the event of a termination under the provisions of this Section 10.2, the termination shall be effective as of the time that physical possession of the Demised Premises so appropriated shall be taken and Rent and all other payments pursuant to this Lease shall be apportioned and adjusted as of the time of such termination, but the amount charged by the taking authority or its assigns for Rent or use and occupancy between the time of appropriation and the time of termination shall be deductible from Rent and other charges paid or payable hereunder. If there shall be an appropriation by right of eminent domain and if the term of this Lease shall not be terminated as aforesaid, then the term of this Lease shall continue in full force and effect and Landlord shall, within a reasonable time after physical possession is taken of the premises appropriated, restore what may remain of the Demised Premises, Tenant's Service Area and the Common Areas to as close to substantially the same condition they respectively were in prior thereto, as is reasonably possible subject to reduction in size thereof. A just proportion of the Rent and all other amounts payable by Tenant pursuant to this Lease, according to the nature and extent of the injury to Tenant's business, shall be suspended or abated until the fifteenth (15th) day after what may remain of the Demised Premises and the Common Areas shall be restored, as aforesaid, and thereafter a just proportion of the Rent and any such other amounts, according to the nature and extent of the injury to Tenant's business, shall be suspended or abated for the balance of the term of this Lease. For the purpose used herein, Rent shall be deemed allocable seventy percent (70%) to the Demised Premises and thirty percent (30%) to the Common Areas.

10.3    Condemnation Awards.

Landlord reserves to itself, and Tenant assigns to Landlord, all rights to damages accruing on account of any appropriation by eminent domain or by reason of any act of any public authority for which damages are payable. Tenant agrees to execute such instruments of assignment as may be reasonably requested by Landlord in any petition for the recovery of such damages, and to turn over to Landlord any damages that may be recovered in any such proceeding. It is agreed and understood, however, that Landlord does not reserve to itself, and Tenant does not assign to Landlord, any damages in an amount equal to the unamortized cost to Tenant of any improvements made by Tenant to the Demised Premises as well as any award to Tenant for moving expenses, relocation costs or on account of the loss of this Lease. The unamortized cost to Tenant of any improvement made by Tenant to the Demised Premises shall be determined in accordance with the straight-line method of amortization and the life expectancy of such improvement used by Tenant for federal income tax purposes. As used hereinbefore, **"the cost to Tenant of any improvements"** shall mean the actual cost to Tenant of making such improvements less any contribution thereto or reimbursement thereof made by Landlord to Tenant, including, without limitation, reimbursement effected by deductions from Rent payable under this Lease.

## ARTICLE XI
## INDEMNIFICATION

11.1    Landlord's Insurance.

Landlord shall maintain fire and extended coverage insurance at least as broad as the Insurance Services Office's Causes of Loss Special Form, insuring the Shopping Center Buildings, the Common Areas, the Demised Premises and the Leasehold Improvements, in an amount equal to one hundred percent (100%) of the full replacement cost thereof and so as to prevent the application of co-insurance provisions of such property insurance. **"Leasehold Improvements"** shall include all improvements made by Landlord or Tenant that are permanently affixed to the realty or so attached to the realty that same by law be deemed a part of the realty, including, but not limited to, all lighting, ceiling tiles, partition walls, wall coverings and floor coverings, but specifically excluding all of Tenant's Personal Property as defined in Section 11.2.

11.2    Tenant's Insurance.

Tenant shall maintain, at its expense, from the date Tenant physically occupies the Demised Premises, fire and extended coverage insurance at least as broad as the Insurance Services Office's Causes of Loss Special Form, insuring all of Tenant's Personal Property within the Demised Premises, which shall include the fixtures and furnishings paid for by Tenant, inventory, merchandise, business operating equipment and such other items placed on the Demised Premises by Tenant and not permanently affixed to the Demised Premises (all hereinafter referred to as "**Tenant's Personal Property**") in an amount equal to one hundred percent (100%) of the full replacement cost thereof and so as to prevent the application of co-insurance provisions. Tenant may carry such insurance under so-called "blanket" policies covering other of Tenant's properties, and such insurance may have commercially reasonable deductible amounts deemed prudent by Tenant.

11.3    Liability Insurance.

Each Party shall, for the benefit of the other, maintain commercial general liability insurance in an amount of not less than One Million Dollars ($1,000,000) combined single limit for bodily injury and property damage per occurrence and have an aggregate of not less than Five Million Dollars ($5,000,000) and such insurance may be satisfied by so called "blanket" or "umbrella" policies. Landlord and Tenant shall also provide umbrella coverage in an amount not less than Twenty Million Dollars ($20,000,000). As long as Tenant or Landlord has a net worth of Forty Million Dollars ($40,000,000) or more, commercially reasonable deductibles shall be acceptable to Landlord and its mortgagee(s). Tenant's insurance policy shall name Landlord and Landlord's mortgagee(s) and the ground lessor, if any, as additional insured(s), and Landlord's insurance policy shall name Tenant as an additional insured.

11.4    Waiver of Subrogation.

Notwithstanding anything to the contrary contained in this Lease, each Party, on behalf of itself and on behalf of anyone claiming under or through it by way of subrogation or otherwise, waives all rights and causes of action against the other Party and such Party's agents and invitees for any liability arising out of any loss or damage in or to the Demised Premises, its contents and the Property caused by:  (a) any peril normally covered under "All Risk" or Special Form policies described in Article XI (whether or not such Party actually carries such insurance policies); or (b) if the scope of coverage is broader than in (a) above, then any peril actually covered under the property insurance maintained by such Party.  This release and waiver shall be complete and total even if such loss or damage may have been caused by the negligence of the other Party or such Party's agents or invitees and shall not be affected or limited by the amount of insurance proceeds available to the waiving Party, regardless of the reason for such deficiency in proceeds.  Each Party covenants that, from and after the Demised Premises Delivery Date, its insurance policies will contain waiver of subrogation endorsements, and, if such endorsements for any reason are about to become unavailable, it will give the other Party not less than thirty (30) days' prior written notice of such impending unavailability.

11.5    General Requirements.

All policies of insurance required to be maintained by Landlord or Tenant shall be issued by insurance companies having an A.M. Best rating of at least A-/VII or better and authorized to do business in the state in which the Demised Premises is located.  All policies of insurance shall include a written undertaking from the insurer to notify all insureds and additional insureds at least ten (10) days prior to cancellation for nonpayment of premiums, and at least thirty (30) days prior to cancellation for any other reason. Either Party may provide any insurance required hereunder under so-called blanket policies covering other parties and locations so long as the coverage required hereunder is not diminished.  Furthermore, upon request, either Party shall furnish the other with a certificate of insurance evidencing any such policy.  In the event that Tenant

has a tangible net worth of at least FORTY MILLION DOLLARS ($40,000,000), Tenant may self-insure all or any portion of its insurance obligations set forth in this Article XI; provided, however, (a) Tenant's right to continue to self-insure shall be conditioned upon Tenant maintaining a tangible net worth of at least Forty Million Dollars ($40,000,000), and (b) the amounts which Tenant is required to pay and all loss or damages resulting from risks for which Tenant has elected to self-insure shall be subject to the waiver of subrogation provisions hereof and shall not limit Tenant's indemnification obligations set forth herein.

11.6    Indemnification.

Subject to Section 11.4, each Party (in the capacity of "**Indemnitor**") hereby agrees to indemnify, defend and hold the other Party (in the capacity of "**Indemnitee**") harmless from and against all costs, expenses, claims, suits, causes of action, liabilities, losses, fines, penalties, charges, judgments, injuries and damage, including, without limitation, reasonable attorneys' fees and costs (collectively, "**Indemnified Costs**") relating to or resulting from bodily injuries, including death, and from injury or destruction of tangible property occurring on the Demised Premises or in other portions of the Landlord's Parcel or otherwise in connection with Indemnitor's failure or alleged failure to comply with the terms of this Lease or Legal Requirements and arising out of such Indemnitor's acts, omissions, use or control thereof, except to the extent caused by the negligent or intentional act or omission of the Indemnitee, its agents, employees or other Occupants. The Indemnitor shall be promptly notified of any suits, proceedings, claims or demands for which the Indemnitee requests indemnification. The Indemnitor shall assume the entire defense thereof and the Indemnitee shall cooperate fully with the Indemnitor in such defense.

**ARTICLE XII**
**DEFAULT**

12.1    Default.

Tenant shall be in default under this Lease: (a) if Tenant shall fail to pay Rent or other amounts due and such failure continues for ten (10) days after written notice thereof from Landlord to Tenant ("**monetary default**"); or (b) if Tenant shall default in the performance or observance of any other provision of this Lease and such failure continues for thirty (30) days after written notice thereof from Landlord to Tenant [or if such failure cannot by its nature be cured within such thirty (30) day period and Tenant shall not, within such period, commence to cure such default and thereafter prosecute the curing of such default to completion with due diligence] ("**non-monetary default**"). If Tenant shall fail to pay Rent or other amounts due to Landlord as provided for in this Lease, such unpaid amounts shall bear interest from the due date thereof to the date of payment at the rate which is the "prime rate" as stated in the Wall Street Journal or the maximum interest rate permitted by law (the "**Default Rate**"), if less.

12.2    Remedies.

(a)    In the event an uncured monetary default or an uncured non-monetary default occurs as provided in Section 12.1 above, then Landlord shall be entitled to the following remedies:

(i)    Landlord may, at Landlord's election, terminate this Lease, such termination to be effective thirty (30) days after written notice thereof to Tenant. All of Tenant's rights in the Demised Premises (and in and to Tenant's Service Area) shall terminate upon such termination of this Lease. Upon any such termination, Tenant shall surrender and vacate the Demised Premises and Landlord may re-enter and take possession of the Demised Premises. In the event of such termination, Tenant covenants to pay to Landlord all Rent that is due and payable through the date of such termination. In addition, Tenant shall be liable for (A) costs of removing and storing Tenant's Personal Property, and (B) the cost to relet the

37

Demised Premises; provided, however, if the term of any reletting is greater than the amount of time remaining on the then current term of this Lease, then the reletting costs shall be reasonably allocated throughout the entire reletting term for purposes of determining such amount applicable to be paid by Tenant otherwise which shall include required repairs and reasonable brokerage and attorney's fees provided all costs are reasonable and necessary in Landlord's reasonable business judgment; or

(ii)    Landlord may, at Landlord's election, pursuant to applicable summary proceedings or other judicial process, re-enter the Demised Premises and terminate Tenant's right to possession, and without terminating this Lease, at any time thereafter, relet the Demised Premises and improvements, or any part(s) of them, for the account, and in the name of Tenant or otherwise, all at prevailing market rates. Any reletting may be for the remainder of the term or for any longer or shorter period (provided, however, that if Landlord enters into a new lease beyond the current term of this Lease, then Tenant shall only be responsible hereunder through the current term of this Lease). Landlord may execute any leases made under this provision in Landlord's name, and Landlord shall be entitled to all rents from the use, operation or occupancy of the Demised Premises or improvements, or both. Landlord shall have the further right, at Landlord's option, to make such reasonable and necessary alterations, repairs, replacements and/or restorations which shall not operate or be construed to release Tenant from liability hereunder. Tenant shall nevertheless pay to Landlord on the due dates specified in this Lease the equivalent of all sums required of Tenant under this Lease, plus Landlord's expenses set forth in Section 12.2(a)(i), less amounts received from successor tenants. In the event Tenant fails to make such payments, Landlord may, from time to time, file suit to recover any past due sums. No act by or on behalf of Landlord under this Section 12.2 shall constitute a termination of this Lease unless Landlord gives Tenant written notice of termination, which may be given notwithstanding any such reletting without termination.

In the event of any default by Tenant hereunder, Landlord shall use commercially reasonable efforts to mitigate its damages; provided, however, in no event shall Landlord's obligation to mitigate require Landlord to prioritize the rental of the Demised Premises over any other space controlled by Landlord.

(b)    It shall also be an event of default entitling Landlord to the aforesaid remedies if an involuntary case under the federal bankruptcy law as now or hereafter constituted is commenced against Tenant, or under any other applicable federal or state bankruptcy, insolvency, reorganization or other similar law, or there is filed against Tenant a petition seeking the appointment of a receiver, liquidator or assignee, custodian, trustee, sequestrator (or similar official) for Tenant or any substantial part of Tenant's Personal Property, or seeking the winding-up or liquidation of Tenant's affairs and such involuntary case or petition is not dismissed within sixty (60) days after the filing thereof, or if Tenant commences a voluntary case or institutes proceedings to be adjudicated as bankrupt or insolvent or consents to the entry of an order for relief under the federal bankruptcy laws as now or hereafter constituted or any other applicable federal or state bankruptcy or insolvency or other similar law, or consents to the appointment of or taking possession by a receiver, liquidator or assignee, trustee, custodian, sequestrator (or other similar official) of Tenant or of any substantial part of Tenant's Personal Property, or if Tenant makes any assignment for the benefit of creditors.

(c)    Notwithstanding the foregoing provisions of this Section 12.2, in the event that Tenant shall receive written notice from Landlord of any alleged default of Tenant under this Lease, and if Tenant shall notify Landlord in writing, prior to expiration of the applicable cure period, that it disputes, in good faith, Landlord's contention that such a default has occurred, then such matter shall be promptly negotiated by Landlord and Tenant, and/or either Party may seek legal remedies but Tenant shall not be deemed to be in default under this Lease with respect to such disputed matter unless a court with proper jurisdiction shall have ruled that Tenant's actions constituted a default hereunder, and Tenant shall not

have cured such default within the applicable cure period following receipt of a copy of such judgment entry from Landlord.

(d)    Except as otherwise set expressly limited herein, Landlord shall have the right to pursue any and all remedies available at law or in equity in the event of a default by Tenant hereunder. All rights and remedies of Landlord hereunder shall be cumulative, and exercise of any one or more rights and remedies of Landlord hereunder shall not constitute a waiver of Landlord's rights to exercise such other remedies as it may have or as otherwise allowed by law. Notwithstanding the foregoing, nothing in this Lease may be construed as giving Landlord the right to accelerate any Rent payable hereunder, to lock Tenant out of the Demised Premises without a court order, or to recover consequential or punitive damages, in the event of a default by Tenant. Landlord hereby waives and releases any common law, statutory, constitutional or equitable lien or security interest it may otherwise have against any property owned by Tenant.

(e)    No failure by either Party to insist upon the strict performance by the other Party of any covenant, agreement, term or condition of this Lease or to exercise any right or remedy consequent upon a breach thereof, shall constitute a waiver of any such breach or of such covenant, agreement, term or condition. No consent or waiver, express or implied, by either Party to or of any breach of any covenant, condition or duty of the other Party shall be construed as a consent or waiver to or of any other breach of the same or any other covenant, condition or duty, unless in writing signed by such Party.

(f)    No payment by Tenant or receipt or acceptance by Landlord of a lesser amount than the total amount due Landlord under this Lease shall be deemed to be other than on account, nor shall any endorsement or statement on any check or payment be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of Rent due, or Landlord's right to pursue any other available remedy.

12.3    Default by Tenant's Assignee.

Notwithstanding anything to the contrary contained in Article XII or elsewhere in this Lease, after any assignment of Tenant's interest in this Lease in which the original Tenant named herein is not released from liability hereunder, Landlord shall not exercise any rights or remedies under this Article XII on account of any default in payment of any Rent or other sum of money unless Landlord shall give: (a) notice to Tenant named herein, as well as the tenant in possession, of such default; and (b) the opportunity to both Tenant named herein as well as the tenant in possession to cure each such default within the applicable period of time provided in Section 12.2 above. After such notice, if the term of this Lease shall be terminated pursuant to the provisions of this Article XII, the Tenant named herein shall not be liable for the payment of any Rent or for the performance or observance of any agreements or conditions to be performed or observed after the date of such termination unless Tenant shall cure any defaults and execute a new lease for the balance of the term of this Lease on the same terms and conditions provided for herein. It is the intention of the Parties hereto that such new lease shall have the same priority relative to other rights or interests in or to the Demised Premises as this Lease. The provisions of this Article XII and the applicable provisions of this Lease shall survive the termination of this Lease and shall continue in full force and effect thereafter to the same extent as if this section were a separate and independent contract between Landlord and the original Tenant.

12.4    Landlord's Waiver of Lien in Favor of Financing Company.

(a)    All of Tenant's Personal Property which may be installed or placed in or upon the Demised Premises by Tenant shall remain the property of Tenant. Tenant may assign, hypothecate, encumber, mortgage or create a security interest in or upon Tenant's Personal Property in the Demised Premises without the consent of Landlord and may remove Tenant's Personal Property at any time during the term of this Lease. Landlord waives any right it may have in Tenant's Personal Property. To the extent Landlord may have a lien on or security interest in the Tenant's Personal Property pursuant to this Lease,

3637421-4 10429.0316000

by law or otherwise, Landlord hereby waives, and agrees not to assert, such lien or security interest. Landlord shall provide to Tenant, within ten (10) days after Tenant's request therefor, a written waiver in a form reasonably satisfactory to Tenant evidencing Landlord's waiver of any rights it has or may have in Tenant's Personal Property. Any of Tenant's Personal Property remaining within the Demised Premises ten (10) days after the expiration or sooner termination of this Lease and not removed by Tenant, subject to Section 12.4(b) below and an executed counterpart of <u>Exhibit F</u>, shall be deemed abandoned by Tenant and shall, at Landlord's option, become the property of Landlord or disposed of by Landlord at Tenant's reasonable cost and expense. The provisions of this Section 12.4 shall survive the expiration or earlier termination of this Lease.

(b)    Furthermore, Landlord has contemporaneously with the execution of this Lease, executed the Collateral Access Agreement, attached hereto as <u>Exhibit F</u>, in favor of Wells Fargo Bank, National Association, as agent for certain lenders ("**Wells Fargo**"), pursuant to which Landlord has agreed that so long as Tenant shall have granted a security interest in Tenant's Personal Property ("**Collateral**") to Wells Fargo: (i) Landlord shall not have any lien, for the performance of any obligations of Tenant, and (ii) Landlord hereby expressly waives the provisions of any law giving to Landlord such a lien. Landlord further agrees to execute additional similar landlord's waivers in accordance with (i) and (ii) above upon Tenant's request in favor of such other financing institutions which may have an interest in the Collateral upon substantially similar terms as those contained in <u>Exhibit F</u>.

<u>12.5    Landlord's Successor.</u>

If any person to whom Tenant shall not then be paying Rent under this Lease shall demand payment of Rent from Tenant or any other amount payable by Tenant under this Lease alleging its right to receive such Rent or other amount as a result of a transfer of Landlord's interest in this Lease or otherwise, Tenant shall not be obligated to honor such demand unless Tenant shall receive written instructions to do so from Landlord or the person to whom Tenant shall then be paying Rent or shall otherwise receive written evidence satisfactory to Tenant of the right of the person making the demand. The withholding of Rent or the payment of Rent to Landlord (the person or entity to whom Tenant shall then be paying Rent) or any other amount payable by Tenant under this Lease by Tenant pending the determination of the right of the party making the demand shall not be deemed to be a default on the part of Tenant.

<u>12.6    Landlord Default and Tenant's Remedies.</u>

With respect to any obligation for which a remedy is not specifically provided elsewhere in this Lease (which remedy shall control in such instance), if (a) Landlord fails to perform any of its obligations under this Lease or breaches any restrictions, (b) Tenant provides Landlord written notice thereof, and (c) Landlord fails to cure such failure within thirty (30) days after the date Tenant gives such notice, or if the default is of such character as to require more than thirty (30) days to cure and Landlord shall fail to use reasonable diligence and continuous efforts in curing such default after service of such notice, then Landlord shall be liable to Tenant for all damages suffered by Tenant as a result of such failure and Tenant may seek specific performance or injunctive relief. In addition to the foregoing, (d) in the event any such failure on the part of Landlord shall materially and adversely affect Tenant's use and occupancy of the Demised Premises as provided herein and Landlord fails to cure such failure within one hundred eighty (180) days after the date Tenant gives written notice of such failure, or (e) in the event Tenant exercises any self-help rights provided for in this Lease and Landlord fails to reimburse Tenant for any costs and expenses incurred in connection therewith within thirty (30) days after the due date for such reimbursement provided for herein, Tenant may terminate this Lease by written notice to Landlord specifically exercising such termination right and specifying the effective date of such termination.

**ARTICLE XIII**
**SELF-HELP**

3637421-4 10429.0316000

13.1    Landlord's Right to Self-Help.

If Tenant shall default in the performance or observance of any agreement or condition contained in this Lease to be performed or observed by Tenant, other than an obligation to pay Rent or other amounts due to Landlord under this Lease, and shall not cure such default within thirty (30) days after written notice from Landlord specifying such default (or if such is a default that cannot, by its nature, be cured within such thirty-(30) day period, and Tenant shall not within such period commence to cure such default and thereafter prosecute the curing of such default to completion with due diligence), Landlord may, at its option, upon an additional five (5) days' prior written notice to Tenant, without waiving any claim for damages for breach of agreement, at any time thereafter cure such default for the account of Tenant, and any amount paid or any contractual liability incurred by Landlord in so doing shall be deemed paid or incurred for the account of Tenant, and Tenant agrees to reimburse Landlord therefor plus interest at the Default Rate within fifteen (15) days after receiving a bill therefor accompanied by invoices or other documentation to substantiate the amount paid on the account of Tenant. Landlord may cure any such default as aforesaid prior to the expiration of said thirty-(30) day period, but after written notice to Tenant and only if the curing of such default prior to the expiration of said thirty-(30) day period is reasonably necessary to protect the Landlord's Parcel or Landlord's interest therein or to prevent injury or damage to persons or property. If Tenant shall fail to reimburse Landlord within thirty (30) days for any amount paid for the account of Tenant hereunder, such amount shall be added to and become due as part of the next payment of Rent due to Landlord hereunder.

13.2    Tenant's Right to Self-Help.

(a)    If Landlord shall default in the performance or observance of any agreement or condition contained in this Lease to be performed or observed by Landlord or if Landlord shall default in the payment of any tax or other charge which shall be a lien upon the Demised Premises or in the payment of any installment of principal or interest upon any mortgage which shall be prior in time to the lien of this Lease and for which Tenant shall not have received a subordination, non-disturbance and attornment agreement in the form required herein, and if Landlord shall not cure such default within thirty (30) days after written notice from Tenant specifying such default (or if such is a default that cannot by its nature be cured within such thirty-(30) day period, and Landlord shall not within such period commence to cure such default and thereafter prosecute the curing of such default to completion with due diligence), Tenant may, at its option, upon an additional five (5) days' prior written notice to Landlord, without waiving any claim for damages for breach of agreement, at any time thereafter, cure such default for the account of Landlord, and any amount paid or any contractual liability incurred by Tenant in so doing shall be deemed paid or incurred for the account of Landlord, and Landlord agrees to reimburse Tenant therefor plus interest at the Default Rate within fifteen (15) days after receiving an invoice therefor accompanied documentation to substantiate the amount paid on the account of Landlord. Tenant may cure any such default as aforesaid prior to the expiration of said thirty-(30) day period, but after notice to Landlord, if the curing of such default prior to the expiration of said thirty-(30) day period is reasonably necessary to protect the Demised Premises, Tenant's Service Area and the Protected Parking Areas or Tenant's interest therein or to prevent injury or damage to persons or property or to Tenant's business. If Landlord shall fail to reimburse Tenant within the fifteen (15)-day period set forth above for any amount paid for the account of Landlord hereunder or any other amount owed to Tenant under this Lease, Tenant shall have the right to (a) offset such amount plus interest accruing at the Default Rate from the next payment of Rent or any other sums due hereunder or such succeeding payments of Rent or other sums due until Tenant recovers the entire reimbursement amount and (b) offset all post-judgment amounts due against future payments of Rent or other sums due, plus interest accruing at the Default Rate, until Tenant recovers the entire judgment amount. In either Subsections (a) or (b), if Tenant cannot so reimburse itself prior to the expiration of the term of this Lease (including Extension Period[s]), then, at Tenant's election, the term of this Lease shall automatically extend (at the same Rent as owed immediately prior to the expiration of the term of this Lease) for the period of time necessary to allow Tenant to be fully reimbursed.

41

(b)     Landlord acknowledges that Tenant has a relationship with (i) real estate brokers that provide a valuable service in locating opportunities for Tenant's stores, including the Demised Premises, and (ii) with so-called "National Account Vendors" (designated in the Specifications, as that term is defined in Exhibit C-1) that provide materials and services for the construction of the Building at a cost-effective price (collectively, "**Tenant's Vendors**").   Notwithstanding the foregoing, Landlord hereby acknowledges that Tenant shall have no liability with respect to the National Account Vendors and their involvement in the performance of Landlord's Demised Premises Work. In each case, Tenant's Vendors provide a valuable service and the non-payment to Tenant's Vendors by Landlord or Landlord's contractors may impair the ability of Tenant's Vendors to perform similar services in the future.   Therefore, Landlord agrees that if any Tenant's Vendor(s) are not paid in full within sixty (60) days from the date that they are contractually obligated to be paid by Landlord or by Landlord's contractors, then at any time after that date, Tenant may provide notice to Landlord (the "**Unpaid Tenant Vendor Notice**") upon which Landlord shall have thirty (30) days to fully pay any unpaid Tenant Vendor(s) and to provide evidence of payment to Tenant or to inform Tenant that a bona fide dispute exists between Landlord or Landlord's contractor and any such Tenant Vendor(s).   If after such thirty (30)-day period any Tenant Vendor remains unpaid or Tenant has not received notice that a bona fide dispute exists (as referenced in the prior sentence), Tenant is entitled to pay such Tenant Vendor directly and then to offset against Rent as provided in Section 13.2(a). If Landlord or Landlord's contractor pays a Tenant Vendor after Landlord has received the Unpaid Tenant Vendor Notice with respect to such Tenant Vendor and notifies Tenant of such payment (and provides substantiating evidence thereof), then Tenant may not pay such Tenant Vendor and withhold Rent as contemplated by this paragraph.

## ARTICLE XIV
## COMMON AREAS

14.1    Right to Use Common Areas.

Landlord grants to Tenant, its agents, employees, customers, invitees, licensees and concessionaires the non-exclusive right during the term of this Lease to use the Common Areas.  Tenant's use of the Common Areas shall be in common with others entitled to the use thereof and subject to the provisions of this Lease.   Tenant and all persons having business with Tenant shall have the right to use, in common with all other Occupants of the Shopping Center and all persons having business with such other Occupants, and no other persons, all Common Areas of the Shopping Center, for parking and access in connection with business with the Occupants leasing space in the Shopping Center Buildings, and, except as otherwise set forth herein, for no other purpose.

14.2    Landlord's Management of Common Areas.

Landlord shall operate, manage, equip, light, insure, repair, clean, maintain and replace, or cause to be operated, managed, equipped, lighted, insured, repaired, cleaned, maintained and replaced, the Common Areas in a good and serviceable condition for their intended purposes.  The portion of the Common Areas on the Landlord's Parcel shall at all times be subject to the exclusive control and management of Landlord.  Landlord may, at any time, temporarily close all or any part of the Common Areas on the Landlord's Parcel to make repairs or changes, to prevent the acquisition of public rights in such portion of the Common Areas and to perform such other acts in or to the Common Areas on the Landlord's Parcel to improve the benefit thereof to Tenant and other Occupants of the Landlord's Parcel as Landlord, in its reasonable discretion, shall deem appropriate. Landlord shall use reasonable efforts to arrange any temporary closing of the Common Areas on the Landlord's Parcel at such times and in such manner as to minimize interference with or disruption of the conduct of Tenant's business in the Demised Premises.   Landlord, at all times during the term of this Lease, shall:

      (a)     keep the pylon sign structure(s), informational sign(s), directional sign(s) and monument structure(s) owned by Landlord (as referred to in Section 8.4 hereof) in good repair and condition;

      (b)     keep, or cause to be kept, such Common Areas of the Shopping Center in good repair and condition and in compliance with Legal Requirements;

      (c)     keep such Common Areas suitably paved and marked for parking and traffic flow;

      (d)     keep such Common Areas reasonably free of refuse and obstruction and free of snow and ice; and

      (e)     keep such Common Areas properly drained.

Landlord shall keep, or cause to be kept, the aforementioned pylon sign structure(s) or monument sign structure(s), Common Areas, and the Parking Areas adequately lit and shall provide sufficient electricity to Tenant's, and any other Occupant's, panels permitted thereon pursuant to Section 8.4(b) hereof, during all times when the Demised Premises shall be open for business and for a reasonable period of time thereafter, and shall keep the landscaped areas of such Common Areas in neat and good condition.

14.3    Charges for Common Area Maintenance.

Landlord acknowledges that this is a "gross minimum rent" Lease and Tenant shall have no obligation to reimburse or pay any amounts to Landlord for any costs or expenses relating to, or incurred for, the operation, management, equipping, lighting, insuring, repairing, cleaning, maintenance or replacement of the Common Areas. Notwithstanding the foregoing, subject to Section 11.4 of this Lease, in the event the need for any repair or replacement of the Common Areas is caused solely by the negligence or willful misconduct of Tenant or its employees, agents or contractors, Tenant shall reimburse Landlord for the reasonable and actual costs incurred by Landlord in connection with such repair or replacement, which reimbursement shall be due and payable within thirty (30) days after Tenant's receipt of Landlord's written request therefor (provided that such request is accompanied by invoices or other reasonable supporting documentation of such costs).

14.4    Intentionally Deleted.

## ARTICLE XV
## MORTGAGE SUBORDINATION

15.1    Mortgage Subordination.

      (a)     Landlord shall, within thirty (30) days of the execution of this Lease, obtain from the current holder of any mortgage, if any, or deed of trust upon the Demised Premises and deliver to Tenant a Subordination, Non-Disturbance and Attornment Agreement ("SNDA") in substantially the same form as Exhibit D attached hereto and incorporated herein by reference, or other such form reasonably acceptable to Tenant, executed by Landlord and the holder of such mortgage or deed of trust.

      (b)     Landlord shall have the right to subject and subordinate this Lease to the lien of any mortgage or deed of trust hereafter placed upon Landlord's interest in the Demised Premises and/or upon the lands and Building of which the Demised Premises is a part, provided that Landlord shall first obtain from the holder of such mortgage or deed of trust an SNDA in substantially the same form as Exhibit D, or other such form reasonably acceptable to Tenant, executed by Landlord and the holder of such mortgage or deed of trust before Tenant will execute and deliver such SNDA to Landlord.

43

(c)    Upon the failure of Landlord to provide an SNDA as required herein to Tenant while this Lease is in effect, Tenant shall have the right to pay monthly, in lieu of Rent payable hereunder, Substitute Rent until such time as Landlord obtains and delivers to Tenant the required SNDA for Tenant's benefit.

(d)    Upon the request of Tenant, Landlord shall, within a reasonable time, execute, acknowledge and deliver a non-disturbance agreement with any permitted subtenant of space in the Demised Premises to the effect that, in the event of termination of this Lease for any reason:

(i)    such subtenant shall be entitled to continued occupancy in the Demised Premises in accordance with its sublease with Tenant as long as such sublease is not terminated in accordance with its terms (including termination for default upon expiration of all applicable periods to cure), but not beyond what would otherwise have been the term of this Lease, and

(ii)    such subtenant agrees to attorn to Landlord under the applicable sublease (including the payment of all rental and other charges without offset for prepayments previously made other than rental and other charges paid not more than one (1) month in advance unless made with the consent or knowledge of Landlord) and agrees not to effect the termination of the same due to any termination of this Lease, and upon such other terms and conditions as are customarily required by mortgage lenders or ground lessors in similar circumstances.

(e)    Notwithstanding the provisions of this Article XV, Landlord shall be obligated to provide a non-disturbance agreement to subtenants of space in the Demised Premises only if all the following conditions are satisfied, hereinafter referred to as **"permitted subtenant"**, all as reasonably determined by Landlord:

(i)    the rent paid pursuant to the applicable sublease must be at or above the Rent and other charges per square foot as set forth in this Lease;

(ii)    if Tenant has subdivided the space, then each subdivision shall be a functional and marketable space and the Building shall not be subdivided into more than two (2) spaces;

(iii)    the sublease must be for a term of at least three (3) years;

(iv)    any such subtenant shall occupy at least twenty thousand (20,000) square feet of LFA;

(v)    Landlord shall not assume any liabilities or obligations materially in excess of those provided for in this Lease; and

(vi)    Landlord shall not be responsible for any payments, allowances, or construction required of Tenant as sublandlord under the sublease.

In addition, Landlord shall not be obligated to issue more than two (2) non-disturbance agreements at any point in time.

15.2    Senior Lease.

(a)    In the event Landlord herein is the tenant under the terms of any senior lease, Landlord agrees that prior to the commencement of Landlord's Demised Premises Work and no later than thirty (30) days after the execution of this Lease, it shall obtain from any such senior landlord an agreement (a **"Recognition Agreement"**) in substantially the same form as Exhibit E, or such other form as is reasonably acceptable to Tenant and such senior landlord, whereby such senior landlord, upon default of Landlord herein or upon termination of Landlord's lease with such senior landlord, and for so long as Tenant herein shall not be in material default, shall assume the obligations of Landlord hereunder and shall not deprive

or disturb Tenant's use and possession of the Demised Premises so long as Tenant attorns to such senior landlord which Tenant hereby agrees to do.

(b)    Upon the failure of Landlord to provide a Recognition Agreement as required herein to Tenant while this Lease is in effect, Tenant shall have the right to pay monthly, in lieu of Rent payable hereunder, Substitute Rent until such time as Landlord obtains and delivers the required Recognition Agreement for Tenant's benefit at which time Tenant shall promptly pay Landlord the difference between Rent owed and Substitute Rent paid as a result of Landlord's failure.

15.3    Landlord's Failure to Pay Mortgage.

If Landlord shall default in making payment under any mortgage or deed of trust encumbering the Demised Premises, or if Landlord is in breach or in default of any such mortgage or deed of trust in any respect, Tenant shall have the right, but not the duty, to make all Rent payments thereafter becoming due under this Lease to the holder of such encumbrance in lieu of making such Rent payments to Landlord, and payments so made shall discharge the obligation of Tenant hereunder respecting the payment of Rent. Should Landlord, in connection with the financing of the Shopping Center or any tract of which the Demised Premises is a part, execute a conditional assignment of Rent, Tenant will execute an acceptance of such assignment, provided the assignment recognizes Tenant's rights hereunder and such lender has executed and delivered to Tenant an SNDA in a form reasonably acceptable to Tenant.

**ARTICLE XVI**
**ASSIGNMENT, RECAPTURE AND USE**

16.1    Assignment and Subletting.

(a)    Tenant shall not assign this Lease or sublet all or any part of the Demised Premises without Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. Notwithstanding the foregoing, Tenant shall be entitled to assign this Lease or sublet all or any part of the Demised Premises without Landlord's consent:

(i)    to a parent, subsidiary or affiliate of Tenant;

(ii)    to the successor to Tenant in the reorganization, consolidation or merger of Tenant or the purchaser of all or substantially all of the stock or assets of Tenant; or

(iii)    to a Permitted Retailer. A **"Permitted Retailer"** shall mean an operator (as permitted under Section 16.4 hereof) that is a national or regional business having sufficient financial strength commensurate with the obligations of Tenant under this Lease.

In the case of (i), (ii) or (iii) above: (A) Tenant shall not be released from liability under this Lease (except as otherwise provided pursuant to Section 16.1(b) below); (B) Tenant shall deliver prior written notice to Landlord of any assignment of this Lease or subletting of the Demised Premises; and (C) any such assignee agrees in writing with a copy to Landlord to assume Tenant's obligations under this Lease and be bound by this Lease.

If Tenant intends to assign this Lease to a Permitted Retailer under Subsection (iii) above, Tenant shall give Landlord written notice of such intention specifying the identity of the Permitted Retailer, which notice shall include the financial information reviewed by Tenant to confirm the financial strength required pursuant to Subsection (iii) above. Landlord shall have fifteen (15) days after receipt of such notice of a proposed assignment to a Permitted Retailer within which Landlord may elect to terminate this Lease and recapture the Demised Premises pursuant to the terms specified in Section 16.2, and thereafter, neither Landlord nor Tenant shall have any obligations hereunder accruing from

and after the effective date of such termination except as expressly provided in this Lease. Landlord's right to terminate shall not apply if the intended assignment to a Permitted Retailer is part of a sale of at least three (3) of Tenant's stores in Virginia, Maryland and/or Washington, D.C.

(b)    In connection with any assignment of this Lease, Tenant shall be automatically released from and relieved of all obligations and liabilities under this Lease that accrue from and after the Release Date (as hereinafter defined) without the need for any documentation from Landlord. The **"Release Date"** means, in the case of assignment of this Lease, the earlier of:

(i)    the effective date of assignment in the event such assignee satisfies the requirements set forth in Section 16.1(b)(ii)(A), (B) and (C) below; or

(ii)    the date after the effective date of such assignment that the assignee satisfies the requirements set forth in Section 16.1(b)(ii)(A), (B) and (C) below:

(A)    assignee has a verifiable, tangible net worth which equals or exceeds One Hundred Million Dollars ($100,000,000), as evidenced by financial information of the assignee delivered by Tenant to Landlord or otherwise publicly available;

(B)    assignee is then also an operator of, or owned by an entity operating, a chain of at least thirty (30) retail stores and has a retail operating history of at least five (5) years; and

(C)    assignee acknowledges and assumes all of Tenant's responsibilities and obligations under this Lease.

(c)    Any public offering or transfer in which all or a portion of Tenant's stock will be sold or traded on a nationally recognized stock exchange or on the "over-the-counter" market or the sale of Tenant's stock on a nationally recognized stock exchange or over-the-counter-market shall be deemed not an assignment for the purposes of this Lease and nothing in this Article XVI shall be applicable to, nor prohibit, such transaction.

(d)    Tenant further acknowledges and agrees that it shall not sublease or otherwise subdivide the Demised Premises into more than two (2) spaces at any time during the term of this Lease.

16.2    Recapture Right of Landlord.

If Tenant elects to cease its business operations at the Demised Premises and such cessation is for reasons other than as permitted under Article IX, Article X, a Force Majeure Event, subletting, compliance with Legal Requirements, repairs, remodeling and/or renovation and Tenant continues to meet its obligations under this Lease and such cessation continues for more than one hundred eighty (180) consecutive days, then Landlord shall have the option of recapturing the Demised Premises and terminating this Lease at any time thereafter subject to Landlord giving written notice of such termination for such termination thirty (30) days in advance.    If Landlord exercises such right of termination, upon the date of termination, Tenant shall be relieved of and from any and all further liability or obligations pursuant to this Lease and to Landlord thereafter accruing. If Landlord fails to exercise such right to terminate within thirty (30) days of the one hundred eighty-(180) day period then such right to terminate shall continue thereafter, but Tenant may cancel such right upon receipt of the written notice by Landlord from Tenant or Tenant's permitted assignee or sublessee of its agreement to reopen for business within the thirty-(30) day termination notice period, or by Tenant's assignee or sublessee opening within such period.

Notwithstanding the foregoing, if (a) Tenant provides notice of its intent to assign to a Permitted Retailer pursuant to Section 16.1(a) above, (b) Landlord fails to terminate this Lease within the time period provided for in Section 16.1(a) above, and (c) Tenant ceases

operating in the Demised Premises for reasons other than those stated in the first sentence of this Section 16.2, then Landlord's right to terminate shall only reactivate in the event such Permitted Retailer is not open in the Demised Premises by the two hundred seventieth (270th) day following Tenant's cessation of business or such longer period (not to exceed an additional ninety (90) days) provided such Permitted Retailer has commenced any necessary work on the Demised Premises and has continuously and diligently pursued to completion the opening of the Demised Premises.

16.3    Intentionally Deleted.

16.4    Use of the Demised Premises.

Tenant agrees that the Demised Premises shall be used for any retail purpose or for no purpose, and for no other purpose. Tenant further agrees that the Demised Premises shall not be used for any use which violates any restriction or exclusive use shown on Exhibit I which Landlord has granted to another Occupant in the Restricted Property (as defined in Section 1.5) prior to the execution of this Lease and such restriction or exclusive is applicable to the Demised Premises (during the period such restriction or exclusive use is operative); provided, however, that Landlord represents and warrants that none of the foregoing use restrictions prevent or impair Tenant from operating a typical Dick's Sporting Goods retail store as is operated by Tenant as of the date of this Lease.  Notwithstanding anything herein, Landlord agrees that the Demised Premises shall not be restricted during the term of this Lease from the sale of: health, fitness and/or exercise equipment; sporting goods and sporting equipment; hunting, camping and fishing equipment and accessories; apparel; or footwear.  Landlord hereby acknowledges that, as part of Tenant's intended operation of a Dick's Sporting Goods store, Tenant may sell, inter alia, firearms for hunting, skeet, sport and recreational use.

## ARTICLE XVII
## INTERPRETATION

17.1    Severability.

It is agreed that if any provision of this Lease or the application of any provision hereof to any person or any circumstance shall be determined to be invalid or unenforceable, such determination shall not affect any other provisions of this Lease or the application of such other provision to any other person or circumstance, and all of such other provisions shall remain in full force and effect.  It is the intention of the Parties hereto that if any provision of this Lease is capable of two (2) constructions, one of which would render the provision valid, the provision shall have the meaning which renders it valid.

17.2    Successors and Assigns.

The words "Landlord" and "Tenant" and the pronouns referring thereto, as used in this Lease, shall mean, where the context requires or permits, the persons named herein as Landlord and as Tenant, respectively, and their respective heirs, legal representatives, successors and assigns, irrespective of whether singular or plural, or masculine, feminine or neuter.  The obligations, agreements and conditions in this Lease contained on the part of Landlord to be performed and observed shall be binding upon Landlord and its successors and assigns and shall inure to the benefit of Tenant and its successors and assigns, and the obligations, agreements and conditions in this Lease on the part of Tenant to be performed and observed shall be binding upon Tenant and its successors and assigns and shall inure to the benefit of Landlord and its successors and assigns.  If Landlord shall be more than one person or entity, the obligations of Landlord hereunder shall be joint and several.

(a)    In the event Landlord's interest in the Demised Premises passes to a Successor (the "**Successor**") by sale, lease, foreclosure or in any other manner, Tenant shall be bound to the Successor under all of the terms of this Lease for the balance of the term (and any Extension Period[s]) with the same force and effect as if the Successor were

47

Landlord under this Lease, and Tenant hereby agrees to attorn to such Successor as its landlord, such attornment to be effective upon written notice thereof given by Landlord to Tenant. In the event that Landlord's interest in the Demised Premises passes to a Successor, the Successor is likewise bound unto Tenant as set forth above. The predecessor Landlord, as set forth herein, shall be released from all future obligations to Tenant hereunder arising after the date Landlord's interest so passes and the Successor shall be liable to Tenant for all claims occurring or arising under the Lease regardless of when such claims arose.

(b)      The liability of Landlord to Tenant under the terms of this Lease shall be limited to the interest of Landlord in the Shopping Center and Tenant agrees to look solely to Landlord's interest in the Shopping Center (and the proceeds of any sale, insurance proceeds and condemnation awards) for the recovery of any judgment from Landlord, it being intended that neither Landlord nor any partner, shareholder, member, officer, director, or employee, etc., of Landlord shall be personally liable for any such judgment or deficiency.

(c)      Landlord, its successors and assigns, shall look solely to the assets, if any, of Tenant and its successors and assigns, for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director or employee of Tenant or any of its affiliates.

17.3    Force Majeure.

"**Force Majeure Event**" shall mean any act or event that wholly or partially prevents the affected Party from performing any of its obligations (other than the payment of money) if such act or event is beyond the reasonable control and does not arise out of the negligent act or omission of the affected Party to perform such obligation or comply with such condition.

Notwithstanding the foregoing, Force Majeure Events do not include: weather conditions that may reasonably be expected in the geographic location of the Demised Premises; delays in obtaining goods, materials or equipment due to present or future shortages; economic hardship; requirements, actions or failure to act on the part of any governmental authority; design errors or equipment failure.

In order to claim an excuse for failure to timely perform or in order to obtain an extension of the period for performance of an obligation as a result of a Force Majeure Event, the affected Party shall:

(a)      use commercially reasonable efforts to mitigate the effects of a Force Majeure Event to end the suspension of performance by such Party; and

(b)      give the other Party prompt written notice (but in any event no later than five (5) business days after the occurrence) describing the available particulars of the Force Majeure Event, including an estimation of its expected duration and probable impact on the performance of such Party's obligations hereunder ("**Force Majeure Notice**"), and the affected Party shall thereafter furnish timely reports of the steps taken and progress made in overcoming the effects of the Force Majeure Event during the continuation of the Force Majeure Event and any period of excuse.

If a Force Majeure Event gives rise to a claim for an excuse for failure to perform which, despite the exercise of commercially reasonable efforts by the affected Party, legitimately and demonstrably results in a necessary extension of time to satisfy an obligation or time constraint, then in any case where either Party is required to do an act, such delays caused by or resulting from a Force Majeure Event shall operate to extend, on a day-for-day basis, the period of time which shall not be counted in determining the time when the performance of such act must be completed, whether such time be designated by a fixed time, a fixed period of time or "a reasonable time".

17.4    Holding Over.

48

If Tenant or any person claiming under Tenant shall remain in possession of the Demised Premises or any part thereof after the expiration of the term of this Lease without any agreement in writing between Landlord and Tenant with respect thereto, the person remaining in possession shall, prior to acceptance of Minimum Rent by Landlord, be deemed a tenant at sufferance and, after acceptance of Minimum Rent by Landlord, the person remaining in possession shall be deemed a tenant from month-to-month subject to the provisions of this Lease insofar as the same may be made applicable to a tenancy from month-to-month subject to the provisions of this Lease with Minimum Rent payable at one hundred twenty-five percent (125%) of the Minimum Rent in effect immediately prior to such holdover.

17.5    Waivers.

Failure of either Party to complain of any act or omission on the part of the other Party, no matter how long the same may continue, shall not be deemed to be a waiver by such Party of any of its rights hereunder. No waiver by either Party at any time, express or implied, of any breach of any provision of this Lease shall be deemed a waiver of a breach of any other provision of this Lease or a consent to any subsequent breach of the same or any other provision. If any action by either Party shall require the consent or approval of the other Party, the other Party's consent to or approval of such action on any one or more occasions shall not be deemed a consent to or approval of said action on any subsequent occasion or a consent to or approval of any other action on the same or any subsequent occasion. Unless expressly and specifically limited herein, any and all rights and remedies which either Party may have under this Lease or by operation of law, either at law or in equity, upon any breach shall be distinct, separate and cumulative and shall not be deemed inconsistent with each other and no one of them, whether exercised by such Party or not, shall be deemed to be in exclusion of any other. Any two (2) or more or all of such rights and remedies may be exercised at the same time. Without limiting the generality of the foregoing, if any restriction contained in this Lease for the benefit of either Party shall be violated, such Party, without waiving any claim for breach of agreement against the other Party, may bring such proceedings as it may deem necessary, either at law or in equity, in its own name or in the name of the other Party, against the person or entity violating such restriction.

17.6    Disputes.

It is agreed that if at any time a dispute shall arise as to any amount or sum of money to be paid by one Party to the other Party under the provisions hereof, the Party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest", such payment not being regarded as a voluntary payment, and there shall survive the right on the part of such Party to institute suit for recovery of such sum. If it shall be adjudged that there was no legal obligation on the part of such Party to pay such sum or any part thereof, such Party shall be entitled to recover such sum or so much thereof as it was not legally required to pay under the provisions of this Lease. If at any time a dispute shall arise between the Parties hereto as to any work to be performed by either of them under the provisions hereof, the Party against whom the obligation to perform the work is asserted may perform such work and pay the reasonable cost thereof "under protest", the performance of such work in no event being regarded as a voluntary performance, and there shall survive the right on the part of such Party to institute suit for recovery of the reasonable cost of such work. If it shall be adjudged that there was no legal obligation on the part of such Party to perform the same or any part thereof, such Party shall be entitled to recover the reasonable cost of such work or the reasonable cost of so much thereof as such Party was not legally required to perform under this Lease. Any amount not in dispute shall be paid as set forth in this Lease.

17.7    Quiet Enjoyment.

Landlord agrees that upon Tenant's payment of Rent and performing and observing the agreements and conditions on its part to be performed and observed hereunder, Tenant

49

shall and may peaceably and quietly have, hold and enjoy the Demised Premises and all rights of Tenant hereunder during the term of this Lease without any manner of hindrance or molestation by Landlord or anyone claiming by, through or under Landlord.

17.8    Notices.

Any notice, consent or approval provided for herein shall be deemed duly given by the sender thereof to the addressee thereof only if in writing and mailed to such addressee at the **"Notice Address"** of such addressee (as set forth below) by registered or certified mail, postage prepaid, return receipt requested, or by Federal Express, Airborne or other overnight courier service which delivers upon signed receipt of the addressee. The time of the giving of any such notice given in the manner required above shall be the time of receipt thereof by the addressee or any agent of the addressee, except that if the addressee or such agent of the addressee shall refuse to receive any such notice or if there shall be no person available at the time of delivery thereof to receive such notice, the time of the giving of such notice shall be the time of such refusal or the time of such attempted delivery, as the case may be.

| | |
|---|---|
| The Notice Address of Landlord shall be: | with a copy to: |
| | |
| River Ridge Mall JV, LLC | Williams Mullen |
| 1971 University Boulevard | 200 S. 10th Street, Suite 1600 |
| Lynchburg, VA 24515 | Richmond, VA 23219 |
| Attn: Trey Falwell, Vice President | Attn: John M. Mercer, Esq. |
| | |
| The Notice Address of Tenant shall be: | with a copy to: |
| | |
| Dick's Sporting Goods, Inc. | Dick's Sporting Goods, Inc. |
| 345 Court Street | 345 Court Street |
| Coraopolis, Pennsylvania  15108 | Coraopolis, Pennsylvania  15108 |
| Attention: Senior Vice President – Real Estate | Attention:  Legal Department |

and, prior to the Rental Commencement Date, a copy to:

Dick's Sporting Goods, Inc.
345 Court Street
Coraopolis, Pennsylvania 15108
Attention:  Vice President of Construction

If the sender of any notice to any addressee shall have previously been given notice by said addressee of a change of address of said addressee, such changed address shall thereafter, as to such sender, be deemed the Notice Address of such addressee. In the event named Tenant assigns its interest under this Lease pursuant to Subsection 16.1(a), Landlord agrees that it will continue to send copies of any notices which Landlord sends under this Lease to named Tenant as well as to Tenant's assignee.

17.9    Cost and Expense.

Wherever in this Lease provision is made for the doing of any act by any person, it is understood and agreed that such act shall be done by such person at its own cost and expense unless a contrary intent is expressed.

17.10   Hazardous Materials.

(a)    Definitions.

(i)    **"Environmental Laws"** – All present and future federal, state and municipal laws, ordinances, rules and regulations applicable to the environmental and ecological condition of the Demised Premises and the Shopping Center, if applicable, including, without limitation, the Federal Comprehensive Environmental

50

Response, Compensation and Liability Act of 1980, as amended; the Federal Resource Conservation and Recovery Act; the Federal Toxic Substance Control Act; the Clean Air Act; the Clean Water Act; the rules and regulations of the Federal Environmental Protection Agency, or any other federal, state or municipal agency or governmental board or entity having jurisdiction over the Demised Premises.

(ii)     "**Hazardous Substances**" – includes:

(A)     those substances included within the definitions of "**hazardous substances**", "**hazardous materials**", "**toxic substances**", "**solid waste**", or "**infectious waste**" in any of the Environmental Laws;

(B)     such other substances, materials and wastes which are or become regulated under applicable local, state or federal law, or which are classified as hazardous, toxic or infectious under Environmental Laws; and

(C)     asbestos and asbestos-containing material (regardless of its condition); mold; any chemical, material or substance at any time defined as or included in the definition of "**hazardous substances**", "**hazardous wastes**", "**hazardous materials**", "**extremely hazardous waste**", "**biohazardous waste**", "**pollutant**", "**toxic pollutant**", "**contaminant**", "**restricted hazardous waste**", "**infectious waste**", "**toxic substances**" or any other term or expression intended to define, list or classify substances by reason of its properties being harmful to health, safety or the indoor or outdoor environment (including harmful properties such as ignitability, corrosivity, reactivity, carcinogenicity, toxicity or words of similar import) under any Legal Requirements; any oil, petroleum fraction or petroleum derived substance; urea formaldehyde foam insulation; electrical equipment which contains any oil or dielectric fluid containing polychlorinated biphenyls.

(b)     Tenant, at its sole cost and expense, shall promptly comply with all Environmental Laws which shall impose any duty upon Tenant with respect to the use, occupancy or maintenance of the Demised Premises. Tenant shall promptly comply with any notice from any source issued pursuant to the Environmental Laws pertaining to Tenant's use, occupancy or maintenance of the Demised Premises, whether such notice shall be served upon Landlord or Tenant.

(c)     Tenant shall not cause or permit to occur:

(i)     any violation of the Environmental Laws related to environmental conditions on, under or about the Demised Premises, or arising from Tenant's use, occupancy or maintenance of the Demised Premises, including soil and ground water conditions; and

(ii)     the use, generation, release, manufacture, refining, production, processing, storage or disposal of any Hazardous Substances (in actionable levels) on, under or about the Demised Premises, or the transportation to or from the Demised Premises of any Hazardous Substances, except as necessary and appropriate for general use in which case the use, storage or disposal of such Hazardous Substances shall be performed in compliance with the Environmental Laws and the highest standards prevailing in the industry.

(d)     Tenant shall immediately notify Landlord of (i) any violation by Tenant, its employees, agents, representatives, or contractors of the Environmental Laws on, under or about the Demised Premises, or (ii) the presence or suspected presence of any Hazardous Substances on, under or about the Demised Premises and shall immediately deliver to Landlord any notice received by Tenant relating to Subsections (i) and (ii) above from any source.

51

(e) Tenant and Landlord shall execute affidavits, representations and the like from time to time, within ten (10) days of either Party's request therefor, concerning such Party's actual knowledge and belief regarding the presence of any Hazardous Substances on, under or about the Shopping Center or the Demised Premises, as applicable.

(f) Upon reasonable belief that Hazardous Substances are present in, under or about the Demised Premises and upon advance notice (except in the case of emergency when no notice shall be required), Landlord and its agent shall have the right, but not the duty, (unless it is reasonably believed that such Hazardous Substances first existed prior to the Demised Premises Delivery Date or originated outside the Demised Premises, in which cases, Landlord shall have a duty) to inspect the Demised Premises and conduct tests thereon at any time to determine whether, or the extent to which, there has been a violation of Environmental Laws by Tenant or whether there are Hazardous Substances on, under or about the Demised Premises. In exercising its rights herein, Landlord shall use its best efforts to minimize interference with Tenant's business but such entry shall not constitute an eviction of Tenant, in whole or in part, and Landlord shall not be liable for any interference, loss or damage to Tenant's Personal Property or business operations caused thereby unless such Hazardous Substances first existed prior to the Demised Premises Delivery Date or originated outside the Demised Premises, and was not caused by Tenant or anyone claiming by, through or under Tenant.

(g) If Landlord, any lender or governmental agency shall ever require testing to ascertain whether there has been a release of Hazardous Substances on, under or about the Demised Premises or a violation of the Environmental Laws, and such requirement arose in whole or in part because of an act or omission on the part of Tenant, then the reasonable costs thereof shall be reimbursed by Tenant to Landlord upon demand as Additional Rent, otherwise Landlord shall pay for such testing at its sole cost and expense.

(h) Tenant shall indemnify, protect, defend and hold harmless Landlord and Landlord's managing agent from any and all claims, losses, liabilities, costs, expenses or damages, including reasonable attorneys' fees and costs of remediation, incurred by Landlord in connection with any breach by Tenant of its obligations under this Section 17.10. In the event Tenant is required to undertake remediation activities which damage the Shopping Center (other than Tenant's improvements), Tenant shall be responsible for the cost of replacement of said improvements damaged or destroyed as a result of such work. The covenants and obligations of Tenant under this Section 17.10 shall survive the expiration or earlier termination of this Lease for a period of two (2) years.

(i) Landlord represents and warrants that, as of the Demised Premises Delivery Date, the Shopping Center (including the Demised Premises) shall not contain any Hazardous Substances and has never been used as a sanitary landfill, waste dumpsite or for the treatment, storage or disposal of Hazardous Substances. Landlord shall indemnify, protect, hold harmless and defend Tenant from any and all claims, losses, liabilities, costs, expenses or damages, including reasonable attorney's fees in connection with: (i) the violation of any Environmental Laws by Landlord; (ii) the presence of any Hazardous Substances at the Shopping Center (including the Demised Premises) not caused by Tenant; and (iii) any violation of the obligations of Landlord contained in this Section 17.10. In the event of a finding of any Hazardous Substances at the Shopping Center (including the Demised Premises) not caused by the acts of Tenant, Landlord shall promptly undertake all remediation activities required by law and Landlord shall pay all costs and expenses to complete the remediation. In the event Landlord is required to undertake remediation activities that damage Tenant's Personal Property or Leasehold Improvements in the Demised Premises, Landlord shall be responsible for the cost of replacement of said Tenant's Personal Property and Leasehold Improvements damaged or destroyed as a result of such work. If it is reasonably necessary for Tenant to cease its business operations in the Demised Premises in whole or in part due to Landlord's remediation efforts, all Rent shall equitably abate until Tenant resumes business operations in all of the Demised Premises. Landlord's representations, warranties and indemnity of Tenant pursuant to this section shall survive the expiration or termination of this Lease.

52

(j)    Remediation activities shall include:    (i) the investigations of the environmental condition; (ii) the preparation and delivery of any notices, studies, or reports; and (iii) the performance of any cleanup, disposal, removal, remedial or restoration work.

17.11   Tenant's Financial Statements.

Upon written request by Landlord during the term of this Lease, Tenant shall provide to Landlord, within one hundred twenty (120) days following the end of Tenant's fiscal year, a copy of Tenant's most recent consolidated financial statements prepared as of the end of Tenant's fiscal year.   Notwithstanding the foregoing, Tenant will, within thirty (30) days after a written request therefor, send Landlord a copy of Tenant's most recent Annual Report filed with the Securities and Exchange Commission if such report is not available to the public through the website www.freeedgar.com, or a similar website or public information clearinghouse.

17.12   Headings and Captions.

The marginal notes used as headings for the various provisions of this Lease are used only as a matter of convenience for reference and are not to be considered a part of this Lease or used in determining the intent of the Parties to this Lease.

17.13   Third Party Fees.

Landlord and Tenant each warrant and represent to the other that it has not dealt with any broker or real estate representative or consultant in connection with this Lease other than Greenwood Realty ("**Tenant's Master Broker**") and H&R  Retail ("**Tenant's Local Broker**") and Colliers International ("**Landlord's Broker**").   In connection therewith, Landlord agrees to be responsible to pay Three and No/100 Dollars ($3.00) per square foot of the LFA of the Demised Premises to Tenant's Local Broker, pursuant to a separate agreement between Landlord and Tenant's Local Broker.   Tenant's Local Broker will then pay Tenant's Master Broker its fee as a cooperating broker, pursuant to a separate agreement.   Landlord agrees to be responsible to pay any fee or commission owed to Landlord's Broker, pursuant to a separate agreement between Landlord and Landlord's Broker. Otherwise, each Party shall defend, indemnify and hold the other Party harmless from and against any and all such indemnified costs relating to a breach of the foregoing representation by the indemnifying Party in bringing about this Lease.

17.14   Relationship of the Parties.

Nothing contained in this Lease shall be deemed or construed by the Parties hereto, nor by any third party, as creating the relationship of principal and agent, partnership or joint venture between the Parties hereto.   It being understood and agreed that no provision contained in this Lease, nor any acts of the Parties hereto, shall be deemed to create any relationship between the Parties hereto other than Landlord and Tenant.

17.15   Memorandum of Lease.

(a)    The Parties will execute, concurrently with the execution of this Lease, a Memorandum of this Lease in substantially the form as shown on the attached Exhibit G and Tenant may record same at Tenant's expense (including but not limited to all taxes, fees and charges in connection therewith) with the applicable title registry office.

(b)    Intentionally omitted.

(c)    If such Memorandum of Lease shall have been recorded, upon the expiration or earlier termination of this Lease, Tenant agrees to execute a Release of Memorandum of Lease ("**Release**") within twenty (20) days after receipt of a request therefor.   If such Release has not been executed after an additional ten (10) days' written notice to Tenant (unless Tenant advises of a dispute pursuant to Section 17.6 or Section 12.2 relating to such

Release), Landlord is expressly authorized to execute such Release as the agent and attorney in fact for Tenant.

(d)     Tenant and/or its assignee may, at Tenant's expense, record any evidence of such assignment and any sublease of all or part of the Demised Premises as any party to such assignment and/or sublease shall deem necessary or appropriate.

<u>17.16   Representations and Warranties.</u>

(a)     Landlord warrants and represents to Tenant that:

(i)     on or before the Demised Premises Delivery Date, Landlord shall have good fee simple title to the Property, the Demised Premises and the Common Areas on the Landlord's Parcel in fee simple absolute, subject only to the Title Matters; that Landlord has full right, authority and financing to make this Lease and to perform as required under this Lease; and the construction of the Building and related improvements by Landlord in accordance with the Final Plans and the use of the Demised Premises for the sale of health, fitness and/or exercise equipment, clothing, sporting goods, sporting equipment, hunting, fishing and camping equipment (including, inter alia, firearms for hunting, skeet, sport and recreational use) and casual and athletic footwear does not conflict with any other agreement to which Landlord is bound or any other covenant, condition or restriction affecting or running with the land of which the Demised Premises and the Shopping Center are a part. Landlord will furnish to Tenant, upon request, evidence reasonably satisfactory to Tenant of its title and authorization;

(ii)     as of the date of this Lease, the Demised Premises is zoned to allow its use, as a matter of right, for the sale of health, fitness and/or exercise equipment, clothing, sporting equipment, sporting goods, casual and athletic footwear and Tenant's use of the Common Areas of the Shopping Center for access to the Demised Premises, accessory automobile parking, signage (subject to Section 8.4) and service facilities contemplated by this Lease shall not be prevented or materially impaired by any current zoning, building, health, safety, environmental or other governmental law or regulation, or by any restriction, covenant, lease or agreement entered into, whether of record or not;

(iii)     to the best of Landlord's knowledge and belief, there are no claims, causes of action or other proceedings pending or threatened in respect to the ownership, operation or environmental condition of the Shopping Center or any part thereof (including disputes with mortgagees, governmental authorities, utility providers, contractors, adjoining land owners or suppliers of goods), except for claims which are fully insured and as to which the insurer has accepted defense without reservation;

(iv)     to the best of Landlord's knowledge and belief, there is no existing, pending, contemplated, threatened or anticipated: (A) condemnation of any part of the Shopping Center; (B) repaving, widening, change of grade or limitation on the use of streets, roads, or highways abutting the Shopping Center; (C) special tax or assessment to be levied against the Shopping Center; (D) change in the zoning classification of the Shopping Center; or (E) change in the tax assessment of the Shopping Center; and

(v)     Landlord shall not change the name of the Shopping Center without giving at least ninety (90) days' prior notice to Tenant and Landlord shall not include the name of any Occupant (other than Tenant) in the name of the Shopping Center.

If, at any time, any representation or warranty made by Landlord herein proves to be incorrect or there is a breach or default of any of Landlord's representations, warranties, covenants or agreements under this Section 17.16 or elsewhere in this Lease which results in

54

deprivation or impairment in any material respect in the use and enjoyment of the Demised Premises, including any adverse impact on Tenant's business conducted at the Demised Premises, or if, for any other reason, Tenant shall be deprived of or impaired in the use and enjoyment of the Demised Premises and Common Areas as herein provided, the Rent to be paid by Tenant shall be equitably abated during any such period. If such period continues for more than thirty (30) days after notice from Tenant and such additional period as is reasonably necessary to cure same so long as Landlord is pursuing with due diligence, but not longer than ninety (90) days, Tenant may, at its option, terminate this Lease by notice to Landlord while reserving all rights which Tenant may have for Landlord's breach of this Lease, including the right to monetary damages.

(b)    Landlord and Tenant represent and warrant to each other that:  (i) it is duly organized, validly existing and in good standing in accordance with the laws of the state under which it was organized; (ii) all action necessary to authorize the execution of this Lease has been taken by it; and (iii) the individual executing and delivering this Lease on behalf of each Party has been authorized to do so, and such execution and delivery shall bind Landlord and Tenant.  Each Party, at the other Party's request, shall provide the other with evidence of such authority.

17.17  Attorney's Fees.

If any legal action is instituted as a result of a default by either Party under this Lease that is not cured within the applicable cure period, the prevailing Party in such action shall be entitled to recover its reasonable attorney's fees from the non-prevailing Party.

17.18  Waiver of Trial by Jury.

Landlord and Tenant mutually, expressly, irrevocably and unconditionally waive the right to trial by jury for any proceedings arising out of or in connection with this Lease, or any conduct or course of dealing of the Parties, or any statements or actions of any person related to this Lease.

17.19  This Instrument.

This instrument contains the entire and only agreement between the Parties and no oral statements or representations or prior written matter not contained in this instrument shall have any force or effect.  This Lease shall not be modified in any way except by a writing subscribed to by both Parties.

17.20  Access.

Landlord shall have access to the Demised Premises at all reasonable times during Tenant's regular business hours for purposes of making inspections, exercising any cure rights as set forth in Section 13.1 above and showing the Demised Premises to prospective mortgagees or purchasers.  Landlord shall give Tenant's manager on duty reasonable advance oral notice before seeking access to the Demised Premises, but in an emergency situation no such notice shall be necessary.

17.21  Estoppel Certificate.

In connection with a sale, assignment, sublease or loan involving the Demised Premises, within twenty (20) days after receipt of a request, each Party agrees to deliver to the other a duly executed and acknowledged instrument certifying:

(a)    whether this Lease is in full force and effect;

(b)    the existence of any default for which notice has been given, including the nature or extent of such default and the status of any curative measures (or asserted defenses) taken with respect to such default;

(c)    whether there has been any modification or amendment to this Lease, and if yes, referencing the modification or amendment;

(d)    as to the commencement and expiration dates of the term; and

(e)    as to the date to which Rent has been paid.

Any such certificate shall be certified to the prospective purchaser, assignee, sublessee or lender, as the case may be.  The statements contained in such certificate are not affirmative representations, warranties, covenants or waivers but shall act solely to estop the Party giving such certificate from asserting any claim or defense against the recipient of the certificate to the extent such claim or assertion is based upon facts which are contrary to those contained in such certificate, and the recipient has acted in reasonable reliance upon such statements without knowledge of facts to the contrary.  In no event will either Party be obligated to issue such certificate more than twice in any twelve (12) month period.

17.22   Interpretation.

"Include", "includes" and "including" mean considered part of a larger group and not limited to the items recited.  "Shall" means is obligated to.  "May" means is permitted to.  "Legal Requirements" shall mean all applicable law, including without limitation and by way of illustration, all statutes, ordinances, orders, rules, regulations, code standards and requirements of governmental or quasi-governmental entities having jurisdiction over the Demised Premises and the Shopping Center.  The necessary grammatical changes required to make the provisions hereof apply either to corporations, partnerships or individuals, men or women, as the case may be, shall in all cases be assumed as though in each case fully expressed.

17.23   Plats, Riders and Exhibits.

Clauses, plats, riders, addenda and exhibits, if any, affixed to this Lease are hereby incorporated herein by reference as if fully set forth and are expressly made a part hereof.

17.24   Rules and Regulations.

Tenant shall comply with the rules and regulations of the Shopping Center as established from time-to-time by Landlord, within thirty (30) days after Landlord notifies Tenant thereof, provided they:  (a) are reasonable; (b) do not adversely affect the normal conduct of any business operations in the Demised Premises; (c) do not adversely affect any of Tenant's rights under this Lease; and (d) are enforced against all similarly situated Occupants of the Shopping Center in a non-discriminatory manner and without prejudice against Tenant.  In the event of any conflict between the provisions of this Lease and any rules or regulations, the provisions of this Lease shall prevail and govern.

17.25   Intentionally Deleted.

(SIGNATURES ON NEXT PAGE)

IN WITNESS WHEREOF, the Parties hereto have caused this Lease to be executed as of the Effective Date.

"LANDLORD":

WITNESSES

RIVER RIDGE MALL JV, LLC,
a Virginia limited liability company

Name: Amanda Stanley

By: Liberty University, Inc
Name:
Title: Its Sole Member
By: _____
Its: Vice President
Jerry Falwell III

Name: Alisa Martin

"TENANT":

WITNESSES

DICK'S SPORTING GOODS, INC.,
a Delaware corporation

Name: Alexandra Miele

By: _____
Name: Lee J Belitsky          MU
Title: EVP & CFO

Name: Edward W. Schmitzer

3637421-4 10429.0316000

STATE OF _Virginia_ )
City )
COUNTY OF _Lynchburg_ ) SS:

On this _2nd_ day of _Dec_, 20_19_ before me personally came _Jerry Falwell, III_, to me personally known, who, being by me duly sworn, did depose and say that he/she/they reside(s) in _Campbell Co_, _Virginia_, that he/she/they is/are _Vice President_ of _Liberty Univ_, the _Corporation_ described in, and executed the within instrument, and he/she/they acknowledged to me that, having been duly authorized to do so, he/she/they executed the same on behalf of and in the name of said _Corporation_

Witness my hand and Notarial Seal this _2nd_ day of _Dec_, 20_19_

_Theresa McNabb_
Notary Public

_Theresa mcnabb_
(Printed Signature)

My Commission Expires: _May 31, 2021_

My County of Residence: _Amherst, VA_

THERESA McNABB
NOTARY
PUBLIC
REG. # 364456
COMMONWEALTH OF VIRGINIA

**COMMONWEALTH OF PENNSYLVANIA** )
) SS:
**COUNTY OF ALLEGHENY** )

On this _27_ day of _November_, 20_19_ before me personally came _Lee J Belitsky_, to me personally known, who, being by me duly sworn, did depose and say that he resides in Allegheny County, Pennsylvania, that he is the _EVP &CFO_ of DICK'S SPORTING GOODS, INC., a Delaware corporation, the corporation described in and which executed the within instrument, and that acknowledged to me, that having been duly authorized to do so, he executed the same on behalf of and in the name of said corporation.

Witness my hand and Notarial Seal this _27_ day of _November_, 20_19_

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Sheree A. Parente, Notary Public
Chippewa Twp., Beaver County
My Commission Expires July 7, 2021
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

_Sheree A Parente_
Notary Public

_Sheree A Parente_
(Printed Signature)

My Commission Expires: _7|7|21_

My County of Residence: _Beaver_

58

3637421-4 10429.0316000







**RIVER RIDGE**

October 18, 2023

<u>VIA OVERNIGHT DELIVERY</u>

Dick's Sporting Goods, Inc.
345 Court Street
Coraopolis, Pennsylvania 15108
Attention: Senior Vice President – Real Estate

Re: Lease dated December 2, 2019 (the "<u>Lease</u>") between River Ridge Mall JV, LLC ("<u>Landlord</u>")
and Dick's Sporting Goods, Inc. ("<u>Tenant</u>") concerning the Demised Premises (as defined in the
Lease) located in the River Ridge Mall, Lynchburg, Virginia (the "<u>Shopping Center</u>")

To Whom It May Concern:

Reference is made to the Lease identified above. All capitalized terms not defined herein shall
have the meaning set forth in the Lease.

In accordance with the terms of the Lease, please be advised that (i) Landlord has completed
construction of the Initial Redevelopment Work in the Sears Redevelopment Area pursuant to
Section 3.1 of the Lease, and (ii) Landlord has satisfied the Deferred Co-Tenancy Requirement
under Section 1.7 of the Lease. HomeGoods opened its business to the public in the Deferred
Co-Tenancy Area on January 19, 2023, and Ulta opened its business to the public in the Deferred
Co-Tenancy Area on July 7, 2023. Homegoods and Ulta are both national Required Tenants and
are fully staffed, stocked and operating as a retail business in substantially all of their respective
premises (see <u>Exhibit A</u> attached photos of the storefronts).

Because Landlord has satisfied the Deferred Co-Tenancy Requirement, rent for the Demised
Premises reverted to the Minimum Rent payable under Section 4.1 of the Lease as of July 7,
2023. Accordingly, Tenant currently owes a total of **$125,311.98** in Minimum Rent for July through
October 2023. This total amount accounts for the net deficiency between the Substitute Rent paid
and the Minimum Rent due from and after July 7, 2023 (see <u>Exhibit B</u>, attached hereto, for the
rent breakdown). Please pay this amount within **ten (10) days** following the date of this letter.

If you have any questions, feel free to contact us. Thank you for your prompt attention to this
matter.

Sincerely,
JLL | Managing Agent for River Ridge Mall JV, LLC

Melissa W. Faria, General Manager

cc:    Dick's Sporting Goods, Inc (*via Overnight Delivery*)
345 Court Street
Coraopolis, Pennsylvania 15108
Attention: Legal Department

(103643010.4)


EXHIBIT
C



Exhibit A
RIVER RIDGE
Storefront Photos







Exhibit B

**Minimum Rent Due**

Dick's Sporting Goods
River Ridge Mall
Account Reconciliation thru 10/17/23

Deferred CO-Tenancy ends 7/6/23. ULTA open 7/7/23

| DATE | BASE RENT | Pymt Ref | CHECK AMOUNT | BALANCE | RUNNING BALANCE |
|------|-----------|----------|--------------|---------|-----------------|
| 7/07 thru 7/31/23 | $ 36,290.32 | ACH081623 | $ (19,813.53) | $ 16,476.79 | $ 16,476.79 |
| 8/1/2023 | $ 45,000.00 | ACH092023 | $ (26,164.81) | $ 18,835.19 | $ 35,311.98 |
| 9/1/2023 | $ 45,000.00 | | | $ 45,000.00 | $ 80,311.98 |
| 10/1/2023 | $ 45,000.00 | | | $ 45,000.00 | $ 125,311.98 |
| | $ 171,290.32 | | $ (45,978.34) | $ 125,311.98 | |

Pro-rated Jul23 rent
$ 45,000.00
times 25/31 days
$ 36,290.32



345 Court Street, Coraopolis, PA 15108
Leigha Hanby, Senior Corporate Counsel | Office Phone: 724-273-3195 | E-Mail: Leigha.Hanby@dcsg.com

January 5, 2023

<u>VIA OVERNIGHT DELIVERY</u>

River Ridge Mall JV, LLC
1971 University Boulevard
Lynchburg, VA 24515
Attn: Trey Fallwell, Vice President

    Re:    **Deferred Ongoing Co-Tenancy Violation
           <u>Lynchburg, VA (Store No. 1503)</u>**

To Whom it May Concern:

    This letter is written in connection with that certain Lease dated December 2, 2019 (the "Lease"), by and between River Ridge Mall JV, LLC, as Landlord, and Dick's Sporting Goods, Inc., as Tenant, for certain premises in the River Ridge Mall in Lynchburg, Virginia. All capitalized terms not defined herein shall have the meaning as set forth in the Lease.

    This letter responds to your correspondence dated October 18, 2023 (received October 23, 2023)("Landlord's Notice"), which asserts that (i) Landlord has completed construction of the Initial Redevelopment Work in the Sears Redevelopment Area pursuant to Section 3.1 of the Lease, and (ii) Landlord has satisfied the Deferred Co-Tenancy Requirement under Section 1.7 of the Lease, due to the opening of HomeGoods on January 19, 2023 and Ulta on July 7, 2023. Landlord's assertion is incorrect: the Deferred Co-Tenancy Requirement remains unsatisfied based on the language of the Lease.

    As set forth in Section 1.7 of the Lease:

        (a) As used in this Section 1.7, the term "Deferred Co-Tenancy Requirement" shall mean that **(i) at least one (1) national or regional Required Tenant occupying at least sixteen thousand (16,000) square feet of LFA within the portion of the Deferred Co-Tenancy Area identified as "16K" on the Lease Plan, and (ii)** at least one (1) national or regional Required Tenant occupying at least twenty-five thousand (25,000) square feet of LFA within the portion of the Deferred Co-Tenancy Area contiguous [sic] to the Demised Premises and identified as "25K" on the Lease Plan, shall be open, fully staffed, stocked and operated as a retail business in substantially all of their respective premises. As used herein, a regional or national Required Tenant shall mean an Occupant that



EXHIBIT

D

River Ridge Mall JV, LLC
January 5, 2024
Page 2

satisfies either (A) or (B) of the Required Tenant definition set forth in Section 1.8 below.

(b) If the Deferred Co-Tenancy Requirement is not satisfied on the later to occur of (i) the one hundred eightieth (180th) day after the Rental Commencement Date, and (ii) the satisfaction of the Initial Co-Tenancy Requirement ("Deferred Co-Tenancy Requirement Violation"), then Tenant shall pay to Landlord monthly, in lieu of Rent, in arrears, no later than the thirtieth (30th) day of the following month, Substitute Rent until the end of the calendar month in which such Deferred Co-Tenancy Requirement is satisfied. In the event the Deferred Co-Tenancy Requirement Violation continues for two (2) years (the "Deferred Co-Tenancy Requirement Period"), Tenant shall have the right to terminate this Lease upon written notice to Landlord given within sixty (60) days following the expiration of the Deferred Co-Tenancy Requirement Period. Termination of this Lease shall be effective on the date set forth in Tenant's notice of termination, which in no event shall be more than thirty (30) days following the expiration of such sixty-(60) day period. In the event Tenant fails to provide such written termination notice within the sixty-(60) day period set forth above, Tenant shall be deemed to have waived its right to terminate this Lease as provided herein.

(*Emphasis added.*) Upon information and belief, Ulta has opened in only ten thousand (10,000) square feet of LFA within the portion of the Deferred Co-Tenancy Area identified as "16K" on the Lease Plan. (*See* enclosed brochure for "River Ridge," prepared by JLL.) Accordingly, DSG shall be entitled to continue to pay Substitute Rent until the end of the calendar month in which such Deferred Co-Tenancy Requirement is satisfied.

As Landlord is aware, Landlord and Tenant communicated via phone and email regarding the fact that the opening of Ulta in ten thousand (10,000) square feet of LFA will not satisfy the Deferred Ongoing Co-Tenancy Requirement. (*See* enclosed emails between Craig Pettit and Jason Stryker dated March 9 – 22, 2022). Landlord's representative, Craig Pettit, acknowledged the requirement, specifically inquiring whether there was "any discussion on incentives to allow [DSG] to waive or modify that provision." No waiver or modification was negotiated.

While Landlord's Notice is not characterized as a default, DSG disputes that a default has occurred. To the extent that Landlord may deliver a Notice of Default, pursuant to Section 12.2 of the Lease, DSG shall not be deemed to be in default with respect to such disputed matter unless a court with proper jurisdiction shall have ruled that Tenant's actions constituted a default, and that Tenant failed to cure within the applicable cure period following receipt of a copy of such judgment entry from Landlord.

DSG reserves all rights and remedies available under the Lease, at law, and in equity.

River Ridge Mall JV, LLC
January 5, 2024
Page 3

Very truly yours,
DICK'S SPORTING GOODS, INC.

Leigha Hanby
Senior Corporate Counsel

cc:     Williams Mullen
        200 S. 10th Street, Suite 1600
        Richmond, VA 23219
        Attn: John M. Mercer, Esq.

Enclosures

1503

October 18, 2023



RIVER RIDGE



**VIA OVERNIGHT DELIVERY**

Dick's Sporting Goods, Inc.
345 Court Street
Coraopolis, Pennsylvania 15108
Attention: Senior Vice President – Real Estate

Re: Lease dated December 2, 2019 (the "Lease") between River Ridge Mall JV, LLC ("Landlord") and Dick's Sporting Goods, Inc. ("Tenant") concerning the Demised Premises (as defined in the Lease) located in the River Ridge Mall, Lynchburg, Virginia (the "Shopping Center")

To Whom It May Concern:

Reference is made to the Lease identified above. All capitalized terms not defined herein shall have the meaning set forth in the Lease.

In accordance with the terms of the Lease, please be advised that (i) Landlord has completed construction of the Initial Redevelopment Work in the Sears Redevelopment Area pursuant to Section 3.1 of the Lease, and (ii) Landlord has satisfied the Deferred Co-Tenancy Requirement under Section 1.7 of the Lease. HomeGoods opened its business to the public in the Deferred Co-Tenancy Area on January 19, 2023, and Ulta opened its business to the public in the Deferred Co-Tenancy Area on July 7, 2023. Homegoods and Ulta are both national Required Tenants and are fully staffed, stocked and operating as a retail business in substantially all of their respective premises (see Exhibit A attached photos of the storefronts).

Because Landlord has satisfied the Deferred Co-Tenancy Requirement, rent for the Demised Premises reverted to the Minimum Rent payable under Section 4.1 of the Lease as of July 7, 2023. Accordingly, Tenant currently owes a total of **$125,311.98** in Minimum Rent for July through October 2023. This total amount accounts for the net deficiency between the Substitute Rent paid and the Minimum Rent due from and after July 7, 2023 (see Exhibit B, attached hereto, for the rent breakdown). Please pay this amount within **ten (10) days** following the date of this letter.

If you have any questions, feel free to contact us. Thank you for your prompt attention to this matter.

Sincerely,
JLL | Managing Agent for River Ridge Mall JV, LLC

Melissa W. Faria, General Manager

cc:   Dick's Sporting Goods, Inc (*via Overnight Delivery*)
      345 Court Street
      Coraopolis, Pennsylvania 15108
      Attention: Legal Department

(103643010.4)



Exhibit A

# RIVER RIDGE

## Storefront Photos







Exhibit B

**Minimum Rent Due**

| Dick's Sporting Goods | | | | | |
|---|---|---|---|---|---|
| River Ridge Mall | | | | | |
| Account Reconciliation thru 10/17/23 | | | | | |
| | | | | | |
| | | Deferred CO-Tenancy ends 7/6/23. ULTA open 7/7/23 | | | |
| | | | | | |
| DATE | BASE RENT | Pymt Ref | CHECK AMOUNT | BALANCE | RUNNING BALANCE |
| | | | | | |
| 7/07 thru 7/31/23 | $ 36,290.32 | ACH081623 | $ (19,813.53) | $ 16,476.79 | $ 16,476.79 |
| 8/1/2023 | $ 45,000.00 | ACH092023 | $ (26,164.81) | $ 18,835.19 | $ 35,311.98 |
| 9/1/2023 | $ 45,000.00 | | | $ 45,000.00 | $ 80,311.98 |
| 10/1/2023 | $ 45,000.00 | | | $ 45,000.00 | $ 125,311.98 |
| | | | | | |
| | $ 171,290.32 | | $ (45,978.34) | $ 125,311.98 | |
| | | | | | |
| | | | | | |
| | Pro-rated Jul23 rent | | | | |
| | $ 45,000.00 | | | | |
| | times 25/31 days | | | | |
| | $ 36,290.32 | | | | |



# River Ridge
3405 Candlers Mountain Rd
Lynchburg, VA 24502

## Retail space for lease

- River Ridge is located less than a half mile from Liberty University, the largest university in Virginia and one of the largest Christian universities in the world
- River Ridge is the only regional shopping mall in a 55-mile radius
- River Ridge is strategically located between the region's two major highways SR-29 and SR-460
- In 2019, River Ridge began the start of a multi-million dollar property redevelopment, and addition of West End District

## Leasing Contact

**Kim Salvatori**
VP, Retail Leasing
+1 941 906 7786
kim.salvatori@am.jll.com

## Key Retailers

AMERICAN EAGLE        

        

# Site plan

River Ridge

3405 Candlers Mountain Rd
Lynchburg, VA 24502
www.shopriverridgemall.com



**Tenant Overview**

| | |
|---|---|
| TJ Maxx | 26,315 SF |
| JC Penney | 83,202 SF |
| Belk | 153,064 SF |
| Regal Cinema | 56,681 SF |
| Dicks Sporting Goods | 45,000 SF |
| SeaQuest | 20,502 SF |
| HomeGoods | 25,018 SF |
| Ulta | 10,000 SF |
| **Total GLA** | **405,848 SF** |

| Area Profile | 5-mile radius | 10-mile radius | 15-mile radius |
|---|---|---|---|
| Est. Population | 93,391 | 157,937 | 182,032 |
| Est. Households | 36,465 | 62,099 | 71,488 |
| Avg. Household Income | $75,305 | $86,262 | $86,928 |
| Median Age | 34.4 | 38.1 | 39.1 |

**Property Data**

| | |
|---|---|
| Site | 74 Acres |
| Small Shop GLA | 139,167 SF |
| Total GLA | 619,916 SF |



Although information has been obtained from sources deemed reliable, JLL does not make any guarantees, warranties or representations, express or implied, as to the completeness or accuracy as to the information contained herein. Any projections, opinions, assumptions or estimates used are for example only. There may be differences between projected and actual results, and those differences may be material. JLL does not accept any liability for any loss or damage suffered by any party resulting from reliance on this information. If the recipient of this information has signed a confidentiality agreement with JLL regarding this matter, this information is subject to the terms of that agreement. ©2020. Jones Lang LaSalle IP, Inc. All rights reserved.